# No. 25-2202(L)

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

Cross-Appeal Nos. 25-2320, 25-2323, 25-2324,
25-2334, 25-2340, 25-2341, 25-2355, 25-2390, 25-2391,
25-2392, 25-2442, 25-2443, 25-2448, 25-2450, 25-2457

IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001

On Appeal and Cross-Appeals from the
United States District Court for the Southern District of New York
No. 1:03-md-1570 (S.D.N.Y.) (GBD) (SDN), Hon. George B. Daniels

**OPENING BRIEF FOR DEFENDANT-APPELLANT**
**KINGDOM OF SAUDI ARABIA**
**(REDACTED FOR PUBLIC FILING)**

Michael K. Kellogg
Gregory G. Rapawy
Andrew C. Shen
Kellogg, Hansen, Todd, Figel
& Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 326-7900
Fax: (202) 326-7999
*Counsel for Defendant-Appellant / Cross-Appellee Kingdom of Saudi Arabia*

July 21, 2026

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES .......... vi

GLOSSARY .......... xiv

INTRODUCTION .......... 1

JURISDICTION .......... 4

ISSUES PRESENTED .......... 4

STATEMENT OF THE CASE .......... 5

I. STATEMENT OF THE FACTS .......... 5

A. The Kingdom of Saudi Arabia .......... 5

B. Al Qaeda and the 9/11 Attacks .......... 6

C. Hazmi and Mihdhar in Southern California .......... 7

1. Los Angeles: Johar and Thumairy .......... 7

2. Los Angeles: Bayoumi and Morgan .......... 9

3. San Diego: Bayoumi and the Parkwood Apartments .......... 12

4. San Diego: other contacts .......... 14

5. Los Angeles: Mihdhar departs .......... 16

6. San Diego: Hazmi departs .......... 16

D. Other Saudi Officials or Employees .......... 16

1. Jarrah .......... 17

2. Sowailem .......... 17

3. Sadhan and Sudairy .......... 18

4. Jaithen and Mersal .......... 19

E. Phone Calls and Records ....................20

1. Bayoumi's calls to Saudi government offices ....................20

2. Thumairy's calls to Saudi government offices and to Sowailem ....................21

3. Bayoumi's calls to and from Thumairy ....................21

F. U.S. Investigations of the 9/11 Attacks ....................22

1. 9/11 Commission ....................23

2. 2004 FBI-CIA Joint Report ....................23

3. 9/11 Review Commission ....................24

4. Operation Encore ....................24

II. PROCEDURAL HISTORY ....................25

A. Pre-2016 Litigation ....................25

B. JASTA and this Court's Remand ....................27

C. The 2018 Ruling and Jurisdictional Discovery ....................28

D. Plaintiffs' Motion for Reconsideration ....................29

E. *Daubert* Motions ....................29

F. The 2025 Ruling ....................30

1. Jurisdictional factfinding ....................30

2. Evidentiary objections ....................30

3. Causation ....................31

4. Preliminary jurisdictional findings ....................31

a. Nature of employment ....................32

b. Scope of employment ....................33

c. Knowing assistance to the hijackers ....................34

5. Saudi Arabia's burden ....................................................... 34

6. Unresolved factual disputes ....................................................... 35

G. Saudi Arabia's Appeal and Plaintiffs' Cross-Appeals ....................................................... 36

SUMMARY OF ARGUMENT ....................................................... 37

STANDARD OF REVIEW ....................................................... 39

ARGUMENT ....................................................... 39

I. THE DISTRICT COURT FAILED TO FIND FACTS NECESSARY TO DETERMINE ITS JURISDICTION ....................................................... 39

A. A District Court Must Resolve Factual Disputes Raised by a Foreign State's Motion To Dismiss ....................................................... 39

B. Section 1605B(b) Requires Jurisdictional Findings on Scope of Employment, Tortious Conduct, and Causation ....................................................... 43

C. The District Court Did Not Resolve Factual Disputes Material to Scope of Employment, Tortious Conduct, and Causation ....................................................... 45

1. The district court erroneously made only a "preliminary assessment of some disputed facts" ....................................................... 45

2. The factual disputes the district court declined to resolve were necessary to determine its jurisdiction ....................................................... 48

II. BAYOUMI AND THUMAIRY DID NOT ACT WITHIN THE SCOPE OF THEIR EMPLOYMENT ....................................................... 50

A. Bayoumi's and Thumairy's Alleged Acts Neither Furthered Saudi Arabia's Interests nor Were Under Its Direction and Control ....................................................... 51

1. Helping Al Qaeda attack the United States would not have furthered Saudi Arabia's interests or purposes ....................................................... 51

2. The *Riviello* factors confirm that helping Al Qaeda was not part of Bayoumi's or Thumairy's duties ....................................................... 54

3. Bayoumi and Thumairy did not help Al Qaeda at Saudi Arabia's direction or under its control ....57

B. To the Extent the District Court Made Factual Findings on Scope of Employment, It Clearly Erred ....59

1. The district court failed to weigh evidence that no one directed Bayoumi or Thumairy to help the hijackers ....60

2. The district court drew unreasonable inferences from Bayoumi's "connections" to the hijackers ....61

3. The district court drew unreasonable inferences from Bayoumi's association with other Saudi employees ....62

4. The district court drew unreasonable inferences from phone call records ....64

5. The district court relied on conjecture about Bayoumi's compensation increase ....68

III. BAYOUMI AND THUMAIRY COMMITTED NO TORTIOUS ACT ....69

A. The District Court Erred in Treating Conduct That Was Not Inherently Violent as an ATA Primary-Liability Tort ....69

B. To the Extent the District Court Made Factual Findings on Tortious Conduct, It Clearly Erred ....71

1. The district court failed to weigh important agency findings ....71

2. Bayoumi did not plan to meet the hijackers ....74

3. Bayoumi had innocent motives to help the hijackers find an apartment ....76

4. The "airplane drawing" had no plausible connection to the 9/11 attacks ....77

5. There was no evidence that Thumairy did anything, knowingly or otherwise, to help the hijackers ........ 81

IV. NO ACT BY BAYOUMI OR THUMAIRY "CAUSED" PLAINTIFFS' DAMAGES ........ 82

A. Section 1605B(b) Requires a Showing That, But For the "Tortious Act," Plaintiffs Would Not Have Been Damaged ........ 82

1. The phrase "caused by" requires at least but-for causation ........ 82

2. The district court erred in construing "caused by" not to require but-for causation ........ 86

B. Bayoumi's and Thumairy's Acts Did Not Cause the 9/11 Attacks Under Any Standard ........ 90

1. Nothing Bayoumi or Thumairy did was a but-for cause of the 9/11 attacks ........ 90

2. Nothing Bayoumi or Thumairy did was a substantial factor in causing the 9/11 attacks ........ 91

CONCLUSION ........ 93

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES

*Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166 (2d Cir. 2013) ........ 85, 87

*Agyin v. Razmzan*, 986 F.3d 168 (2d Cir. 2021) ........ 52, 54

*Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82 (2d Cir. 2006) ........ 46

*Anderson v. City of Bessemer City*, 470 U.S. 564 (1985) ........ 59

*Associated Gen. Contractors of California, Inc. v. Carpenters*, 459 U.S. 519 (1983) ........ 83

*Basko v. Sterling Drug, Inc.*, 416 F.2d 417 (2d Cir. 1969) ........ 91

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988) ........ 73

*Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808 (2d Cir. 2021) ........ 40, 45

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170 (2017) ........ 2, 40, 41, 42, 45, 46, 85, 88

*Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2847 (2025) ........ 85

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ........ 83, 88

*Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436 (2d Cir. 2019) ........ 43

*Burrage v. United States*, 571 U.S. 204 (2014) ........ 83, 88

*Comcast Corp. v. National Ass'n of African Am.-Owned Media*, 589 U.S. 327 (2020) ........ 84

*Comparelli v. Republica Bolivariana De Venezuela*, 891 F.3d 1311 (11th Cir. 2018) ........ 42

*Deutsch v. Shein*, 597 S.W.2d 141 (Ky. 1980) ........ 89

*Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011) ........................................................26

*Doe v. Guthrie Clinic, Ltd.*, 5 N.E.3d 578 (N.Y. 2014).....................................52, 57

*Doe v. Menefee*, 391 F.3d 147 (2d Cir. 2004) ...........................................59, 63, 73

*Donohue v. Young*, 751 N.Y.S.2d 253 (App. Div. 2002) .......................................58

*Dunn v. University of Rochester*, 194 N.E. 856 (N.Y. 1935) ............................52, 57

*EPA v. Calumet Shreveport Ref., L.L.C.*, 145 S. Ct. 1735 (2025) ...........................84

*Federal Republic of Germany v. Philipp*, 592 U.S. 169 (2021) .................39, 40, 85

*Fein v. Cook*, 61 N.Y.S.3d 10 (App. Div. 2017) ....................................................55

*Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922 (2d Cir. 1998) ................41, 47

*Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445 (6th Cir. 1988) ...............42

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)............................83, 84, 87, 88

*Hamm v. United States*, 483 F.3d 135 (2d Cir. 2007) ......................................51, 58

*Hartzell v. United States*, 786 F.2d 964 (9th Cir. 1986).........................................58

*Henson v. Santander Consumer USA Inc.*, 582 U.S. 79 (2017) ..............................89

*Holmes v. Securities Inv'r Prot. Corp.*, 503 U.S. 258 (1992) ..............83, 84, 87, 88

*Ierardi v. Sisco*, 119 F.3d 183 (2d Cir. 1997).........................................................57

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
513 U.S. 527 (1995)..............................................................................87, 88

*Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018
(9th Cir. 1987) ..........................................................................................44

*June v. Union Carbide Corp.*, 577 F.3d 1234 (10th Cir. 2009) ..............................91

*Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147 (2d Cir. 2007)..............................39, 59

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123
(D.C. Cir. 2004) ...............................................................................88, 89, 90

*Krizek v. Cigna Grp. Ins.*, 345 F.3d 91 (2d Cir. 2003) .......... 77

*Kucana v. Holder*, 558 U.S. 233 (2010) .......... 89

*Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) .......... 70

*Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395 (2d Cir. 2014) .......... 41

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......... 46

*Lundberg v. State*, 255 N.E.2d 177 (N.Y. 1969) .......... 51

*Mack v. Altmans Stage Lighting Co.*, 470 N.Y.S.2d 664 (App. Div. 1984) .......... 92

*Mazzarella v. Syracuse Diocese*, 953 N.Y.S.2d 436 (App. Div. 2012) .......... 51

*Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*,
531 F. Supp. 3d 673 (S.D.N.Y. 2021) .......... 33

*Morrison Motor Co. v. Manheim Servs. Corp.*, 346 So.2d 102
(Fla. Dist. Ct. App. 1977) .......... 53

*Murray v. UBS Sec., LLC*, 601 U.S. 23 (2024) .......... 84

*Nam v. Permanent Mission of Republic of Korea to United Nations*,
118 F.4th 234 (2d Cir. 2024) .......... 41, 42, 45, 47, 81

*Naumovski v. Norris*, 934 F.3d 200 (2d Cir. 2019) .......... 84, 85

*NLRB v. SW Gen., Inc.*, 580 U.S. 288 (2017) .......... 90

*O'Bryan v. Holy See*, 556 F.3d 361 (6th Cir. 2009) .......... 89

*Overton v. Ebert*, 580 N.Y.S.2d 508 (App. Div. 1992) .......... 55

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017),
*vacated and remanded sub nom. Opati v. Republic of Sudan*,
590 U.S. 418 (2020) .......... 86, 90

*Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36
(D.C. Cir. 2000) .......... 42

*Pittman ex rel. Pittman v. Grayson*, 149 F.3d 111 (2d Cir. 1998) .......... 71

*Point Prods. A.G. v. Sony Music Ent't, Inc.*, 215 F. Supp. 2d 336 (S.D.N.Y. 2002) .......... 92

*Rausman v. Baugh*, 682 N.Y.S.2d 42 (App. Div. 1998) .......... 52, 57

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) .......... 42

*Republic of Hungary v. Simon*, 604 U.S. 115 (2025) .......... 40

*Rivera v. State*, 142 N.E.3d 641 (N.Y. 2019) .......... 52, 54, 57

*Riviello v. Waldron*, 391 N.E.2d 1278 (N.Y. 1979) .......... 33, 51, 54, 55, 56, 57

*Robinson v. Government of Malaysia*, 269 F.3d 133 (2d Cir. 2001) .......... 30, 40, 41, 44, 45, 56, 85, 88

*Ross v. American Express Co.*, 35 F. Supp. 3d 407 (S.D.N.Y. 2014), *aff'd sub nom. Ross v. Citigroup, Inc.*, 630 F. App'x 79 (2d Cir. 2015) .......... 80

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) .......... 83, 84, 87

*RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184 (S.D.N.Y. 2009) .......... 92

*Rux v. Republic of Sudan*, 461 F.3d 461 (4th Cir. 2006) .......... 87, 90

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007) .......... 83, 88

*Stanley v. City of Sanford*, 606 U.S. 46 (2025) .......... 89

*Swarna v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010) .......... 43, 47, 52

*Terrorist Attacks on September 11, 2001*, *In re*:

349 F. Supp. 2d 765 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008), *cert. denied*, 557 U.S. 935 (2009) .......... 25

538 F.3d 71 (2d Cir. 2008), *cert. denied*, 557 U.S. 935 (2009) .......... 26

714 F.3d 118 (2d Cir. 2013) .......... 84

741 F.3d 353 (2d Cir. 2013) .......... 26

134 F. Supp. 3d 774 (S.D.N.Y. 2015), *vacated and remanded*, 2017 WL 8776686 (2d Cir. Feb. 7, 2017) .......... 26

*United States v. DiMaria*, 727 F.2d 265 (2d Cir. 1984) ........................................60

*United States v. Lawal*, 736 F.2d 5 (2d Cir. 1984) ...............................................60

*United States v. Rizzo*, 349 F.3d 94 (2d Cir. 2003) ........................................60, 75

*University of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) ......83, 84, 85, 88

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983) ..........................25

*Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230
(2d Cir. 2002)..........................................................................................43

*Watson v. Kingdom of Saudi Arabia*, 159 F.4th 1234 (11th Cir. 2025) ......53, 54, 86

*Weiss v. National Westminster Bank, PLC*, 993 F.3d 144 (2d Cir. 2021)..............70

*Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145 (2d Cir. 1991),
*aff'd*, 504 U.S. 607 (1992) ............................................................................4

*Wilson v. McRae's, Inc.*, 413 F.3d 692 (7th Cir. 2005) .........................................60

*Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377
(S.D.N.Y. 2009)...............................................................................30, 45

CONSTITUTION, STATUTES, AND RULES

U.S. Const. art. III ..............................................................................................46

Antiterrorism Act, 18 U.S.C. § 2331 *et seq.* .......................................38, 69, 70, 84

18 U.S.C. § 2331(1)(A) ..................................................................................70

18 U.S.C. § 2333..........................................................................................69, 70

18 U.S.C. § 2333(a) ........................................................................................70

18 U.S.C. §§ 2339A-2339C...............................................................................69

Civil Rights Act of 1964, tit. VII, 42 U.S.C. § 2000e *et seq.* ................................84

42 U.S.C. § 2000e-2(m)....................................................................................84

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583,
90 Stat. 2891 (codified as amended at 28 U.S.C. §§ 1330,
1332, 1391(f), 1441(d), 1602-1611) ............................ 1, 2, 4, 25, 26, 27, 37,
39, 40, 43, 44, 46, 85, 87, 89

28 U.S.C. § 1330(a) ....................................................................4, 45

28 U.S.C. § 1604.........................................................................25, 39

28 U.S.C. §§ 1605-1607 ....................................................................25

28 U.S.C. § 1605(a)(3).......................................................................40

28 U.S.C. § 1605(a)(5)...........................................................26, 44, 89

28 U.S.C. § 1605(a)(5)(A) ..................................................................27

28 U.S.C. § 1605(a)(7) (repealed 2008) ..............................................87

28 U.S.C. § 1605A..............................................................................26

28 U.S.C. § 1605A(a)(1).......................................................................87

28 U.S.C. § 1605B ...............................................................................4

28 U.S.C. § 1605B(b) ............................................. 2, 3, 27, 31, 43, 44, 69,
82, 84, 85, 86, 89, 90, 91

28 U.S.C. § 1605B(b)(1).......................................................................27

28 U.S.C. § 1605B(b)(2)..................................................................2, 27, 70

28 U.S.C. § 1605B(d) ..........................................................................27

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222,
130 Stat. 852 (2016) .................................................. 27, 28, 37, 39, 46, 89

§ 2(b), 130 Stat. 853............................................................................89

28 U.S.C. § 1291 ...................................................................................4

42 U.S.C. § 1983 ..................................................................................84

46 U.S.C. app. § 740 (1994) ................................................................87

49 U.S.C. § 42121(b)(2)(B)(i) .............................................................84

Fed. R. Evid.:

Rule 803(8) ....................................................................................73

Rule 803(8)(A)(iii)..........................................................................73

Rule 803(8)(B).................................................................................73

LEGISLATIVE MATERIALS

162 Cong. Rec. S2845 (daily ed. May 17, 2016)...................................................90

OTHER MATERIALS

National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States* (July 2004), https://govinfo.library.unt.edu/911/report/911Report.pdf ....................................................... 5, 6, 7, 10, 11, 12, 13, 14, 15, 16, 23, 50, 53, 62, 63, 68, 71, 72, 73, 74, 78, 80, 90

N.Y. State Educ. Dep't, *New York State Next Generation Mathematics Learning Standards* (updated June 2019), https://www.nysed.gov/sites/default/files/programs/standards-instruction/nys-next-generation-mathematics-p-12-standards.pdf..................................................................................78

II *Oxford English Dictionary* (2d ed. 1989) ........................................................82

*Prosser and Keeton on Law of Torts* (5th ed. 1984)..............................................85

Restatement (Second) of Torts (1965).......................................................89, 91, 92

Restatement (Third) of Torts: Liability for Physical and Emotional Harm (2010)..........................................................................................91

U.S. Amicus Br., *Republic of Hungary v. Simon*, 604 U.S. 115 (2025) (No. 23-867 (U.S. Sept. 5, 2024)) ...............................................................43

Vienna Convention on Consular Relations of 1963, Apr. 24, 1963,
21 U.S.T. 77, 596 U.N.T.S. 261 ....................................................................29

Vienna Convention on Diplomatic Relations of 1961, Apr. 18, 1961,
23 U.S.T. 3227, 500 U.N.T.S. 95 ..................................................................29

*Webster's Third New International Dictionary* (1993) ............................................82

# GLOSSARY

| | |
|---|---|
| 9/11 Rep. | National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States* (July 2004), https://govinfo.library.unt.edu/911/report/911Report.pdf |
| ATA | Antiterrorism Act, Pub. L. No. 102-572, tit. X, § 1003, 106 Stat. 4506, 4521 (1992) (codified as amended at 18 U.S.C. § 2331 *et seq.*) |
| CIA | Central Intelligence Agency |
| FBI | Federal Bureau of Investigation |
| FSIA | Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (codified as amended at 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602-1611) |
| JA | Joint Appendix |
| JASTA | Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) (codified at, *inter alia*, 28 U.S.C. § 1605B) |
| KSA | Kingdom of Saudi Arabia |
| KSM | Khalid Sheikh Mohammed |
| MOIA | Ministry of Islamic Affairs |
| SA | Special Appendix |
| Terrorist Financing Monograph | John Roth et al., National Commission on Terrorist Attacks Upon the United States, *Monograph on Terrorist Financing: Staff Report to the Commission* (2004), https://www.9-11commission.gov/staff_statements/911_TerrFin_Monograph.pdf |

## INTRODUCTION

The Kingdom of Saudi Arabia is a longstanding ally and security partner of the United States. One focus of that partnership has been counterterrorism. During the 1990s, Saudi Arabia fought the terrorist organization Al Qaeda by stripping its founder Osama bin Laden of his Saudi citizenship, by freezing his assets, and by working with the United States to seek his expulsion from Sudan and Afghanistan. For its part, Al Qaeda denounced Saudi Arabia's King Fahd and launched attacks on Saudi soil. Today, Saudi Arabia still works with the United States to fight Al Qaeda, ISIS, and other terrorist threats, as well as to promote peace in the Middle East and nurture a flourishing trade partnership.

Saudi Arabia's strong bilateral relationship with the United States has been plagued by allegations that, in early 2000, two Saudi government employees living in Southern California knowingly helped two Al Qaeda operatives who were later part of the September 11, 2001 attacks on the United States. Those allegations have been investigated and rejected by the 9/11 Commission, the 9/11 Review Commission, the FBI (twice), and the CIA. The district court has nonetheless ordered a trial on those same allegations. But no trial can proceed because that court lacks jurisdiction under the Foreign Sovereign Immunities Act of 1976.

The FSIA declares foreign states like Saudi Arabia presumptively immune from suit. To proceed to the merits despite immunity, the district court had to

answer three key jurisdictional questions: *first*, whether the two Saudi employees, Omar Al Bayoumi and Fahad Al Thumairy, committed the "tortious act," 28 U.S.C. § 1605B(b)(2), of helping the 9/11 hijackers while knowing their plans; *second*, whether any tort was within "the scope of [their] . . . employment," *id.*, for Saudi Arabia; and, *third*, whether any tort within that scope "caused" the "money damages," *id*. § 1605B(b), Plaintiffs seek. For each issue, the court had to "resolve . . . factual disputes," even if "intertwined" with the merits. *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174, 178 (2017).

The court did not do that work. Instead, it rejected Saudi Arabia's immunity based on an "inference" drawn only "for the limited purpose of jurisdictional inquiries," SA216; on "preliminary finding[s]," SA220-221; and on a "preliminary assessment of certain disputed facts," SA226. It declined to "weigh[] the evidence" or to "assess[] witnesses' credibility," stating that those tasks would "need to take place at trial." SA226. It even suggested it would leave some issues "to be resolved by a jury," SA188 – but there are no juries in FSIA cases. The court refused to decide whether Bayoumi met the hijackers on purpose or by chance, whether he helped them find an apartment with good intentions or bad ones, and whether a math equation scribbled on a notepad found in his garage was damning or innocuous. None of that can be squared with *Helmerich* and controlling Circuit precedent.

The court made other legal errors. Its preliminary finding that Bayoumi and Thumairy acted within the scope of their employment relied on a vague inference that their employment had "some connection" with their alleged torts. "Some connection" (a phrase the court repeated four times, SA216, SA219-220) is not the New York standard for vicarious liability. Similarly, the court's preliminary finding of causation turned on a diluted "reasonable connection" standard. SA213. It never found that anything Bayoumi or Thumairy did "caused," § 1605B(b), the 9/11 attacks in the ordinary sense of "cause."

The court also clearly erred in its preliminary assessment of the evidence. Even factual findings after a bench trial can be set aside for failures to consider conflicting evidence, for unreasonable inferences, and for speculation. Here, the court failed to weigh consistent testimony from Bayoumi, Thumairy, and more than a dozen other witnesses that none knew of the hijackers' intentions or of any direction to help them. It inferred conspiracy from purportedly unexplained phone calls by ignoring corroborated explanations. And it inferred from Bayoumi's mere association with Nawaf Al Hazmi, Khalid Al Mihdhar, and others who met them not only Bayoumi's own guilt, but also that of his employer, Saudi Arabia.

In this case of great historical and international importance, the court denied immunity to a valuable U.S. ally based on legal and factual errors that cannot withstand review. This Court should reverse.

## JURISDICTION

This appeal arises from a suit against a foreign state. The district court has erroneously asserted subject-matter jurisdiction under 28 U.S.C. § 1330(a) and § 1605B. On August 28, 2025, the court denied Saudi Arabia's motion to dismiss for lack of subject-matter jurisdiction because of FSIA immunity. SA182-226. On September 8, Saudi Arabia filed a timely appeal. JA4505-07. This Court has appellate jurisdiction under 28 U.S.C. § 1291 and the collateral order doctrine. *See*, *e.g.*, *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 147 (2d Cir. 1991) (exercising jurisdiction over an appeal from a "ruling that subject matter jurisdiction is proper under the FSIA"), *aff'd*, 504 U.S. 607 (1992).

## ISSUES PRESENTED

1. Whether the district court failed to resolve factual disputes necessary to determine its jurisdiction under the FSIA.

2. Whether that court erred in its preliminary finding that Omar Al Bayoumi and Fahad Al Thumairy acted within the scope of their employment for Saudi Arabia in assisting Nawaf Al Hazmi and Khalid Al Mihdhar.

3. Whether that court erred in its preliminary finding that Bayoumi and Thumairy committed tortious acts through that assistance.

4. Whether that court erred in concluding that Plaintiffs' allegations met the applicable causation requirement.

# STATEMENT OF THE CASE

## I. STATEMENT OF THE FACTS

### A. The Kingdom of Saudi Arabia

The Kingdom of Saudi Arabia is a sovereign state in the Arabian Peninsula. Its religion is Islam; its constitution is the Quran and the Sunna. Its government is a monarchy. JA656; JA663-65. It is a longstanding ally, security partner, and trading partner of the United States. JA3778-78; JA658-59; JA665-66. That partnership has included, in the 1980s and 1990s, supporting Afghani resistance to Soviet invasion; and, in the 1990s and 2000s, hosting hundreds of thousands of U.S. troops. 9/11 Rep. 56-57, 60, 372-73;[1] JA667-68; JA3765-67, JA3777-78. Saudi Arabia sends tens of thousands of students to the United States each year. JA658-59; JA3777-78.

Saudi Arabia's religious establishment, including its Ministry of Islamic Affairs ("MOIA"), follows the Hanbali school of Islamic jurisprudence and the historical tradition of Salafism. JA3761-64. MOIA promotes "quietism": deference to political authorities and the peaceful spread of Islam through preaching and missionary work. JA3781, JA3788. Saudi Arabia's most senior

[1] The National Commission on Terrorist Attacks Upon the United States is often called the "9/11 Commission." Its 2004 report, the "9/11 Report," is available at https://911commission.gov.

religious scholars have long condemned terrorism, including attacks on civilians and suicide attacks. JA3783.

### B. Al Qaeda and the 9/11 Attacks

Al Qaeda is a foreign terrorist organization. 9/11 Rep. 185. In the 1990s and 2000s, its leader was Osama bin Laden, originally a Saudi citizen. Al Qaeda is, and was in the 1990s, an enemy of the United States and of Saudi Arabia. It called for attacks on U.S. troops in Saudi Arabia and condemned the Saudi government for cooperating with the United States. *Id.* at 47-48, 51; JA3769-73; *see also* JA2022-27 (262:21-267:9). In 1998, Al Qaeda attempted a terrorist attack on Saudi soil, but Saudi security forces "disrupted" it. 9/11 Rep. 115, 152; JA3771; *see also* 9/11 Rep. 60 (discussing 1995 and 1996 attacks in which Al Qaeda may have been involved).

During the 1990s, Saudi Arabia worked with the United States to fight Al Qaeda and other terrorist threats. In 1994, Saudi Arabia stripped bin Laden of his Saudi citizenship and froze his assets. 9/11 Rep. 57, 170, 497 n.113; JA3769; JA667. In 1996 and 1998, it cooperated with the United States to seek his extradition from Sudan and from Afghanistan. 9/11 Rep. 62-63, 115; JA3769, JA3771-72. Bin Laden "believed" that an "assassination attempt" against him in Sudan was "the work of the Egyptian or Saudi regimes, or both." 9/11 Rep. 63.

On September 11, 2001, Al Qaeda launched horrific attacks on the United States using hijacked airplanes, causing thousands of deaths and massive destruction. Bin Laden personally "select[ed] . . . targets" for the 9/11 attacks and approved the plan in "March or April 1999." *Id.* at 154-55. Al Qaeda member Khalid Sheikh Mohammed ("KSM") was the attacks' "principal architect." *Id.* at 145. According to an FBI report closing an investigation into the attacks, information about them was "compartmentalized" within Al Qaeda to avoid "discover[y]"; even the hijackers "did not know about the nature of the operation until shortly before the attack." JA940.

### C. Hazmi and Mihdhar in Southern California

Two 9/11 hijackers, Nawaf Al Hazmi and Khalid Al Mihdhar, came to Southern California in January 2000. Their goals were first to learn English and then to learn how to fly planes. SA193. They failed to do either. 9/11 Rep. 221-23. Mihdhar left in June, and Hazmi in December. SA207. Both later participated in the attacks as "muscle," not pilots. 9/11 Rep. 231, 239.

#### 1. Los Angeles: Johar and Thumairy

On January 15, 2000, Hazmi and Mihdhar arrived in Los Angeles on a flight from Bangkok. SA193. Some time later, they visited the King Fahad Mosque in Culver City. SA193. They met a congregant named Mohammed Johar on the sidewalk and asked for help finding "a place to stay." JA2084-86 (92:11-94:9),

JA2094 (102:1-3), JA2113-14 (180:12-181:11), JA2153-54 (382:4-383:3). He showed them some "motels," a "restaurant," a "bus station," and a "grocery." JA2093-97 (101:22-102:12, 103:16-18, 104:4-105:6), JA2104-06 (121:3-123:3), JA2125 (201:19-24), JA2128 (204:9-12). Johar testified that [redacted]. JA2100-01 (117:16-118:23), JA2153-54 (382:7-383:15), JA2157 (386:14-20). [redacted]. JA2154-56 (383:16-385:8).

At that time, the imam of the King Fahad Mosque was Fahad Al Thumairy, a MOIA employee. SA192. MOIA had sent him to Los Angeles in 1996; he became the mosque's imam when it opened in 1998. SA192; JA1810-12 (125:22-127:3).[2] Johar introduced Hazmi and Mihdhar to Thumairy [redacted]. JA2086 (94:14-23), JA2088-89 (96:2-97:4), JA2093 (101:11-21), JA2134-36 (211:15-213:15), JA2156 (385:9-19). He testified that [redacted]. JA2086 (94:14-23), JA2117-18 (190:19-191:3), JA2122 (195:14-23), JA2131 (207:7-15), JA2134-36 (211:15-20, 212:19-21, 213:6-7). He recalls that they spoke with Thumairy [redacted]

[2] Thumairy was supervised by the "Da'wah" office (*da'wah*, literally "call," means missionary work) in Saudi Arabia's Washington, D.C. Embassy. He held diplomatic status, SA192; JA864-65, but did not work as a diplomat.

[redacted]. JA2088-90 (96:15-18, 97:22-98:4), JA2156-57 (385:20-386:4). [redacted]. JA2093 (101:17-21), JA2121 (194:7-12).

Thumairy testified that he does not recall Hazmi and Mihdhar. JA1838-39 (340:15-341:2), JA1842 (346:1-19), JA1844 (348:1-9), JA1871 (491:4-6). As the imam of a large, flourishing mosque, he met many visitors. JA1891-92 (565:7-566:13). He did nothing to help Hazmi or Mihdhar, received no direction from anyone to help them, and directed no one else to help them. JA1871-73 (491:7-21, 492:11-493:2). He neither knew nor suspected anything about the 9/11 attacks before they happened. JA1873 (493:4-11); *see* JA940-41.

### 2. Los Angeles: Bayoumi and Morgan

Omar Al Bayoumi worked as an accountant for Saudi Arabia's civil aviation authority. SA190-191; JA669-94.[3] From 1994 to 2000, he was seconded to Saudi government contractor Dallah Avco and sent to the United States to learn management and accounting. SA191; JA695-714.[4] His secondment was part of

[3] A 2017 FBI internal memorandum states that a redacted source "reported the . . . information" that Bayoumi was a "cooptee of the Saudi General Intelligence Presidency." JA1044-45, *cited in* SA191 n.7. Bayoumi denied "ever ha[ving] any assignment for any Saudi intelligence or law enforcement agency." JA2505-06 (724:18-725:13).

[4] In April 2000, Bayoumi received an increase in his compensation. He testified that it reflected compensation he already should have been receiving based

a "Saudization" initiative to train Saudi civil service employees for positions of responsibility. SA191. While in the United States, he lived in San Diego and volunteered at a local mosque ("Madina Mosque") he had helped found. SA191; JA2367-70 (145:24-147:4, 148:4-9), JA2373-74 (151:2-18, 152:15-21).

On or around February 1, 2000, Bayoumi visited Los Angeles. SA196; 9/11 Rep. 217; JA754. He invited Kaysan Morgan, an American acquaintance and recent convert to Islam, to join him. SA196.[5] Bayoumi and Morgan first went to the Saudi Consulate, where Bayoumi filled out paperwork to renew his family's passports. JA2425-26 (381:11-382:13); JA760. Bayoumi also picked up religious materials for the Madina Mosque from Ismail Mana, a Consulate employee. SA197; JA2423 (379:16-22), JA2427-33 (383:13-389:14); JA769 (¶ 15); JA740 (¶ 12).

After leaving the Consulate, Bayoumi and Morgan looked for a restaurant that served halal food. SA198. After first stopping at a place that either was closed or did not serve meals, SA198, they found a suitable restaurant (the Mediterranean Café). While they were ordering lunch, Hazmi and Mihdhar

---

on his educational attainment, his prior work experience, and his payment of educational expenses out of his salary. JA2494-99 (699:21-704:14).

[5] Morgan has changed his name repeatedly. He is referred to in parts of the record as "Isamu Dyson," as "Osama," and as "Cayson Bin Don."

walked in. SA198. Bayoumi spoke with them in Arabic, which Morgan did not understand. SA199. Bayoumi mentioned to them that he lived in San Diego. SA199; *see* JA2554 (796:9-13). He testified that he did not advise them to come there or offer to help them. JA2507-08 (726:23-727:2), JA2554 (796:3-13). After the conversation, Bayoumi and Morgan returned to San Diego. SA199-200.

That lunch-time conversation at the Mediterranean Café has been the subject of intense scrutiny. Both Bayoumi and Morgan have been questioned about it repeatedly over the course of decades, and each (Morgan especially) has given varying accounts. SA199 (discussing some differences); *see* JA3728-35 (¶ 1567) (collecting others); 9/11 Rep. 217-18 (calling Morgan's "recollection . . . spotty and inconsistent" but stating "Bayoumi's version can be challenged as well"). Bayoumi maintains that the meeting happened by chance. SA199; JA2506-07 (725:14-726:8). Morgan testified that he has "no personal knowledge of any facts indicating that [the] encounter . . . was anything other than a coincidence," JA1954-55 (28:22-29:6), and told investigators so at the time, SA199 (citing JA770-71 (¶ 19)).[6]

[6] Morgan signed a declaration drafted by Plaintiffs' counsel. JA1958 (43:19-23). It states that he "now believe[s]," based on sources including "FBI Agents" who interviewed him, that "preparations had been made for al-Hazmi and al-Mihdhar's arrival in California outside of my knowledge." JA773 (¶ 30). When cross-examined, he testified that he had "requested . . . the words 'outside of my knowledge' be included" because, "to the extent that there were preparations made

### 3. San Diego: Bayoumi and the Parkwood Apartments

Several days later, Hazmi and Mihdhar went to San Diego. SA200. Johar testified that he drove them to a bus stop in Santa Monica. SA200; JA2142-44 (278:18-279:7, 280:4-18), JA2147 (284:10-13). They went to a mosque at the Islamic Center of San Diego, where they again met Bayoumi. SA200; 9/11 Rep. 219. He testified that he did not expect to meet them there. JA2440 (422:20-23), JA2510-11 (729:9-730:4). They were looking for a place to stay. Bayoumi referred them to the Parkwood Apartments, where he and his family lived. SA201; JA2450-51 (439:24-440:13), JA2514 (733:20-24).

Bayoumi helped Hazmi and Mihdhar rent an apartment. SA201-202. He took them to the rental office, helped them fill out a lease application, and co-signed it as their guarantor. SA201. He took them to the bank and helped them open an account and get a certified check for their deposit and first month's rent. SA202; JA2451-53 (440:14-442:9). The bank would not issue a certified check for Hazmi the first day he opened an account, so the bank employee suggested using Bayoumi's account, and Bayoumi agreed. SA202; JA2453-54 (442:13-443:9),

---

for 9/11 hijackers," he doesn't "know anything about that." JA1961-63 (78:12-80:14).

JA2518 (737:3-17). But Bayoumi did not provide the funds: "the al Qaeda operatives reimbursed him on the spot." 9/11 Rep. 219.[7]

Asked why he did those things for two men he did not know, Bayoumi gave two answers. The first, [redacted], was cultural hospitality. SA202; JA2520 (739:5-11) ("[I]f you go to the community . . . and ask for someone to cosign with you . . . to rent an apartment, at least ten people would help you without hesitation."); JA2519 (738:16-23) (testifying that, when he first arrived in California, "[a]n American person" whom he "didn't know" but "met at the mosque" helped him "look[] for" and "f[ind] [an] apartment"). The second was financial: Bayoumi expected, and testified that he got, a referral fee for bringing new tenants to Parkwood. SA201; JA2515 (734:1-17).

Bayoumi interacted with Hazmi and Mihdhar a few times after that, including at a "social gathering," SA223, to thank those who had volunteered and led Ramadan prayers at the Madina Mosque. SA202-203; JA2463-64 (460:12-461:7) (calling the gathering "an honoring of volunteers at the mosque").[8] He

[7] *See* JA827-78 [redacted]; JA2518 (737:12-17) (testifying that "they made a deposit first, then the check went out," and that this happened "at the same time"); JA2518 (737:18-23) (testifying that Bayoumi never gave the hijackers "any money" or paid for "any of their expenses").

[8] The district court rejected Plaintiffs' contention that the gathering was "a highly incriminating welcome party in honor of the hijackers," finding "nothing [to] . . . indicate[] that the hijackers were the focus." SA223; *see* 9/11 Rep. 219.

spent much of the rest of 2000 outside the United States, in Saudi Arabia or the United Kingdom, and had no contact with them. JA2523-36 (744:3-757:1). He testified that he never received any direction to help them, never directed anyone to do so, and did not know their plans. JA2503-05 (722:14-724:17).

#### 4. San Diego: other contacts

Hazmi and Mihdhar met others in San Diego as well who did as much for them as Bayoumi did, or more. One contact was Al-Mohdar Mohamed Abdullah Zeid, a college student from Yemen. SA206; *see* 9/11 Rep. 216, 218-19. [redacted]. JA2177-93 (131:17-147:12). He helped them get drivers' licenses and apply to language and flight schools. SA206. Bayoumi knew Zeid from the mosque as someone who would offer "help" to "anyone" "to make some money on the side." SA206; JA2485-86 (589:17-590:7). Zeid testified that [redacted], JA2178-79 (132:21-133:8, 133:16-18), JA2181 (135:1-14), JA2185-86 (139:23-140:9), JA2188 (142:2-17), JA2239-40 (430:10-431:24); that neither Bayoumi nor Thumairy instructed him to help the hijackers, SA206; JA2247-49 (454:12-455:12, 456:12-22), JA2252-53 (461:18-462:23), JA2256-58 (465:21-467:15), JA2261-62 (474:14-475:6); and that he had no advance knowledge of the 9/11 attacks, SA206; JA2243-44 (445:4-446:12).

A second contact was Anwar Al Aulaqi, the imam of the Al Ribat Mosque. SA202. Aulaqi may have gone with Hazmi and Mihdhar (separately from Bayoumi) to the Parkwood Apartments rental office. SA202; JA781 (¶ 8). Aulaqi was "initially a revered mainstream Islamic preacher in America" and "considered to be a legitimate authority . . . by [many] Western Muslims." JA831 (book by Plaintiffs' proffered expert). Well after the 9/11 attacks, he became a known Al Qaeda recruiter, and the United States killed him with a drone strike. SA202; JA831-35, JA837-38. Bayoumi knew him as an imam. SA202; JA2472 (482:12-21).

A third contact was Abdussattar Shaikh, who rented Hazmi and Mihdhar a room in his home at the end of May 2000. SA205. Shaikh became close to Hazmi, prayed with him, let him use a computer, and helped him with the Internet. SA205; 9/11 Rep. 222 (calling Shaikh Hazmi's "housemate"). Shaikh was an FBI "asset" or "informant." JA2674 & n.185, JA2675 & n.197. He saw nothing suspicious about Hazmi and Mihdhar. 9/11 Rep. 223; JA2676, JA2679. Bayoumi testified that he did not introduce Shaikh to Hazmi and Mihdhar. JA2391-93 (228:1-230:15); *see* JA2675 (they "met [Shaikh] at the mosque they attended"). Shaikh was not deposed.

### 5. Los Angeles: Mihdhar departs

On June 9, 2000, Hazmi and Mihdhar returned to Los Angeles, accompanied by Zeid. SA206-207. The three stayed in a motel. SA206. The following day, Mihdhar flew out of Los Angeles, returning to Yemen. SA207. Some witnesses recall seeing Thumairy with Hazmi or with Hazmi and Mihdhar during this visit. SA206-207. Documentary evidence indicates that Thumairy left Los Angeles before the hijackers arrived.[9]

### 6. San Diego: Hazmi departs

After Mihdhar left for Yemen, Hazmi returned to San Diego. He continued to live with Shaikh and worked at a gas station. In December 2000, he left San Diego for Arizona. SA207; 9/11 Rep. 223.

## D. Other Saudi Officials or Employees

Several other Saudi officials or employees who had no contact with the hijackers became witnesses or discovery subjects.

---

[9] Thumairy sent a letter on Embassy letterhead dated June 9, showing he was in Washington, D.C., JA840; and his passport shows he arrived in Riyadh, Saudi Arabia on June 10, which (given flight times) would not be possible if he had been in Los Angeles on the evening of June 9, JA1880-85 (505:4-510:20); JA723-25(passport with Arabic stamp; certified translation as “8/3/1421 AH (6/10/200 [sic] AD)”); JA736 (calendar confirming June 10, 2000 as 3 Rabi’ al-Awwal 1421; Rabi’ al-Awwal is the eighth month of the Hijri calendar).

### 1. Jarrah

Musaed Al Jarrah was assistant head of the Islamic Affairs Department at the Saudi Embassy in Washington, D.C. SA195. The FBI inadvertently released Jarrah's name, tied to an allegation that he "tasked" Thumairy and Bayoumi with assisting Hazmi and Mihdhar. JA599. It then clarified that the allegation was an "investigative theory" instead of an "objective . . . fact." JA594. Jarrah [redacted] Bayoumi, [redacted], but does not recall him. JA842-50; JA2280 (193:3-21). Jarrah does not know Thumairy personally, JA2299 (605:5-20), but helped renew his assignment to the United States, JA2271-77 (166:24-172:12). Jarrah testified that he had never heard of Hazmi or Mihdhar before the 9/11 attacks and never directed (or was directed by) anyone to help them. JA2289-90 (595:22-596:10), JA2293 (599:5-11), JA2295-96 (601:22-602:5).

### 2. Sowailem

Khalid Al Sowailem headed the Da'wah Office at the Saudi Embassy. SA195. He was Thumairy's nominal supervisor, approving vacation requests and filling out cursory evaluations. SA195; JA727-28; JA2942-44; JA852. Thumairy communicated with him mostly about administrative matters. JA1804-05 (114:23-115:10). Bayoumi wrote Sowailem two thank-you letters

for MOIA's support for the Madina Mosque. SA195, SA208. Sowailem (who died in 2018) was not deposed.

### 3. Sadhan and Sudairy

For Ramadan 1419 (December 1998 and January 1999), MOIA sent Adel Al Sadhan and Mutaeb Al Sudairy to San Diego to preach at the Madina Mosque. JA1605-06 (27:9-28:16), JA1615 (123:4-23) (Sadhan) & JA2313 (78:1-11), JA2338 (157:15-19) (Sudairy) (discussing the trip); JA731-34 (date conversion); SA208. They were part of a MOIA program that sent preachers to mosques worldwide during Ramadan. JA855. In Southern California, Sadhan and Sudairy met Thumairy and Bayoumi. JA1609 (56:5-15) (Sadhan); JA2320 (104:9-13), JA2324 (111:8-23), JA2327-28 (139:19-140:7), JA2330-31 (142:17-143:7), JA2334-35 (150:22-151:1) (Sudairy). Sudairy testified that he never instructed Thumairy or Bayoumi to do anything and never received any instructions from them. JA2342-43 (364:7-365:8). Sadhan testified the same about Thumairy, and does not recall Bayoumi at all. JA1618-19 (130:24-131:17), JA1629 (383:14-21). Neither ever met or spoke with Hazmi or Mihdhar. JA1629-30 (383:22-384:20) (Sadhan); JA2343 (365:9-13) (Sudairy).[10]

[10] In June 1999, Bayoumi traveled to Washington, D.C., where he visited Sadhan and Sudairy. He took a video during the trip. The district court rejected Plaintiffs' mischaracterization of it as "a chilling and damning video of Bayoumi 'casing' the U.S. Capitol." SA223.

#### 4. Jaithen and Mersal

For Ramadan 1420 (December 1999 and January 2000), MOIA sent Abdullah Al Jaithen to the United States. JA1564-66 (57:9-59:12). He spent five or six days in Los Angeles and a night in San Diego. JA1567 (60:16-21), JA1570 (83:21-23), JA1572-73 (85:6-9, 85:18-86:19), JA1581 (123:3-16), JA1590-91 (158:14-159:4). Bayoumi heard Jaithen lecture. JA2418 (335:10-13). Thumairy had dinner with him. JA1576-78 (102:2-104:1), JA1583 (125:3-24). Before the 9/11 attacks, he never heard of Hazmi or Mihdhar or discussed them with anyone. JA1596-98 (306:21-308:18).

For Ramadan 1419, MOIA sent Majed Al Mersal to Los Angeles. JA2042-43 (79:5-80:22), JA2046 (101:13-23). For Ramadan 1420, it sent him to San Diego, where he met Jaithen. JA2051-52 (183:19-184:1), JA2059-60 (219:10-220:16), JA2066-67 (234:23-235:13); JA857. Mersal recalls Thumairy, but Thumairy does not recall Mersal. JA2055-56 (197:14-20, 198:18-22); JA1829 (287:8-16). Bayoumi recalls Mersal, but Mersal does not recall Bayoumi except from later press coverage. JA2415 (330:7-17); JA2063 (231:19-24), JA2070 (257:15-23). Before the 9/11 attacks, Mersal never heard of Hazmi or Mihdhar or discussed them with anyone. JA2073-75 (289:10-291:16).[11]

[11] Plaintiffs accuse Sadhan, Sudairy, Jaithen, and Mersal of being “Al Qaeda extremists” who, during their Ramadan travel, acted as “‘advance teams’ KSA sent

### E. Phone Calls and Records

From January to April 2000, Bayoumi and Thumairy called Saudi diplomatic and consular missions on the phone. They also called one another. Before the district court, Plaintiffs and Saudi Arabia disputed which calls took place between whom.[12] The court declined to resolve those disputes. SA189. Instead, it accepted Plaintiffs' phone call allegations only "to the extent that KSA does not dispute that the phone calls indeed took place." SA197 n.12. The summary that follows focuses on undisputed calls.

#### 1. Bayoumi's calls to Saudi government offices

From January 19 to February 22, 2000, Bayoumi made [redacted] calls to the general number for Saudi Arabia's Washington, D.C. Embassy; [redacted] to the Islamic Affairs number at the Embassy; [redacted] to the Embassy's Cultural Mission, which assists Saudi students in the United States; and [redacted] to Saudi Arabia's Los Angeles Consulate. *Compare* SA197 & n.12, SA204 (citing JA4240-301; JA4041-46; JA3705-07, JA3721-24, JA3726-27 (¶¶ 1265, 1519, 1527, 1564)) *with* JA3269-75, JA3278-84 (underlying call records). From March 1 to 29, Bayoumi made [redacted] calls to [redacted] and [redacted] to [redacted]. JA3285-88, JA3291-95, JA3297-302. Of

---

to provide support for the hijackers." SA219. The district court rejected the advance-team accusations as "a step too far." SA219.

[12] *See*, *e.g.*, JA3677-84, JA3687-91, JA3696-701 (¶¶ 445-447, 607, 749, 788) (Saudi Arabia's contentions that Plaintiffs double-counted or misattributed phone calls and cited unreliable hearsay to allege that phone calls occurred).

those [redacted] calls over three months, [redacted] lasted less than one minute and [redacted] between one and two minutes, JA3269-75, JA3278-88, JA3291-95, JA3277-302, suggesting they may not have reached the intended recipients.

Bayoumi testified that he called Saudi offices about his educational records, JA2539-41 (766:6-768:2), JA2549-51 (776:17-778:8); about passport renewals, JA2421 (377:15-19); and to request books, religious materials, and donations for the Madina Mosque, JA2407-09 (301:13-303:19), JA2423 (379:10-13).[13]

### 2. Thumairy's calls to Saudi government offices and to Sowailem

Thumairy made a number of calls to Saudi government offices from January to March 2000. The district court's order mentioned one [redacted] call, on February 3, 2000, from Thumairy to Sowailem. SA200; *see* JA3725-26 (¶ 1529); JA3251. Thumairy testified that he "communicate[d]" with the Embassy and Sowailem "regularly regarding . . . vacations" and other administrative matters. JA1792 (51:10-23).

### 3. Bayoumi's calls to and from Thumairy

[redacted]. JA3718 (¶ 1506); JA3253. [redacted]. JA3692-95 (¶ 735); JA3269. [redacted]

---

[13] Plaintiffs allege that Bayoumi called Sowailem on February 18 and 19, 2000. SA204 & n.17. Their attribution of the called number to Sowailem is based on unreliable hearsay. JA3700-01 (¶ 788) (objection).

[redacted].[14]

Bayoumi testified that he sometimes called Thumairy, among other imams, to ask religious questions or to pass on questions from congregants at the Madina Mosque. JA2457 (451:1-23). Thumairy testified that he often received calls about religious questions. JA1875-77 (495:13-497:13).[15]

### F. U.S. Investigations of the 9/11 Attacks

Four U.S. agencies have investigated the 9/11 attacks: the 9/11 Commission, the 9/11 Review Commission, the CIA, and the FBI. Each found no evidence that Saudi Arabia sent Bayoumi or Thumairy to support the attacks.

---

[14] Plaintiffs alleged that Bayoumi made additional calls to a cell phone number ending in 3362, which they attributed to Thumairy. Saudi Arabia disputed that attribution, citing contemporaneous records showing the 3362 number did not then belong to Thumairy. JA3692-95, JA3702-04, JA3712-15, JA3719-20 (¶¶ 735, 1254, 1407, 1416, 1512). Saudi Arabia also disputed Plaintiffs' attribution to Bayoumi of calls to the 3362 number from a publicly available phone at the Madina Mosque. *Id.*

[15] The district court's decision also refers to other disputed calls, including 2 on February 3, 2000, from Thumairy to a number that Plaintiffs attribute based solely on hearsay to an imam named Abduljalil Mezgouri, SA200; JA3683-84, JA3687-91 (¶¶ 447, 607) (objection); an April 19 call from a phone number associated with Bayoumi's wife to a number Plaintiffs attribute based solely on hearsay to Aulaqi, SA204; JA3738-42 (¶¶ 1758, 1760) (objection); and an April 25 call from Thumairy to that same misattributed number, SA204-205; JA3740-42 (¶ 1760) (objection).

### 1. 9/11 Commission

In July 2004, the 9/11 Commission "consider[ed]" Thumairy "as a possible contact for" Hazmi and Mihdhar but did "not f[ind] evidence" that Thumairy "assist[ed] . . . the two operatives." 9/11 Rep. 216. It investigated Bayoumi, found "no credible evidence that he believed in violent extremism or knowingly aided extremist groups," and deemed him "an unlikely candidate for clandestine involvement with Islamist extremists." *Id.* at 218. It "found no evidence that the Saudi government as an institution or senior Saudi officials individually funded" Al Qaeda. *Id.* at 171.

### 2. 2004 FBI-CIA Joint Report

In December 2004, the FBI and the CIA jointly reported to Congress "no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or . . . had foreknowledge of terrorist operations." JA1139. They also found "no information to indicate that . . . Omar al-Bayoumi . . . materially supported the hijackers wittingly, [was an] intelligence officer[ ] of the Saudi Government or provided material support for the 11 September attacks, contrary to media speculation." JA1139.

### 3. 9/11 Review Commission

In 2014, the 9/11 Review Commission reviewed the 9/11 Report and considered new information that had emerged. By that time, the FBI had begun "Operation Encore," a second attempt to investigate the 9/11 attacks that focused on Bayoumi, Thumairy, and Jarrah as its three main subjects. JA932-40. The 9/11 Review Commission found that "new information" uncovered by Operation Encore was "not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." JA3747-49.[16]

### 4. Operation Encore

In May 2021, the FBI completed and closed its investigation of Operation Encore. It declassified and released an electronic communication explaining the closure. JA932-40. Its communication stated that "Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the [Al Qaeda] hijackers in furtherance of the 9/11 attack" and that, "nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged." JA940-42.

[16] When the 9/11 Review Commission issued its report, Operation Encore was not public, so the report does not call it by name.

## II. PROCEDURAL HISTORY

Plaintiffs are victims of the 9/11 attacks: victims' estates, families, businesses, and insurers. They seek to hold Saudi Arabia liable for causing the attacks through the alleged actions of Bayoumi and Thumairy in helping Hazmi and Mihdhar. As the district court docket shows, Plaintiffs also seek to hold liable for the attacks Iran, Sudan, Afghanistan, the Taliban, Iraq, Syria; at least 420 individuals; at least 200 banks, companies, charities or charity branches; and at least 33 terrorist organizations, political parties, armies, and other groups.

Saudi Arabia asserts immunity from suit under the Foreign Sovereign Immunities Act of 1976 ("FSIA"). The FSIA makes "foreign state[s] . . . immune from the jurisdiction of the courts of the United States," 28 U.S.C. § 1604, subject to a list of exceptions, *see id.* §§ 1605-1607; *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493-94 (1983) ("At the threshold of every action in a District Court against a foreign state . . . the court must satisfy itself that one of the [FSIA's] exceptions applies[.]").

### A. Pre-2016 Litigation

Many of Plaintiffs' claims were filed in New York federal court, and the rest consolidated by the Joint Panel on Multidistrict Litigation. In 2005, the district court granted Saudi Arabia's motion to dismiss under the FSIA. *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005) (Casey, J.).

In 2008, this Court affirmed, holding that the FSIA's exception to immunity for designated state sponsors of terrorism, 28 U.S.C. § 1605A, was the exclusive basis for bringing terrorism-related claims against foreign states. *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71 (2d Cir. 2008), *cert. denied*, 557 U.S. 935 (2009). Because the United States has never designated Saudi Arabia as a state sponsor of terrorism, § 1605A does not apply to it.

In 2011, this Court decided *Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011) (per curiam). *Doe* overruled the 2008 *Terrorist Attacks* decision in part. *Id.* at 70 & n.10. After *Doe*, terrorism-related claims against a non-designated foreign state can be brought under other FSIA exceptions, such as § 1605(a)(5), the non-commercial-tort exception. *Id.* In 2013, this Court ruled that *Doe* warranted reopening the district court's judgment for Saudi Arabia to consider the non-commercial-tort exception. *In re Terrorist Attacks on September 11, 2001*, 741 F.3d 353, 354-55 (2d Cir. 2013).

In 2015, the district court again dismissed Plaintiffs' claims. *In re Terrorist Attacks on September 11, 2001*, 134 F. Supp. 3d 774 (S.D.N.Y. 2015) (Daniels, J.). Among other things, the court rejected as conclusory Plaintiffs' allegations that Bayoumi and Thumairy acted within the scope of their employment by Saudi Arabia, as § 1605(a)(5) requires. *Id.* at 786-87. Plaintiffs appealed.

### B. JASTA and this Court's Remand

In 2016, while Plaintiffs' appeals were pending, Congress enacted the Justice Against Sponsors of Terrorism Act ("JASTA"). JASTA creates a new exception to FSIA immunity for

> any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by –
>
> > (1) an act of international terrorism in the United States; and
> >
> > (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

28 U.S.C. § 1605B(b). Immunity remains for claims "on the basis of an omission or a tortious act or acts that constitute mere negligence." *Id.* § 1605B(d).

For plaintiffs who satisfy its "act of international terrorism" requirement, *id.* § 1605B(b)(1), JASTA makes three main changes from the non-commercial-tort exception. It includes acts of "agent[s]," *id.* § 1605B(b)(2), as well as officials or employees, *see* SA10; it removes the requirement that the "entire tort" occur in the United States, *see* SA3; and, unlike the non-commercial-tort exception, *see* 28 U.S.C. § 1605(a)(5)(A), it applies to discretionary as well as mandatory acts.

This Court vacated and remanded for the district court to apply JASTA in the first instance. SA3-4. Plaintiffs amended their complaints. Some filed new ones. Saudi Arabia again moved to dismiss.

### C. The 2018 Ruling and Jurisdictional Discovery

On March 28, 2018, the district court granted Saudi Arabia's motion to dismiss in part and denied it in part. SA1-41. Plaintiffs' allegations fell into two categories: allegations that certain employees or alleged employees of Saudi Arabia acting within the scope of their employment had supported the hijackers who committed the 9/11 attacks, SA18-31, and allegations that certain Islamic charities, funded by Saudi Arabia and allegedly its alter egos, had supported Al Qaeda, SA31-37. The court granted the motion as to most of Plaintiffs' allegations about individuals and all their allegations about charities. SA18-37.

The court denied the motion as to Plaintiffs' allegations that Bayoumi and Thumairy had knowingly assisted Hazmi and Mihdhar. SA19-24. Applying JASTA's new "agency" language, the court ruled that "Plaintiffs allege facts sufficient to show that [Bayoumi, Thumairy,] and their agents were following instructions from more senior officials in the Saudi Embassy and, as such, their actions can be attributed to Saudi Arabia." SA22. The court ordered "limited and targeted jurisdictional discovery critical to answering . . . whether and to what extent Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Hazmi, Mihdhar, and other 9/11 hijackers." SA23.

In jurisdictional discovery, Saudi Arabia produced 5,785 documents (9,582 pages), including voluntary productions of documents subject to the Vienna Conventions on Diplomatic and Consular Relations; the FBI produced more than 2,500 documents (more than 13,500 pages); and Plaintiffs deposed 18 current or former officials or employees of Saudi Arabia and eight third-party witnesses. Plaintiffs proffered seven expert witnesses. Saudi Arabia proffered three.

### D. Plaintiffs' Motion for Reconsideration

In December 2022, Plaintiffs sought partial reconsideration of the court's March 2018 order. They asked the court to reopen their claims against Saudi Arabia based on theories that Saudi Arabia had aided and abetted the 9/11 attacks by funding charities and through acts of individuals. On February 7, 2023, the court denied Plaintiffs' motion. SA42-69. It later denied Plaintiffs' request to certify its order for interlocutory appeal. SA70-79.

### E. *Daubert* Motions

After the close of jurisdictional discovery, Saudi Arabia and Plaintiffs each moved to exclude the other side's expert testimony. On December 11, 2024, the magistrate judge (Netburn, J.) granted in part and denied in part each side's motion. SA94-156. The district court adopted that decision. SA157-181.[17]

[17] On January 26, 2024, the magistrate judge granted in part and denied in part Saudi Arabia's motion to strike materials submitted by Plaintiffs, including two supplemental expert opinions, as untimely. SA80-93.

### F. The 2025 Ruling

While the *Daubert* rulings were pending, Saudi Arabia renewed its motion to dismiss. It raised a factual challenge to Plaintiffs' allegations that Bayoumi and Thumairy, acting within the scope of any agency or employment relationship with Saudi Arabia, knowingly assisted the hijackers and caused the 9/11 attacks. On August 28, 2025, the court denied that motion and ordered "Plaintiffs' claims [to] proceed to decision on their merits." SA226.

#### 1. Jurisdictional factfinding

The court acknowledged that where, as here, a foreign state has challenged the factual basis for jurisdiction, the court must "'resolve any disputed issues of fact.'" SA188 (quoting *Robinson v. Government of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001)). It also stated, however, that where there is "'overlap between jurisdictional and merits evidence'" some "'jurisdictional issue[s]'" should be "'le[ft] . . . for the trial'" so that "'a jury'" can decide them. SA188 (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377, 382 (S.D.N.Y. 2009)).

#### 2. Evidentiary objections

The court stated that it was "not necessary" to resolve the parties' evidentiary objections or consider all the evidence because it would reach "the same conclusion on KSA's motion to dismiss" regardless of the contested

evidence. SA189.[18] The court stated that it "mainly consider[ed] facts that the parties do not dispute." SA189. It declined to consider the "conclusions" of the 9/11 Commission, the CIA, and the FBI that no Saudi official or employee knowingly supported the 9/11 attacks. SA189.

### 3. Causation

Saudi Arabia's motion to dismiss had contended that Plaintiffs failed to come forward with evidence to show that their damages were "caused by," 28 U.S.C. § 1605B(b), any alleged tortious acts of Bayoumi and Thumairy. JA646; JA3668-69. The court stated that it would rely on Plaintiffs' "allegations relating to causation" rather than requiring evidence, but would consider "contrary evidence disproving Plaintiffs' allegations," which it said Saudi Arabia had not offered. SA213. The court also reaffirmed an earlier ruling that Plaintiffs had to show only a "'reasonable connection'" between the tortious acts and their damages, SA213 (quoting SA14), and did not have to show that the damages would not have occurred but for the tortious acts, *see* SA12-14, SA213.

### 4. Preliminary jurisdictional findings

The court made "preliminary" jurisdictional findings about "the nature" of Bayoumi's and Thumairy's employment, SA214-217, SA220; the "scope" of that

[18] Examples the court gave of evidence that would not affect its decision included "the contested experts' testimonies," a phonebook found in Bayoumi's possession, and the parties' disputes over "phone call records." SA189.

employment, SA217-221; and whether the two men "knowingly, or at least with deliberate indifference," assisted the hijackers, SA221-223.

**a. Nature of employment.** The court determined that "Plaintiffs have furnished sufficient evidence to raise questions as to the true nature of Bayoumi's and Thumairy's employment with KSA" and to create "a reasonable inference that their employment was more than what their official job titles suggest." SA214.

As to Bayoumi, the court pointed to: (1) his interactions with Hazmi, Mihdhar, and others who assisted them; (2) telephone calls among Bayoumi, Thumairy, and the Saudi Embassy and Consulate; and (3) Bayoumi's April 2000 compensation increase, which it said "could be related to the assistance Bayoumi provided to the hijackers." SA214-216.

As to Thumairy, the court pointed to: (1) the hijackers' choice to visit Los Angeles, where he lived; and (2) certain phone calls between him and Bayoumi. SA216-217. From that, it concluded: "[A]ssuming Bayoumi was likely employed by KSA to assist the hijackers, Thumairy was coordinating with Bayoumi to some degree for that same goal." SA216.

The court continued: "[A]ll the evidence taken together creates a strong inference that it is more likely than not that, for the limited purpose of jurisdictional inquiries, Thumairy and Bayoumi were not just acting as an imam

and an accountant, respectively. Their employment with KSA likely had some connection with assisting the hijackers." SA216.

**b. Scope of employment.** The court applied New York law that "an employer may be vicariously liable for the tortious acts of its employees [1] if those acts were committed in furtherance of the employer's business and [2] within the scope of employment." SA217 (citing *Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 710 (S.D.N.Y. 2021)). The court declared it "unconvincing that Bayoumi and Thumairy acted on their own accord for their own personal interests." SA225.

The court applied a multi-factor test drawn from *Riviello v. Waldron*, 391 N.E.2d 1278 (N.Y. 1979). SA217-220. The court did not resolve several factors, SA218-219, but stated that the "most important factor" – whether the employer could "reasonably have anticipated" the alleged torts – "clearly favor[ed] the Plaintiffs." SA217, SA219. It stated that an employee's torts need be only "generally, not specifically, foreseeable to the employer." SA219. "Because Plaintiffs have demonstrated that Bayoumi's and Thumairy's employment with KSA had some connection with assisting the hijackers, the tortious act here passes the bar of general foreseeability." SA219.

The court concluded: "Plaintiffs have provided evidence that creates the overall impression that Bayoumi and Thumairy were not just an accountant or an

imam as they claim, and their employment had some connection with assisting the hijackers." SA220. It then "reiterate[d]" that it was making "a preliminary finding concerning jurisdictional inquires only." SA220.

**c. Knowing assistance to the hijackers.** The court stated that Plaintiffs "furnished sufficient evidence . . . to demonstrate, at the very least, that Bayoumi had some knowledge when providing support to the hijackers." SA221. It reasoned that: (1) Bayoumi "had never gone out of his way to help any other strangers to the degree he helped the hijackers"; (2) based on "the surrounding circumstances," it was "more likely than not" that his meetings with the hijackers "were not just chance meetings"; and (3) an airplane drawing found in his garage "facially connects [him] with knowledge of the 9/11 Attacks." SA221-222.

As to Thumairy, the court observed there was "less evidence" but reasoned that: (1) Thumairy met with the hijackers at least once; (2) there were phone calls between Thumairy and Bayoumi before and after the hijackers arrived, although "there is no evidence as to the content of these calls"; and (3) the FBI had "a photo of Thumairy and the hijackers." SA222; *contra infra* pp.81-82 (discussing the lack of evidence for the photo).

### 5. Saudi Arabia's burden

The court then determined that Saudi Arabia "fail[ed] to show by a preponderance of evidence that the JASTA exception does not apply." SA224.

It acknowledged that Saudi Arabia proffered innocent explanations for phone calls between Bayoumi, Thumairy, the Embassy, and the Consulate. SA224 ("KSA argues that those calls were related to Bayoumi's education, requests for religious materials, other administrative matters, or religious questions because the calls occurred during the holy month of Ramadan."). But it rejected those explanations as "based on speculation rather than direct evidence." SA224.

The court also stated that Saudi Arabia "fails to explain why Bayoumi received a significant raise during the time when he assisted the hijackers." SA224. And it rejected as "conclusory" or "self-serving" Saudi Arabia's contentions that "Bayoumi's encounters with the hijackers were coincidences," that he helped the hijackers because he was "good-natured," and that "the airplane drawing was unrelated to the 9/11 Attacks." SA224-225.

#### 6. Unresolved factual disputes

The court ended its opinion with a section titled "Plaintiffs are Allowed to Prove their Case at Trial." SA225. It observed that "the parties dispute a significant portion of the facts" and the "reasonable conclusions" to be drawn from those facts. SA225. It listed "example[s]" of factual disputes: whether Bayoumi's "meeting[s] with the hijackers . . . were pre-planned or by chance"; what his "motive" was in helping the hijackers get an "apartment . . . [at] Parkwood where

he lived"; and what the "meaning" was of the "notepad page with an airplane drawing, notes, and numbers." SA225-226.

The court added: "Some of the disputed facts cannot be resolved at this stage of the litigation, because weighing the evidence or assessing witnesses' credibility will need to take place at trial." SA226. It stated that it was relying on "the entire body of undisputed facts[ ] and [its] preliminary assessment of certain disputed facts." SA226. Because "the evidence d[id] not compel the Court to take KSA's version of events," it stated, "KSA did not carry its burden to convince the Court by a preponderance of the evidence." SA226.

### G. Saudi Arabia's Appeal and Plaintiffs' Cross-Appeals

Saudi Arabia appealed. JA4505-07. The district court granted Saudi Arabia's motion to stay discovery pending appeal. JA4513-18. Plaintiffs conditionally cross-appealed from the court's previous decisions partially granting Saudi Arabia's motion to dismiss, rejecting Plaintiffs' alternative theories of jurisdiction and liability, and denying reconsideration. *E.g.*, JA4603-05. Saudi Arabia moved to dismiss those cross-appeals for lack of appellate jurisdiction. This Court referred that motion to the merits panel. JA4602.

## SUMMARY OF ARGUMENT

**I.A.** The FSIA makes foreign states immune from the jurisdiction of U.S. courts unless a statutory exception to immunity applies. Before deciding the merits of a case against a foreign state, a district court must decide whether it has jurisdiction over that state. The court must resolve both legal and factual disputes necessary to determine its jurisdiction as early in the case as possible. That requirement applies even if jurisdiction and the merits overlap.

**B.** Three elements of the JASTA exception are in dispute: an act (1) within the scope of employment (2) that was a tort and (3) that caused Plaintiffs' damages. The district court should have resolved factual disputes about those elements before asserting jurisdiction.

**C.** The district court did not resolve necessary factual disputes. Instead, it relied on "preliminary finding[s]" and only a "preliminary assessment of certain disputed facts." It erroneously declined to weigh evidence or assess credibility. It could not properly leave those matters for trial.

**II.A.** In assessing scope of employment, the district court misapplied New York law. If Bayoumi and Thumairy had knowingly helped Al Qaeda attack the United States, they would have been acting against Saudi Arabia's interests. The traditional factors that govern scope of employment all weigh in Saudi Arabia's

favor. The court's assertion that helping the hijackers had "some connection" with Bayoumi's and Thumairy's employment fell short of the governing standard.

**B.** If this Court construes the district court's preliminary findings on scope of employment as findings of fact, it should reverse them for clear error. The court incorrectly declined to consider important evidence. It drew unreasonable inferences from Bayoumi's acquaintances, overlooked corroborated explanations for phone calls it found suspicious, and relied on a mistaken premise that Bayoumi gave the hijackers money. The 9/11 Commission found, and the record shows, he never did.

**III.A.** The district court also erred in its preliminary finding that Bayoumi and Thumairy committed tortious acts. It misapplied the law in treating Bayoumi's and Thumairy's conduct as an act of "international terrorism" under the Antiterrorism Act without finding that Bayoumi or Thumairy themselves took violent or dangerous acts.

**B.** If this Court construes the district court's preliminary findings on tortious conduct as findings of fact, it should reverse them for clear error. There is no evidence that either Bayoumi or Thumairy knew of the hijackers' malign intentions, and no evidence that Thumairy helped them at all. The court's contrary inferences disregarded probative agency findings, assumed facts the record contradicts, and resorted to speculative leaps.

**IV.** By its ordinary meaning and under controlling Supreme Court precedent, the phrase "caused by" in JASTA requires a finding that, but for the tortious act, Plaintiffs' damages would not have occurred. Because the district court misconstrued the statute, it did not make that finding. Nor could it have.

## STANDARD OF REVIEW

This Court "review[s] the district court's legal conclusions concerning sovereign immunity *de novo* and its factual findings for clear error." *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007).

## ARGUMENT

## I. THE DISTRICT COURT FAILED TO FIND FACTS NECESSARY TO DETERMINE ITS JURISDICTION

### A. A District Court Must Resolve Factual Disputes Raised by a Foreign State's Motion To Dismiss

The Foreign Sovereign Immunities Act of 1976 declares "a foreign state . . . immune from the jurisdiction of the courts of the United States . . . except as provided in [28 U.S.C. §§] 1605 to 1607." 28 U.S.C. § 1604. Through that language, the FSIA creates "a baseline presumption of immunity from suit." *Federal Republic of Germany v. Philipp*, 592 U.S. 169, 176 (2021).

Courts "interpret[ ] the FSIA," like "other statutes affecting international relations[,] to avoid, where possible, 'producing friction in our relations with other nations and leading some to reciprocate by granting their courts permission

to embroil the United States in expensive and difficult litigation.'" *Republic of Hungary v. Simon*, 604 U.S. 115, 132 (2025) (quoting *Philipp*, 592 U.S. at 184) (cleaned up). To achieve those ends, the FSIA adopts a "basic objective [of] . . . free[ing] a foreign sovereign from *suit*," not merely liability. *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174 (2017); *accord Robinson v. Government of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001).

*Helmerich* dealt with the FSIA's expropriation exception for certain disputes over "rights in property taken in violation of international law." 28 U.S.C. § 1605(a)(3). The Court held that jurisdiction requires "facts . . . [that] *do* show (and not just *arguably* show) a taking of property in violation of international law." 581 U.S. at 187 (emphases added). "[W]here jurisdictional questions turn upon further factual development, the trial judge may take evidence and resolve factual disputes," but "should normally resolve those factual disputes and reach a decision about immunity as near to the outset of the case as is reasonably possible." *Id.* at 174; *see also id.* at 187 (similar). *Helmerich* instructed courts "still [to] answer the jurisdictional question" even if, "to do so, [they] must inevitably decide some, or all, of the merits issues." *Id.* at 178.[19]

[19] *See also Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 817 (2d Cir. 2021) ("[C]ourts must endeavor to resolve questions of foreign sovereign immunity 'as near to the outset of the case as is reasonably possible,' even if that requires deciding disputed factual issues.") (quoting *Helmerich*, 581 U.S. at 174).

Before and after *Helmerich*, this Court has reversed or vacated district court decisions that left jurisdictional fact disputes open. In *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922 (2d Cir. 1998), *overruled on other grounds by Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395 (2d Cir. 2014), a competitor of a French sovereign instrumentality alleged that the instrumentality had marketed services in the United States and made them available over the Internet; the instrumentality denied doing so. *Id.* at 931-32. The district court accepted the competitor's allegations. This Court vacated. It directed the district court to "consider all the submissions of the parties," to "hold an evidentiary hearing, if . . . warranted," and to "resolve the disputed factual matters by means of findings of fact." *Id.* at 932; *see Robinson*, 269 F.3d at 141 ("a district court must . . . resolve disputed issues of fact").

In *Nam v. Permanent Mission of Republic of Korea to United Nations*, 118 F.4th 234 (2d Cir. 2024), a former driver at a diplomatic mission contended his job had been commercial because his "work was limited to the task of driving." *Id.* at 247. The mission contended the job had been governmental because the driver had "access to classified information" and responsibility for "the safe transport of high-level government officials." *Id.* at 247-48. On cross-motions for summary judgment, the district court rejected the mission's immunity defense, granted the

driver summary judgment on some claims, and directed other claims to "proceed to trial." *Id.* at 240. This Court held that the district court had erred by "drawing all reasonable inferences in [the driver's] favor" and relying on those inferences to deny immunity. *Id.* at 245. It remanded with a direction to "weigh the[] factual issues, outline explicitly its findings of fact, and, if necessary, conduct further fact finding through a hearing." *Id.* at 249.

Other circuits agree. In *Comparelli v. Republica Bolivariana De Venezuela*, 891 F.3d 1311 (11th Cir. 2018), the Eleventh Circuit vacated a district court's decision after *Helmerich* for lack of "factual findings resolving . . . now-critical disputes." *Id.* at 1326. In *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000), the D.C. Circuit vacated a district court's decision that had not "resolve[d]" a "factual dispute" about an alleged forgery that was "material to its subject matter jurisdiction." *Id.* at 41. And in *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445 (6th Cir. 1988), *abrogated on other grounds by Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992), the Sixth Circuit reversed a denial of sovereign immunity because it was "troubled by the kind and quality of plaintiff's evidence" on "which the district court relied." *Id.* at 452; *see id.* at 453 (criticizing the lack of a "clearly . . . set out . . . factual predicate" for jurisdiction over a French state-owned enterprise).

When finding jurisdictional facts under the FSIA, courts in this Circuit follow a "unique 'burden-shifting framework'" derived from "the FSIA's legislative history." *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 443 (2d Cir. 2019) (discussing *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230 (2d Cir. 2002), and *Swarna v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010)). "[T]he defendant" must first "present[ ] *prima facie* evidence that it is a foreign sovereign." *Swarna*, 622 F.3d at 143. If so, "the burden falls on the plaintiff to establish by a preponderance of the evidence that an exception under the FSIA permits jurisdiction." *Id.* (citing *Virtual Countries*, which describes this as the plaintiff's "burden of production," 300 F.3d at 241). If the plaintiff carries that burden, then the foreign sovereign must carry the "ultimate burden of persuasion" on immunity. *Swarna*, 622 F.3d at 143.[20]

### B. Section 1605B(b) Requires Jurisdictional Findings on Scope of Employment, Tortious Conduct, and Causation

It is common ground that Plaintiffs seek "money damages . . . against a foreign state," their damages are for "physical injur[ies] to person or property or death occurring in the United States," and their damages were "caused by . . . an

[20] The United States has argued that not only the "burden of production," but also the "ultimate burden of proof," should "rest with the plaintiff." U.S. Amicus Br. 31 n.*, *Republic of Hungary v. Simon*, No. 23-867 (U.S. Sept. 5, 2024). Although this panel is bound by Circuit precedent, review of the burden-allocation issue may later be warranted *en banc* or by certiorari.

act of international terrorism in the United States." 28 U.S.C. § 1605B(b) (full text at SA239). Saudi Arabia challenged the district court's jurisdiction because no one acting for Saudi Arabia "within the scope of any office, employment, or agency" committed any "tortious act" that "caused" Plaintiffs' injuries. *Id.* The court should have made factual findings on each point.

In *Robinson*, this Court held that a district court properly dismissed a slip-and-fall negligence claim against Malaysia under the FSIA's non-commercial-tort exception, 28 U.S.C. § 1605(a)(5), because the plaintiff "neither pleaded nor c[a]me forward with evidence sufficient to show that his claim [wa]s for a 'tortious act or omission' caused by the Malaysian government." 269 F.3d at 146. *Robinson* also endorsed the statement that "'[t]he "scope of employment" provision of the tortious activity exception essentially requires a finding that the doctrine of respondeat superior applies to the tortious acts of individuals.'" *Id.* at 144 (quoting *Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1025 (9th Cir. 1987)). None of the differences between § 1605(a)(5) and § 1605B(b), *supra* p.27, affects *Robinson*'s identification of the scope of employment (or agency), a tortious act, and causation as jurisdictional questions.

### C. The District Court Did Not Resolve Factual Disputes Material to Scope of Employment, Tortious Conduct, and Causation

#### 1. The district court erroneously made only a "preliminary assessment of some disputed facts"

The court did not make the factual findings necessary for jurisdiction. Initially, the court cited *Beierwaltes* and *Robinson* and acknowledged that it should "resolve disputed issues of fact." SA188. But it then incorrectly stated that an " 'overlap between jurisdictional and merits evidence, . . . such that fact-finding on the jurisdictional issue will adjudicate factual issues required by the Seventh Amendment to be resolved by a jury,' " would warrant " 'leav[ing] the jurisdictional issue for the trial.' " SA188 (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377, 382 (S.D.N.Y. 2009)). That reasoning was contrary to *Helmerich* and *Nam*, which required the court to find jurisdiction before proceeding to trial, as well as to 28 U.S.C. § 1330(a), which conveys jurisdiction only over a "nonjury civil action against a foreign state."[21]

Later, the court quoted *Robinson*, stating that "whether a tortious act occurred is certainly a jurisdictional fact that this Court must determine" and that it was "required to make a finding . . . on whether the doctrine of respondeat superior applies to the tortious acts of individuals." SA212-213. But it then stated that it

[21] Elsewhere, the court acknowledged that it would be the "factfinder during trial," SA220, contradicting its reference to *Wiwa* and a jury.

would consider only "whether Plaintiffs could bring a *legally cognizable* claim of a tortious act, or whether KSA is amenable to suit," and conducted only a "*limited* examination on the merits." SA212 (emphases added). Remarkably, the court cited *Helmerich* for that "limited examination," overlooking the Supreme Court's direction that, if to "answer the jurisdictional question" a district court "must inevitably decide some, or all, of the merits issues, so be it." 581 U.S. at 178.

The court described its conclusion about scope of employment as "a preliminary finding concerning jurisdictional inquiries only." SA220. About tortious conduct, it said only that Plaintiffs had "shown [enough] to support jurisdiction." SA222-223. It cited *Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82 (2d Cir. 2006), an Article III standing case. For Article III standing, a plaintiff may get to trial based on facts that are "taken to be true" only "for purposes of . . . summary judgment." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The FSIA, by contrast, requires that "factual disputes" for "a decision about immunity" be "resolve[d] . . . as near to the outset of the case as is reasonably possible." *Helmerich*, 581 U.S. at 174. The court was ruling more than 21 years after MDL consolidation and more than 7 after this Court's post-JASTA remand. It lacked authority to put off fact disputes further.

At times, the court seemed to recognize it should resolve factual disputes by a "preponderance of the evidence." SA224-226. But then, in the section titled

"Plaintiffs are Allowed to Prove their Case at Trial," it reaffirmed that it was considering only "undisputed facts" and a "preliminary assessment of certain disputed facts." SA225-226. It stated that "[s]ome . . . disputed facts cannot be resolved at this stage of the litigation, because weighing the evidence or assessing witnesses' credibility will need to take place at trial." SA225-226. Reserving those disputes for trial is contrary to *Nam*, which instructed a district court to "weigh . . . factual issues," to make "explicit[ ] . . . findings of fact," and, "if necessary," to hold a "hearing" for "further fact finding." 118 F.4th at 249.

On causation, the court relied merely on "Plaintiffs' allegations" and stated that it would "consider" any "contrary evidence" that "KSA could offer . . . disproving [those] allegations." SA213. That was the same "error" this Court corrected in *Filetech*: "accept[ing] the mere allegations of the complaint as a basis for finding subject matter jurisdiction." 157 F.3d at 932. Under this Circuit's burden-shifting test, the district court should instead have considered whether Plaintiffs had "satisfie[d] [their] burden that an FSIA exception applies" and then (if necessary) considered whether Saudi Arabia had carried "the ultimate burden of persuasion." *Swarna*, 622 F.3d at 143. Thus, even if the court applied the correct causation standard (which, as shown in Part IV.A, it did not), it still failed to make necessary findings under that standard.

### 2. The factual disputes the district court declined to resolve were necessary to determine its jurisdiction

The factual disputes the court left unresolved were crucial to its ruling on jurisdiction. Examples it gave of "disputed facts" included "whether" Bayoumi's "meetings" with the hijackers "were pre-planned or by chance"; what his "motive" was for the "assistance" he offered to the hijackers; and what the "meaning" was of the "notepad page with an airplane drawing" found in Bayoumi's garage. SA225-226. If the court had found (as it should have) that Bayoumi met the hijackers only by chance, that his motive in assisting them was innocent, and that the notepad page had nothing to do with the 9/11 attacks, it could not have let the case proceed.

The court's decision to bypass witness credibility also went to the core of its rulings on scope of employment and on tortious conduct. Saudi Arabia presented testimony not only from Bayoumi and Thumairy, but from nine other current and former Saudi officials and employees whom Plaintiffs accused of complicity. Each testified that he knew nothing about the hijackers' plans and never gave or received any instruction to help them. JA653 (¶ 232) (collecting testimony).[22]

[22] JA2502-05 (721:22-724:17); JA1870-74 (490:6-494:20); JA2292-93 (598:23-599:11), JA2295-301 (601:22-607:4); JA738-41 (¶¶ 3-16); JA1935-44 (211:9-220:13), JA1947-48 (263:15-264:2); JA1594-99 (304:9-305:12, 306:21-309:16); JA2073-75 (289:10-291:16); JA1629-30 (383:14-384:20), JA1632-37 (386:13-391:15); JA2341-43 (363:5-365:20), JA2345-48 (367:17-370:15); JA2030-33 (362:7-365:9); JA1516-22 (335:9-341:15); JA1673 (222:6-16), JA1676 (259:13-21).

That included Jarrah, the former Embassy employee whom Plaintiffs accused, based on an "investigative theory" the FBI later disavowed, of "tasking" Bayoumi and Thumairy with helping the hijackers. *Supra* p.17. The court could not reasonably disregard that testimony without considering its credibility.

Non-Saudi third-party witnesses who met or assisted the hijackers gave similar evidence. JA649-50, JA652 (¶¶ 87, 105, 131-133) (collecting testimony). Examples included Johar's testimony that he introduced the hijackers to Thumairy (not vice versa) and that no one ever told him to help them, JA2086 (94:14-23), JA2088-89 (96:2-97:4), JA2093 (101:11-21), JA2100-01 (117:16-118:23), JA2134-36 (211:15-213:15), JA2153-54 (382:13-383:15), JA2156-57 (385:9-19, 386:14-20); Zeid's testimony that [redacted] and that Bayoumi did not tell him to help them, JA2178-79 (132:21-133:8, 133:16-18), JA2181 (135:1-14), JA2185-86 (139:23-140:9), JA2188 (142:2-17), JA2239-40 (430:10-431:24), JA2247-49 (454:12-455:12, 456:12-22), JA2252-53 (461:18-462:23), JA2256-58 (465:21-467:15); and Morgan's cross-examination concession that he saw nothing to indicate that Bayoumi's lunch-time conversation with the hijackers at the Mediterranean Café was "anything other than a coincidence," JA1954-55 (28:22-29:6).

The court's refusal to weigh contested evidence likewise excluded essential points. Saudi Arabia's evidence showed that its state religion is quietist and

condemns violent jihad, JA3781, JA3788; that during the 1990s it sought to stop Al Qaeda and bring Osama bin Laden to justice, 9/11 Rep. 57, 62-63, 115, 170, 497 n.113; JA3769, JA3771; JA667; that its religious establishment condemned terrorist attacks as "sabotage and depravity" punishable by death, JA3783; and that it is a "longstanding" security partner of the United States, JA658-59. All that evidence went to Saudi Arabia's lack of any motive to help Al Qaeda attack the United States – a vital counterweight to Plaintiffs' theory that unnamed Saudi officials worked with Bayoumi to help Hazmi and Mihdhar while knowing they were terrorists.[23]

## II. BAYOUMI AND THUMAIRY DID NOT ACT WITHIN THE SCOPE OF THEIR EMPLOYMENT

The district court misconstrued and misapplied New York law in concluding (even "preliminar[il]y," SA220) that Bayoumi and Thumairy acted within the scope of their employment when they allegedly provided knowing assistance to Hazmi and Mihdhar. Under the correct standard, Plaintiffs failed to meet their burden of production as a matter of law; or, at a minimum, findings were required that the court never made.

[23] For example, against Plaintiffs' hearsay-based contention that Bayoumi was a "cooptee" of Saudi's General Intelligence Presidency, SA214, the court should have weighed the 9/11 Report's finding that then-Crown Prince Abdullah sent the head of that agency, Prince Turki Bin Faisal, to Afghanistan to urge the Taliban to expel bin Laden from that country. 9/11 Rep. 115.

### A. Bayoumi's and Thumairy's Alleged Acts Neither Furthered Saudi Arabia's Interests nor Were Under Its Direction and Control

New York courts attribute an employee's tort to an employer only where the employee "d[id] something in furtherance of the duties he owes to his employer" and "the employer [wa]s, or could [have] be[en], exercising some control, directly or indirectly, over the employee's activities." *Lundberg v. State*, 255 N.E.2d 177, 179 (N.Y. 1969). Both requirements must be met: "there is no liability as a matter of law" for an act "unrelated to the furtherance of the employer's business," *Mazzarella v. Syracuse Diocese*, 953 N.Y.S.2d 436, 437 (App. Div. 2012), and, even for " 'work motivated' " acts, the employer is not liable where " 'the element of control is lacking,' " *Hamm v. United States*, 483 F.3d 135, 138 (2d Cir. 2007) (quoting *Lundberg*, 255 N.E.2d at 179). Neither is met here.

#### 1. Helping Al Qaeda attack the United States would not have furthered Saudi Arabia's interests or purposes

An employer can be liable for an employee's "act[s] in furtherance of [the employer's] interests," even though the employee "perform[ed] negligently or otherwise than in an authorized matter." *Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (N.Y. 1979) (restaurant liable for cook's negligent toss of knife). "The purpose of the rule is to render the employer responsible, in proper cases, for the employee's tortious acts, which although errant, were done in furtherance of the

employer's business." *Rausman v. Baugh*, 682 N.Y.S.2d 42, 43 (App. Div. 1998) (hospital not liable for social worker's defamatory report).

Consistent with that purpose, the scope-of-employment test does not reach "a malicious attack completely divorced from the employer's interests," *Rivera v. State*, 142 N.E.3d 641, 646 (N.Y. 2019) (State not liable for prison guard's "gratuitous" blow to inmate); a breach of duty "motivated by purely personal reasons," *Doe v. Guthrie Clinic, Ltd.*, 5 N.E.3d 578, 579-80 (N.Y. 2014) (clinic not liable for nurse's disclosure of confidential information to her sister); or "work . . . performed voluntarily for the benefit of the [employee] and not of the employer," *Dunn v. University of Rochester*, 194 N.E. 856, 857 (N.Y. 1935) (per curiam) (workers' compensation did not cover gas station employee's servicing of a car "for his own profit"). Similarly, this Court has ruled as a matter of law that a Kuwaiti diplomat's alleged abuse of a household employee "did not . . . further Kuwait's purposes in the United States." *Swarna*, 622 F.3d at 145; *see also Agyin v. Razmzan*, 986 F.3d 168, 184-85 (2d Cir. 2021) (the "employee must . . . act at least 'in part to benefit the employer' ") (citation omitted).

Helping Al Qaeda launch "a malicious attack," *Rivera*, 142 N.E.3d at 646, on the United States would not have furthered Saudi Arabia's interests or its purposes. Saudi Arabia is a longstanding ally and security partner of the United States, including in counterterrorism. JA3777-78; JA658-59; JA665-66. Saudi

Arabia also is a longstanding enemy of Al Qaeda. Well before 2000, Saudi Arabia stripped Osama bin Laden of his Saudi citizenship, froze his assets, and worked with the United States to bring him to justice for Al Qaeda's terrorist acts. 9/11 Rep. 57, 62-63, 115, 170, 497 n.113; JA3769-71; JA667. Its religious leaders had denounced terrorism and suicide attacks. JA3783. The court could not have found that helping Al Qaeda helped Saudi Arabia.[24]

*Watson v. Kingdom of Saudi Arabia*, 159 F.4th 1234 (11th Cir. 2025), is instructive. *Watson* involved a rogue attack by a Saudi airman. Saudi Arabia sent him to the U.S. for "a joint military program . . . to learn English and then to attend pilot training," but he instead attacked a naval airbase on behalf of Al Qaeda. *Id.* at 1246-47, 1269. Florida law, like New York law, imposes vicarious liability only where tortious conduct is "'activated at least in part by a purpose to serve'" the employer. *Id.* at 1269 (quoting *Morrison Motor Co. v. Manheim Servs. Corp.*, 346 So.2d 102, 104 (Fla. Dist. Ct. App. 1977)). Even on the pleadings, the

---

[24] Plaintiffs contend Saudi Arabia "allow[ed]" MOIA to "propagate Wahhabism overseas" and to "endorse[] violent and extremist religious views." SA194 n.10 (citing JA919-24 (¶¶ 20-21, 34, 48, 52)). Saudi Arabia contends its religious beliefs are "quietist and peaceful." SA194 n.10 (citing JA648 (¶ 6)). The court did not resolve the dispute. But Plaintiffs' allegations about so-called "Wahhabism" came from experts whose opinions the court found unreliable and unhelpful. SA167, SA172. It found reliable and helpful, SA177-179, the opinion of Saudi Arabia's expert that Al Qaeda's "ideology is entirely at odds with the quietist apolitical brand of Islam practiced and promoted in Saudi Arabia," JA3788, yet refused to consider it, SA189.

Eleventh Circuit reasoned that "[i]t ma[de] no sense" to say the airman acted to serve Saudi Arabia; his attack sought to "destroy" the security relationship his employer sought to advance. *Id.* at 1269-70. The same logic applies here.

### 2. The *Riviello* factors confirm that helping Al Qaeda was not part of Bayoumi's or Thumairy's duties

To guide the inquiry whether an "employee is doing something in furtherance of the duties he owes to his employer," *Agyin*, 986 F.3d at 184, courts applying New York law "consider, among other factors":

> "the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated" (i.e., whether it was foreseeable).

*Rivera*, 142 N.E.3d at 645 (quoting *Riviello*, 391 N.E.2d at 1281). The court recited those factors, SA217-220, but misapplied them.

*First*, the "time, place and occasion," *Riviello*, 391 N.E.2d at 1281, of Bayoumi's work for Saudi Arabia had no connection to his assistance to Hazmi and Mihdhar. The court acknowledged that Bayoumi came to San Diego to study English and pursue a graduate degree in 1994, six years before he met Hazmi and Mihdhar in 2000. SA218. He attended various schools, SA191, but nothing suggests the hijackers visited any of them. Thumairy similarly came to Los Angeles in 1996, years before the hijackers. SA218.

The court erroneously reasoned that the acts occurred "at the cities and during the time period" that Saudi Arabia employed Bayoumi and Thumairy. SA218. That implausibly suggests this factor would favor an "in furtherance" finding for everyone in Southern California in the late 1990s. Yet New York courts reject vicarious liability for torts committed "driving from the employer's premises to a nearby store during a regular morning coffee break," *Overton v. Ebert*, 580 N.Y.S.2d 508, 508 (App. Div. 1992), or taking "a weekend bicycle ride[ ] in a public park," *Fein v. Cook*, 61 N.Y.S.3d 10, 11 (App. Div. 2017).

*Second*, nothing about the "history" or "actual practice," *Riviello*, 391 N.E.2d at 1281, of Bayoumi's or Thumairy's employment involved helping terrorists. The court did not find otherwise. It said only that, "[i]n actual practice, [Saudi Arabia] had a history *of an employer-employee relationship* with Bayoumi and Thumairy." SA218 (emphasis added). That was undisputed; otherwise, the scope of that employment would not be in question. The court should instead have asked whether history or practice suggested that helping terrorists was part of that employment (and should have answered no).

*Third* and *fourth*, knowingly helping terrorists is not an act "commonly done," *Riviello*, 391 N.E.2d at 1281, by accountants (as Bayoumi had been in Saudi Arabia), by students (as he was in the United States), or by imams (as Thumairy was throughout his career). Nor would it be within the "normal methods

of performance," *id.*, for those jobs. The court conceded that "[c]ommon sense" tells us it would "surely [be] unusual" for an "accountant" to "assist[ ] hijackers" and that "Bayoumi's assistance to the hijackers bore little relation to his activities as a student pursuing an education in the U.S." SA218-219.[25]

For the "commonly done" and "normal methods" factors, the court determined that there was "little record evidence to decide one way or another," that "any record . . . is not sufficient for the Court to evaluate," and that there was not "sufficient admissible evidence to decide." SA218-219.[26] Plaintiffs bore at least the "burden of coming forward with evidence[ ] sufficient to deprive [Saudi Arabia] of immunity." *Robinson*, 269 F.3d at 135. Accordingly, lack of evidence on some factors should have weighed in Saudi Arabia's favor.

*Fifth*, "the specific act" of knowingly helping terrorists was not "one that" Saudi Arabia "could reasonably have anticipated," *Riviello*, 391 N.E.2d at 1281, Bayoumi or Thumairy would commit. To begin with, the court gave "inordinate

[25] The court added that such acts would be "plausibly common for someone employed to provide logistical assistance to the hijackers." SA218. But the *Riviello* factors help decide whether "the conduct of a particular employee, overall, falls within the permissible ambit of the employment." 391 N.E.2d at 1281. It makes no sense to assume the employment includes the tort when applying them.

[26] The court properly rejected as "a step too far" Plaintiffs' allegations that other Saudi government employees who visited Los Angeles or San Diego were so-called "'advance teams' . . . for the hijackers." SA219.

emphasis" to "the concept of general foreseeability," but "scant heed to the other *Riviello* factors." *Ierardi v. Sisco*, 119 F.3d 183, 187 (2d Cir. 1997). As this Court explained in *Ierardi*, *Riviello* "mandates that all of the factors . . . be considered." *Id.* at 188. The district court adopted the same overemphasis on general foreseeability that *Ierardi* rejected.

In any event, the court's analysis of foreseeability relied on the vague premise that Bayoumi's and Thumairy's work had "some connection with assisting the hijackers." SA219. The court cited no case finding vicarious liability based on "some connection" between employment and tort. The violent prison guard in *Rivera*, the indiscreet nurse in *Guthrie Clinic*, the entrepreneurial gas-station attendant in *Dunn*, and the complaining social worker in *Rausman* each committed torts with "some connection" to their employment. But none "was . . . carrying out a *duty* to [an] employer" or acting within a "job description." *Rausman*, 682 N.Y.S.2d at 45. Neither were Bayoumi or Thumairy.

### 3. Bayoumi and Thumairy did not help Al Qaeda at Saudi Arabia's direction or under its control

Bayoumi's and Thumairy's alleged torts also did not fall within the scope of their employment because Plaintiffs came forward with no evidence to show that either man knowingly assisted Hazmi or Mihdhar "under the direction or control" of Saudi Arabia, or "pursuant to [its] orders, . . . rather than as a voluntary

endeavor." *Donohue v. Young*, 751 N.Y.S.2d 253, 254 (App. Div. 2002) (city not liable for firefighter's off-duty attempt to fight fire). As *Hamm* explains, New York requires "case-specific evidence of control," not a mere " 'general right to control . . . activities.' " 483 F.3d at 139 (quoting *Hartzell v. United States*, 786 F.2d 964, 968 (9th Cir. 1986), and rejecting argument that military had a right to control reservist's conduct while he drove his car to a drill).

Indeed, jurisdictional discovery was "targeted" at the question of knowing direction and control: " 'whether and to what extent Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to' . . . Hazmi and . . . Mihdhar." SA184 (quoting SA23). As shown above in Part I.C.2, not one witness testified to a direction. The allegation that Jarrah "tasked" anyone turned out to be a debunked investigative theory. Similarly, Plaintiffs' original allegation that Thumairy met Bayoumi at the Consulate to direct him to the hijackers, SA19-20, turned out to be a case of mistaken identity: Bayoumi met Mana, who merely greeted him and provided boxes of Korans and other religious materials. *Supra* p.10.

Nowhere did the court find as a fact (or a preliminary assessment of a disputed fact) that any Saudi official directed or controlled Bayoumi's or Thumairy's interactions with the hijackers. Instead, it says that they were in "communication," that they were "coordinating," or that phone calls were "related"

to the hijackers. SA220, SA224; *see also* SA224 ("[a]lthough there is no record evidence as to the content of the[ ] phone calls," Saudi Arabia "failed" "to prove that they were *not* related to the hijackers"). Those inferences were unwarranted; but even taken at face value, they are not direction or control.

### B. To the Extent the District Court Made Factual Findings on Scope of Employment, It Clearly Erred

If this Court construes the district court's "preliminary assessment of some disputed facts," SA226, as factual findings, it should review those "factual findings for clear error," *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007). Reversal is warranted because "the entire evidence" should leave this Court "with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985).

A district court clearly errs where it "fail[s] to synthesize the evidence in a manner that accounts for conflicting evidence or the gaps in a party's evidentiary presentation," it "incorrectly assesse[s] the probative value of various pieces of evidence, leading it to rely on speculation," or it "fail[s] to weigh all of the relevant evidence before making its factual findings." *Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004) (Sotomayor, J.). For example, this Court has reversed a finding of a "joint criminal undertaking" because the facts were "equally consistent with numerous non-'joint' possibilities" and "the inferences that the district court was

asked to draw were not more likely than other plausible scenarios." *United States v. Rizzo*, 349 F.3d 94, 101-02 (2d Cir. 2003).

### 1. The district court failed to weigh evidence that no one directed Bayoumi or Thumairy to help the hijackers

Twenty-six witnesses gave depositions. None testified about any direction to help the hijackers. Saudi Arabia produced tens of thousands of documents from its own files, including voluntary document productions from its diplomatic and consular facilities. No document shows any direction to help the hijackers. The court passed over that evidence almost without comment. It dismissed Bayoumi's own testimony as "self-serving denials or excuses." SA225. The " 'self-serving nature' " of testimony "goes only to [its] weight," *United States v. Lawal*, 736 F.2d 5, 8 (2d Cir. 1984) (quoting *United States v. DiMaria*, 727 F.2d 265, 271 (2d Cir. 1984) (Friendly, J.)), and is not a reason to refuse to consider it. *Cf. Wilson v. McRae's, Inc.*, 413 F.3d 692, 694 (7th Cir. 2005) (Easterbrook, J.) (observing that "most testimony" is "self-serving"). If, as the court said, it was not "weighing the evidence or assessing witnesses' credibility," SA226, it had no basis to reject Bayoumi's, Thumairy's, and other witnesses' emphatic denials of involvement in any terrorist plot.

### 2. The district court drew unreasonable inferences from Bayoumi's "connections" to the hijackers

In concluding that Bayoumi's "involvement" with Hazmi and Mihdhar "appears to bear some connection with his employment by" Saudi Arabia, the court stated he had "frequent interactions" with the hijackers and "seemed to serve as a connecting point" with "many other people who . . . provided assistance to the hijackers." SA214-216. The record shows otherwise.

*First*, the record does not show that Bayoumi had "frequent interactions" with the hijackers. He met them in a restaurant in Los Angeles, SA198-199; met them in San Diego and helped them find an apartment, SA200-201; and asked to use that apartment for a social gathering, SA202-203.[27] He then left the country for two months. SA204-205. There is no evidence he interacted with the hijackers after his return. Even if those interactions showed complicity (which they do not), they do not show complicity was part of his job.

*Second*, the record does not show that Bayoumi "serve[d] as a connecting point" for the hijackers. The court identified relevant "connections" as Thumairy, Aulaqi, Zeid, and Shaikh. Although Plaintiffs alleged that Bayoumi introduced the hijackers to some of those individuals, the court did not find he had. It stated only

[27] Plaintiffs alleged that the gathering was a "welcome party" for the hijackers, but the court watched a video of the party and conceded that it "appear[ed] to be simply a social gathering." SA223.

that he "knew" them. SA215. As the 9/11 Commission explained, Bayoumi was a "devout Muslim, obliging and gregarious," who "spent much of his spare time involved in religious study and helping run a [nearby] mosque." 9/11 Rep. 218. That he knew other imams and mosque attendees in the Southern California Islamic community who also met the hijackers does not suggest that he was a "connecting point" from the hijackers to others. Nor does it suggest that he did any connecting on Saudi Arabia's behalf.

Except for Thumairy, none of the other "connections" (Aulaqi, Zeid, and Shaikh) had any connection to the Saudi government. Aulaqi was a U.S. citizen and, according to Plaintiffs' proffered expert, "a revered mainstream Islamic preacher."[28] Zeid was a Yemeni citizen studying in the United States. SA206. Shaikh was a U.S. citizen and an FBI informant. SA205; JA2674 & n.185, JA2675 & n.197. Bayoumi's acquaintance with them had no discernible link to his duties for Saudi Arabia.

#### 3. The district court drew unreasonable inferences from Bayoumi's association with other Saudi employees

The court similarly stated that Bayoumi "knew" other Saudi employees, including Thumairy, Sadhan, and Sudairy. SA215. In doing so, it failed to

---

[28] JA831; *see also* 9/11 Rep. 221. The court refers to Aulaqi as an "Al Qaeda recruiter," SA215, as he later became. In 2000, however, Aulaqi had no known connection to Al Qaeda. He condemned the 9/11 attacks after they occurred and was invited to speak at the Pentagon in 2002. JA833-35.

"account[] for" a substantial "gap[]," *Menefee*, 391 F.3d at 164: the lack of evidence that any of those individuals did anything to help the hijackers.

*First*, the court pointed to no evidence (and there is none) of anything Thumairy did to help the hijackers. SA216. There is evidence only that he met them once or twice, though he does not recall it. SA193-194, SA206-207. Indeed, the court's discussion of his alleged involvement with the hijackers was candidly speculative. Observing that the "hijackers also revisited Los Angeles in June of 2000 before Mihdhar's departure," it commented: "It makes one wonder, who in Los Angeles did [the hijackers] hope to see or what did they intend to do there?" SA216. But they traveled to Los Angeles on June 9; on June 10, Mihdhar flew out of the United States from LAX, a major international airport. 9/11 Rep. 220. No reasonable inference can be drawn from an arrival the day before a long flight. Also, documentary evidence shows that Thumairy was in Washington, D.C. on June 9 and in Riyadh on June 10. *Supra* n.9.

*Second*, the court did not find that Sadhan or Sudairy helped the hijackers (or knew who they were). Bayoumi had met Sadhan and Sudairy in late 1998 and early 1999, when they traveled to San Diego during Ramadan to lead prayers. SA208. He met them again when he traveled to Washington, D.C. in June 1999.

SA208.[29] There is no evidence they met the hijackers or were in San Diego when the hijackers traveled there. Each gave unrebutted testimony that he never heard the hijackers' names prior to the 9/11 attacks. JA1629-30 (383:14-384:20), JA1632-37 (386:13-391:15); JA2341-43 (363:5-365:20), JA2345-48 (367:17-370:15). Accordingly, the court had no basis to infer from Bayoumi's association with them that his employment included helping terrorists.

#### 4. The district court drew unreasonable inferences from phone call records

The court clearly erred in inferring that Bayoumi made phone calls to the Embassy, to the Consulate, and to Thumairy about the hijackers. The core of that error was the court's statement that Saudi Arabia presented "speculation rather than direct evidence" to support its position that the phone calls "related to Bayoumi's education, requests for religious materials, other administrative matters, or religious questions . . . during the holy month of Ramdan." SA224. To the contrary, Saudi Arabia presented corroborated witness testimony on each point.

*First*, Bayoumi testified that he called the Saudi Embassy about his educational records, with a specific example in March 2000. JA2539-41 (766:6-768:2), JA2549-51 (776:17-778:8); *see* JA2550-51 (777:22-778:8) (identifying stamped educational certificate as a document he called the Embassy to discuss).

[29] The court properly rejected Plaintiffs' attempt to mischaracterize a video of the June 1999 trip as "'casing' the U.S. Capitol." SA223.

In another sequence on February 2, 2000, [redacted].[30] The same week, he brought to the Consulate a letter [redacted] confirming his enrollment, which he used to renew his passport. JA756, JA758-59. The court suggested that the call sequence related to the hijackers, [redacted]. SA200. But [redacted], support the innocent explanation that the calls related to educational records.

*Second*, Bayoumi testified that he called the Saudi Embassy and the Saudi Consulate to request books and other religious materials for the Madina Mosque, as well as donations. JA2407-09 (301:13-303:19); *see also* JA2423 (379:10-13) ("I may have called [the Consulate] once, twice or three times, in order for them to prepare the books."). His testimony that he asked for religious materials was corroborated by Mana, who gave him the materials, JA1916-18 (134:8-136:22), and by Morgan, who confirmed that Bayoumi and Mana discussed "Mr. al-Bayoumi's

---

[30] *See* JA3723-24 (¶ 1527) (detailing calls and citing JA4240-301). [redacted].

interest in obtaining religious materials, including Korans from the consulate," JA768 (¶ 12).[31]

*Third*, Bayoumi testified that he called the Saudi Consulate in late January or early February 2000 about the "renew[al]" of his family's "passports." JA2421 (377:15-19). The renewal is corroborated by Bayoumi's application, dated January 31, 2000, JA760; by his passport, which shows an issue date of February 1, JA716-19; and by a 2003 report from the Consulate to the Embassy, JA752-55.

*Fourth*, Thumairy testified that, as an imam, he often received calls about religious questions, especially during Ramadan. JA1875-77 (495:13-497:13). Bayoumi testified that he called Thumairy and other imams to ask such questions or to pass on questions from patrons of the Madina Mosque. JA2457 (451:1-23). Thumairy did not recall Bayoumi, but as an imam he interacted with many people and did not remember them all. JA1891-92 (565:7-566:13).

Other witnesses confirmed that Thumairy's role as an imam included answering religious questions. Examples include Mana, who testified that "from

[31] Other documents showing that Bayoumi contacted the Embassy and the Consulate about religious materials for the mosque include an undated handwritten letter to Jarrah referring to a "telephone conversation regarding furnishings, Qur'ans, books and booklets," JA3041, and a November 1998 letter in which Bayoumi thanked the Consulate for "generous support" for the mosque, including "Qur'ans, books, and carpets," JA3068.

time to time [he] may have called [Thumairy] if we had any religious questions," JA1912-13 (97:23-98:4); Faisal Al Muhanna, who testified that he called Thumairy to "ask him questions about prayers or discuss prayers," JA1898 (47:5-24); and Mersal, who testified that, when he "assist[ed]" Thumairy during Ramadan, he "helped answer[] the worshippers' questions about fasting and other religious-related questions," JA2046 (101:13-23).

In addition, based on the court's stated approach of counting only calls "that KSA does not dispute . . . took place," SA197 n.12, there were [redacted] calls between Bayoumi and Thumairy in January 2000, [redacted]. *Supra* p.22. Accordingly, the court's description of "multiple," "frequent," and "numerous" calls between the two, SA215-216, SA222, was overstated.[32]

Bayoumi and Thumairy generally could not remember specific phone calls and sometimes could not recall people with whom they may have spoken. *E.g.*, SA200 (noting Thumairy's inability to recall a San Diego imam).[33] But that lack of memory was understandable; they were testifying more than two decades later.

---

[32] Call records also show [redacted]. JA3248, JA3252-53. [redacted]. JA1876-77 (496:1-497:13).

[33] The call to that imam (Mezgouri) was disputed. *Supra* n.15.

Even the latitude due a factfinder did not enable the court to disregard corroborated explanations for the calls and infer conspiracy.

### 5. The district court relied on conjecture about Bayoumi's compensation increase

The court clearly erred in asserting that Bayoumi's April 2000 compensation increase "could be related to the assistance [he] provided to the hijackers at that time" and that the "record is . . . unclear as to where the money came from that was provided and expended on behalf of the hijackers." SA215, SA218.

*First*, the record was not unclear. Bayoumi never "provided" or "expended" money "on behalf of the hijackers." He testified, [redacted], that he helped them get a certified check for $1,558 to cover their deposit and first month's rent, but they paid him back immediately. JA651 (¶¶ 113-115); JA2451-54 (440:14-443:13), JA2516-17 (735:21-736:11); JA827-28; JA783 (¶ 14). The court acknowledged that point elsewhere in its opinion. SA202. The 9/11 Commission agreed. 9/11 Rep. 219 ("[n]either then nor later did Bayoumi give money to either Hazmi or Mihdhar").

*Second*, the court's statement that Saudi Arabia "failed to provide a plausible explanation as to why this much increase occurred at this particular time," SA215, was incorrect. Bayoumi testified that his salary had not been commensurate with his education, experience, or need to pay educational expenses. JA2489-91 (692:16-694:4); *see also* JA3108 (Bayoumi had previously, inaccurately, been

classified as "Single" rather than "Married"). In any event, the increase occurred after Bayoumi left the country in March 2000, after which he never interacted with the hijackers. That undermines any plausible connection between the increase and the hijackers.

## III. BAYOUMI AND THUMAIRY COMMITTED NO TORTIOUS ACT

### A. The District Court Erred in Treating Conduct That Was Not Inherently Violent as an ATA Primary-Liability Tort

The court analyzed whether Bayoumi and Thumairy committed "tortious act[s]," 28 U.S.C. § 1605B(b), by looking to whether they "'knowing[ly] or [with] [deliberate[] indifferen[ce] provi[ded] . . . material support to terrorists.'" SA221 (quoting SA9-10, in turn citing the parties' 2017 and 2018 briefs).[34] That largely tracks the criminal material-support provisions of the Antiterrorism Act ("ATA"), *see* 18 U.S.C. §§ 2339A-2339C, but those provisions create crimes, not torts. Statutory tort claims under the ATA rely on 18 U.S.C. § 2333, usually called the ATA's "primary liability" provision.[35] The court left out an important element of an ATA primary-liability claim.

---

[34] Although the court stated that the "parties agree" on the standard, SA221, Saudi Arabia preserved the argument that Plaintiffs failed to show violent or life-endangering conduct. JA3665-67; *see* JA639 (allowing Saudi Arabia to raise arguments on reply; giving Plaintiffs a sur-reply).

[35] Only primary-liability ATA claims were at issue because the court had already rejected jurisdiction over secondary-liability ATA claims. SA53-62.

Section 2333(a) authorizes a plaintiff "injured . . . by reason of an act of international terrorism . . . [to] sue therefor." The ATA defines "international terrorism" as certain "activities that . . . involve violent acts or acts dangerous to human life." 18 U.S.C. § 2331(1)(A). Accordingly, an ATA primary-liability plaintiff must show the defendant's "*own* commission of an act of international terrorism," including the element of "violence or danger." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018) (emphasis added). Non-violent support for terrorism, such as "providing financial services to a known terrorist organization," does not meet this requirement without more. *Id.*; *see also Weiss v. National Westminster Bank, PLC*, 993 F.3d 144, 159-63 (2d Cir. 2021).

The court erred in assessing whether Bayoumi's and Thumairy's acts were tortious under the ATA without considering whether those acts were violent or dangerous to human life. Like the financial and banking services at issue in *Linde* and *Weiss*, acts of helping strangers find an apartment, sign a lease, and obtain a certified check are not acts of violence.[36] Accordingly, they were not jurisdiction-conferring "tortious act[s]" under § 1605B(b)(2) and § 2333.[37]

[36] Nor did the court find or the record show that the airplane drawing found in Bayoumi's garage was used or usable in the 9/11 attacks. *Infra* pp.77-80.

[37] Plaintiffs also asserted common-law torts such as aiding-and-abetting and conspiracy. The court did not rely on those. To do so, it would have had to find that Bayoumi and Thumairy acted "in pursuance of a common plan or design to

### B. To the Extent the District Court Made Factual Findings on Tortious Conduct, It Clearly Erred

The court's mistakes in analyzing scope of employment also skewed its analysis of tortious conduct. As shown in Part II.B, those included its errors in disregarding testimony as "self-serving"; relying on Bayoumi's "interactions" with and "connections" to the hijackers; and drawing unreasonable inferences from phone calls. The court made other errors as well.

#### 1. The district court failed to weigh important agency findings

The legislative and executive branches investigated the 9/11 attacks thoroughly. Four agencies considered and rejected the theory that Bayoumi knowingly helped the terrorists. Several also rejected theories that Thumairy or other Saudi government employees were part of the 9/11 plot. The court erred in disregarding those findings.

*First*, the 9/11 Commission found "no credible evidence that [Bayoumi] believed in violent extremism or knowingly aided extremist groups." 9/11 Rep. 218. It relied on the work of "investigators who ha[d] dealt directly with him and studied his background" and "f[ou]nd him to be an unlikely candidate for clandestine involvement with Islamist extremists." *Id.* It "found [no] evidence that Thumairy provided assistance to the two operatives." *Id.* at 216-17. And it

---

commit a tortious act" with the hijackers. *E.g.*, *Pittman ex rel. Pittman v. Grayson*, 149 F.3d 111, 122 (2d Cir. 1998) (applying New York law).

"found no evidence that the Saudi government as an institution or senior Saudi officials individually funded" Al Qaeda. *Id.* at 171.

*Second*, the FBI and the CIA told Congress they had "no information to indicate that . . . Omar al-Bayoumi" was an "intelligence officer[ ] of the Saudi Government or provided material support for the [9/11] attacks" and "no evidence that . . . the Saudi Government . . . knowingly provided support for the [9/11] attacks . . . or . . . had foreknowledge of terrorist operations." JA1139.

*Third*, the 9/11 Review Commission reviewed "new information" developed by Operation Encore and found it "not sufficient to change the 9/11 Commission's original findings regarding the presence of witting assistance to al-Hazmi and al-Mihdhar." JA3747-49.

*Fourth*, in closing Operation Encore and ending its investigation of the 9/11 attacks (its largest ever), the FBI stated that, "nearly twenty years after the attack, [it had] not identified additional groups or individuals responsible for the attack other than those currently charged." JA942. It determined that Al Qaeda "compartmentalized the attack groups and roles within the [9/11] operation" and had "not ma[d]e the attack plans known in advance to others for fear the nature of the attack would be discovered." JA940. "This information corroborated that Thumairy, Bayoumi, and Al-Jarrah did not knowingly conspire to assist the AQ hijackers in furtherance of the 9/11 attack." JA940-41.

Those "record[s] or statement[s] of . . . public office[s]" were admissible because they "set[ ] out" the "factual findings from . . . legally authorized investigation[s]." Fed. R. Evid. 803(8)(A)(iii). So were the agencies' "conclusion[s] or opinion[s]" based on their factual evaluations. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988). An opposing party may try to show that a report is not "trustworth[y]," Fed. R. Evid. 803(8)(B), and Plaintiffs did try here. The court said it was not "necessary . . . to rule" on the parties' Rule 803(8) disputes because it would not consider "agenc[y] conclusions . . . unless they are undisputed by both parties." SA189. That was a refusal "to weigh all of the relevant evidence." *Menefee*, 391 F.3d at 164.

For example, the court erroneously dismissed as "self-serving" Bayoumi's testimony that he knew nothing of the hijackers' plans. Even if it could reasonably discount his words, it should have considered that four federal agencies agreed with them. The 9/11 Commission's assessment of him as an "unlikely candidate for clandestine involvement with Islamist extremists," 9/11 Rep. 218, should especially have weighed against Plaintiffs' caricature of him as a "covert member" of a so-called "Wahhabi network," SA214. That assessment rested both on face-to-face interviews when memories were fresh and on intelligence expertise.

Similarly, the court should have considered the FBI's finding that information about the 9/11 "attack plans" was "compartmentalized" even within Al Qaeda, "consistent with the FBI's assessment of the last two decades of large scale [Al-Qaeda]-related attacks." JA940. That weighs against any suggestion that outsiders like Bayoumi and Thumairy had "knowledge of the 9/11 Attacks," SA222, much less shared such knowledge with Saudi Arabia.

**2. Bayoumi did not plan to meet the hijackers**

Two witnesses saw Bayoumi's encounter with Hazmi and Mihdhar at the Mediterranean Café. One was Bayoumi himself, who testified that he had no plans to meet the hijackers and that the meeting was a "coincidence." JA2506-07 (725:14-726:8). The other was Morgan, who told investigators the meeting was a coincidence, JA770-71 (¶ 19), and testified that he personally saw nothing to suggest otherwise, JA1954-55 (28:22-29:6), JA1963 (80:10-14). Bayoumi and Morgan also agreed the café was not the first place Bayoumi tried to go: he went first to another establishment that was closed or not serving lunch, and only then to the café. JA2436-37 (393:12-394:7); JA769-70 (¶ 16). That is inconsistent with a planned meeting.

Further, Bayoumi was the original source for information about the Mediterranean Café encounter. *See* 9/11 Rep. 218 ("We know about it because Bayoumi told law enforcement that it happened."). If it was a planned, secret

meeting, he would not have volunteered it to investigators. To be sure, Morgan also saw the meeting happen and told investigators about it after Bayoumi disclosed it. But Morgan was there only because Bayoumi invited him. JA766-67 (¶¶ 5, 8). So, again, if Bayoumi had wanted to meet the hijackers secretly, he would have had no reason to bring Morgan.

The allegation of a planned meeting also does not fit Plaintiffs' other allegations. Thumairy's first meeting with the hijackers occurred before they met Bayoumi. SA193. So did their meeting with Johar. SA193, SA198. Johar testified that he later drove them to a bus stop in Santa Monica. SA198. From there they went to San Diego, where they met Bayoumi again. If (as Plaintiffs allege) Thumairy and Bayoumi were plotting to assist the hijackers and talking by phone, they had no reason to stage a Los Angeles meeting. Thumairy could simply have sent the hijackers to San Diego and called Bayoumi to say they were coming.

Plaintiffs have suggested Bayoumi engaged in an elaborate ruse, pretending to go to the wrong place on purpose and inviting Morgan as "cover." *E.g.*, SA166. It is at least equally plausible that the meeting looks like a coincidence because it was one. *Cf. Rizzo*, 349 F.3d at 102 ("In light of the record viewed in its entirety, the inferences that the district court was asked to draw were not more likely than other plausible scenarios."). The court's inference that the meeting was "not just [a] chance meeting[]," SA221, was unreasonable.

### 3. Bayoumi had innocent motives to help the hijackers find an apartment

Bayoumi had two innocent motives for helping the hijackers find an apartment. *First*, as the court acknowledged, SA202, he testified that it was common in the Islamic community to help "newcomers." JA2486 (590:2-7), JA2519-20 (738:24-739:24). When he came to San Diego, Bayoumi himself received "help . . . find[ing] an apartment" by going to "[t]he community, the congregation that was present at the mosque." JA2356-58 (60:15-62:17). He did not previously know the person who helped him. JA2519 (738:18-19) ("I didn't know him, he didn't know me."). Mosque members would also co-sign a lease for a fellow Muslim who "came new to America" and "need[ed] help." JA2519-20 (738:24-739:24). [redacted].

*Second*, Bayoumi testified that he had a financial interest in helping Hazmi and Mihdhar find an apartment. For "refer[ring] somebody to the apartment complex," he received a fee of "$100" or "$200." JA2515 (734:1-6). He regarded this as "a chance, or an opportunity, if there was an available apartment," and recalled that he did in fact "collect a referral fee" for referring Hazmi and Mihdhar. JA2515 (734:7-17). The apartment manager testified that Bayoumi "regularly inquired . . . about apartments that might be available," beginning "[s]oon after"

he rented his own apartment in "June 1999." JA780 (¶¶ 4-5). That was eight months before Hazmi and Mihdhar arrived – too long for the inquiries plausibly to be related.

The court discounted Bayoumi's explanation because he had not "help[ed] any other strangers to the degree he helped the hijackers." SA221. That assessment relied on the incorrect premise that Bayoumi gave the hijackers "cash." SA221; *contra supra* pp.12-13 & n.7. The court also failed to address Bayoumi's [redacted] testimony that [redacted] received similar help from other Muslims on arriving in this country; and Bayoumi's testimony that he wanted a referral fee, which helps explain his willingness to go out of his way.

Even where a court decides "not to credit" testimony, it "may only draw permissible inferences" with "some evidentiary basis in the record." *Krizek v. Cigna Grp. Ins.*, 345 F.3d 91, 100 (2d Cir. 2003). Here, the court declined to "assess[] witnesses' credibility" before "trial." SA226. There is accordingly even more reason to reject the "impermissible inference[]," *Krizek*, 345 F.3d at 101, that Bayoumi must have known he was helping terrorists because he was too generous with his time to fellow Saudi expatriates in a strange country.

#### 4. The "airplane drawing" had no plausible connection to the 9/11 attacks

The airplane drawing on a notepad found in Bayoumi's garage, SA209, did not suggest that he knew of the 9/11 plot. The drawing is undated and does

not show how long before or after the attacks it was made. It shows a crude picture of an airplane, an equation, and some calculations. JA874. The equation is the well-known Pythagorean theorem, taught in high-school geometry.[38] One common assignment is to use the theorem to calculate the longest line of sight to the Earth's surface from a point high above that surface. JA887-902. Bayoumi had a high-school-aged son in 2000. JA2892 (1986 birthdate). Other pages in the notebook include [redacted]. JA3558 (translation); JA3561.

The parties submitted testimony from aviation experts about the drawing. Both agreed the calculations do not match the 9/11 flight paths. JA3743 (¶ 1905); *see* JA1737 (75:6-10); JA882-86. Plaintiffs' expert (Schiff) opined that using equations to calculate sight-lines for "flight planning" was an "advanced technique in aviation" that he would not "expect others" to know. JA1722-23 (36:10-37:9). Nothing suggests that Bayoumi had any aviation training, much less advanced training. Hazmi and Mihdhar themselves never learned to fly. 9/11 Rep. 222-23. Schiff also conceded that, if he saw the drawing "in and by itself," he "would

[38] *See*, *e.g.*, N.Y. State Educ. Dep't, *New York State Next Generation Mathematics Learning Standards* 103 (updated June 2019) (eighth graders should be able to "[a]pply the Pythagorean Theorem to determine unknown side lengths in right triangles in real-world and mathematical problems in two and three dimensions"), https://www.nysed.gov/sites/default/files/programs/standards-instruction/nys-next-generation-mathematics-p-12-standards.pdf.

have no reason to believe it had anything to do with anything." JA1726-27 (50:11-51:21).

Saudi Arabia's expert (Moss) opined that the equation is not commonly used in aviation and does not predict how far a pilot can truly see because it does not account for atmospheric refraction, absorption, and distortion. JA878-79, JA881, JA884. He pointed to examples where the same equation appeared in high-school textbooks with similar problems. JA877 & nn.12-15, JA887-902. The same day it denied Saudi Arabia's motion to dismiss, the court ruled Moss's testimony reliable and helpful, including his "alternative scenarios for the equations." SA179 (adopting SA154-155).

The court erred in stating that the drawing "facially connect[ed]" Bayoumi "with knowledge of the 9/11 Attacks," while also describing the "meaning" of the drawing as a "dispute[d]" issue it would leave for trial. SA222, SA226. On its face, the drawing consisted of an airplane, an equation, and some calculations. Connecting that to the 9/11 attacks required an inference that the calculations plausibly reflected planning for the hijacked flights; there was no evidence to support that. Further, after ruling Moss's opinion admissible, the court erred in refusing to weigh either his testimony or Schiff's concessions. SA189 (declining to "rely on the[ ] experts' opinions").

The court also put unreasonable emphasis on Bayoumi's own inability to "come up with any reasonable explanation" for the drawing. SA222. Bayoumi candidly acknowledged the handwriting as his but testified that he did not remember the document. JA2398-400 (290:7-292:9). He went on to speculate about what it might have been: an attempt to "measure distance" or a problem he might have "studied in . . . high school." JA2398 (290:23-24), JA2400 (292:8). His failure to recall the document after 20 years was not suspicious. *Cf. Ross v. American Express Co.*, 35 F. Supp. 3d 407, 452 (S.D.N.Y. 2014) (rejecting attempt to "transmogrify an honest lack of recollection," after "ten to fifteen years," "into a conspiracy"), *aff'd sub nom. Ross v. Citigroup, Inc.*, 630 F. App'x 79 (2d Cir. 2015). Given that lack of recall, his conjectures were meaningless.

The court's reliance on the drawing also brings into sharp focus its refusal to consider the FBI's finding that Al Qaeda "compartmentalized" information about the 9/11 attacks. *Supra* pp.72, 74 (discussing JA940). The 9/11 Report explains that KSM told U.S. interrogators that most of the hijackers did not learn that Al Qaeda "plan[ned] to hijack planes and fly them into buildings" before they "reach[ed] the United States" in early 2001, and only learned "specific targets" in August 2001. 9/11 Rep. 236-37, 527 n.109. That timing further undercuts any inference that Bayoumi, a non-Al-Qaeda-member who met failed pilots Hazmi and Mihdhar in early 2000, helped them with advanced flight planning.

### 5. There was no evidence that Thumairy did anything, knowingly or otherwise, to help the hijackers

There is evidence that Thumairy met the hijackers in January 2000, and conflicting evidence whether he met them in June. *Supra* pp.8-9, 16 & n.9. Regardless, there is no evidence (and the court made not even a preliminary finding) that Thumairy took any action to help the hijackers.[39] After acknowledging that "there is less evidence concerning Thumairy," the court stated that "the credible evidence supports the conclusion that Thumairy was working together with Bayoumi to assist the hijackers." SA222. Elsewhere, it uses similarly general language: "coordinating . . . to some degree," SA216, or "participat[ing] in support[ ]," SA223. But a district court denying foreign sovereign immunity must "outline explicitly its findings of fact." *Nam*, 118 F.4th at 249.

The court also erred in stating that "FBI agents possessed a photo of Thumairy and the hijackers taken in front of the King Fahad Mosque." SA222. No such photo is in the record, despite tens of thousands of pages of discovery

---

[39] A footnote in the court's decision refers to an allegation that "Thumairy sent Johar to LAX on January 15, 2000 to meet the two hijackers and bring them to the mosque to see Thumairy" as an issue that the "[p]arties dispute." SA193 n.9. It misattributes the allegation to an "OIG Report." The court's citation is instead to a heavily redacted internal FBI memorandum summarizing statements from an unnamed "CHS" (confidential human source). JA981; *see also* JA3709-11 (¶ 1401) (double-hearsay objection). Thumairy and Johar denied that Thumairy directed Johar to assist the hijackers; Johar testified that he first met them on the sidewalk. *Supra* pp.7-9.

from the FBI. The only testimony about it was hearsay from a witness who never saw the alleged photo.[40] The court acknowledged it was required to "rule on evidentiary objections . . . material to its decision." SA189. Yet, without any such ruling (and with no colorable basis to admit the hearsay), it relied on the photo allegation to impugn not just Thumairy, but also his "employer, KSA." SA222.

## IV. NO ACT BY BAYOUMI OR THUMAIRY "CAUSED" PLAINTIFFS' DAMAGES

### A. Section 1605B(b) Requires a Showing That, But For the "Tortious Act," Plaintiffs Would Not Have Been Damaged

#### 1. The phrase "caused by" requires at least but-for causation

Section 1605B(b) authorizes jurisdiction over claims for "damages . . . caused by" a foreign state's "tortious act or acts." The verb "cause" means "to serve as cause or occasion of; bring into existence." *Webster's Third New International Dictionary* 356 (1993); *see* II *The Oxford English Dictionary* 1001 (2d ed. 1989) ("*OED*") ("[t]o be the cause of; to effect, bring about, produce, induce, make"). It is tied to the noun "cause," which means, as relevant, "a person, thing, fact, or condition that brings about an effect or that produces or calls forth a resultant action or state." *Webster's Third* 356; *see OED* 1000 ("[t]hat which

[40] *See* SA195 (citing JA1995-99 (68:20-72:5)). That witness, mosque president Khalil Al Khalil, testified that he heard of the alleged photo from the mosque's then-director Tajuddin Shuaib, "d[id]n't know" whether "it indicate[d] that Thumairy . . . knew the two hijackers," "didn't see [it] [him]self," and "d[id]n't know about [its] authenticity." JA1997-98 (70:11-14, 71:5-7), JA2001 (74:5-7). Shuaib did not testify. *See* JA3685-86 (¶ 517) (hearsay objection).

produces an effect; that which gives rise to any action, phenomenon, or condition"). That is, damages are "caused by" a tortious act if the act brings the damages into existence, brings them about, produces them, or calls them forth. If the damages would have come about regardless of the act, then, in "common talk," *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63 (2007), it did not "cause" them.

That ordinary interpretation of "caused by" corresponds to the "'simple' and 'traditional' standard of but-for causation." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020) (quoting *University of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013); citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)). The Supreme Court has found but-for causation required by similar phrases: "because of" in *Bostock*, *Nassar*, and *Gross*; "results from" in *Burrage v. United States*, 571 U.S. 204, 210-16 (2014); "based on" in *Safeco*, 551 U.S. at 63; and "by reason of" in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 267-68 (1992). "[C]aused by" demands no less.

Some causal statutory language calls for more than just but-for causation. "[B]y reason of" can require "a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes*, 503 U.S. at 268 (citing *Associated Gen. Contractors of California, Inc. v. Carpenters*, 459 U.S. 519, 534 (1983)); *see Rothstein v. UBS AG*, 708 F.3d 82, 95

(2d Cir. 2013) (extending *Holmes* to primary-liability ATA claims).[41] Similarly, "based on" can "cover only 'core' causes amounting to an action's '*sine qua non*' or 'gravamen.'" *EPA v. Calumet Shreveport Ref., L.L.C.*, 145 S. Ct. 1735, 1750-51 (2025). But courts do not easily read causal statutory language to require less than the "ancient and simple 'but for' common law causation test." *Comcast Corp. v. National Ass'n of African Am.-Owned Media*, 589 U.S. 327, 332 (2020) (citing *Nassar*'s description of but-for causation as a "'default' or 'background' rule").

When Congress authorizes recovery under a "lessened causation standard" that does not include but-for causation, it enacts "deliberate and specific legislation." *Naumovski v. Norris*, 934 F.3d 200, 213 (2d Cir. 2019) (rejecting a lessened standard for 42 U.S.C. § 1983 claims). Examples include whistleblower-protection statutes' use of "'contributing factor'" to "reflect[] a judgment" that personnel actions should not be "even a little bit" based on "whistleblowing," *Murray v. UBS Sec., LLC*, 601 U.S. 23, 36-37 (2024) (quoting 49 U.S.C. § 42121(b)(2)(B)(i)); and Title VII's use of "'motivating factor'" to allow recovery where discriminatory motive was not the but-for cause of an adverse employment action, *Gross*, 557 U.S. at 174 (quoting 42 U.S.C. § 2000e-2(m)). Section 1605B(b) has no such lessening language.

---

[41] *See also In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 122-25 (2d Cir. 2013) (applying *Rothstein* to affirm dismissal of claims against other defendants in this MDL).

Statutory context confirms that "caused by" in § 1605B(b) requires at least but-for causation. Because § 1605B(b) describes the relationship between a "tortious act" and "damages," it is natural to read it to refer to the standard of causation generally applied in tort law. It is "a bedrock principle of tort law that for there to be a recovery for an injury, it must be established that defendant's act was a cause-in-fact of [that] injury." *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 179 (2d Cir. 2013); *see also Nassar*, 570 U.S. at 347 ("It is . . . textbook tort law that an action 'is not regarded as a cause of an event if the particular event would have occurred without it.'") (quoting *Prosser and Keeton on Law of Torts* 265 (5th ed. 1984)); *Naumovski*, 934 F.3d at 213 (similar).

Requiring but-for causation also "interpret[s] the FSIA" to reduce "'friction in our relations with other nations.'" *Philipp*, 592 U.S. at 184 (quoting *Helmerich*, 581 U.S. at 183) (cleaned up). "[W]aivers of foreign sovereign immunity involve complex and delicate foreign-policy judgments," making "[f]aithful adherence to the [FSIA's] text . . . critical." *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1062 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2847 (2025); *cf. Robinson*, 269 F.3d at 146 (noting FSIA's "goal" of "early dismissal" where "the substance of [a] claim does not support jurisdiction").

### 2. The district court erred in construing "caused by" not to require but-for causation

The court incorrectly concluded that "JASTA's 'caused by' requirement was not meant to incorporate principles of 'but for' causation." SA13. Instead, it applied what it called "the traditional test for proximate causation," which it stated requires " 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.' " SA14 (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020)); *accord* SA213. It stated that, to meet this requirement, "the defendant's conduct 'must be a "substantial factor" in the sequence of events that led to the plaintiff's injury' " and that "the plaintiff's injury 'must have been reasonably foreseeable or anticipated as a natural consequence of' the defendant's actions." SA14 (citations omitted).[42]

In construing § 1605B(b) not to require but-for causation, the court made four main errors. *First*, it disregarded the ordinary meaning of "caused by." "Statutory construction must begin with the language employed by Congress

[42] The Eleventh Circuit, in the *Watson* case discussed in Part II.A.1, recently agreed with the district court that § 1605B(b) does not require but-for causation. *See* 159 F.4th at 1258-60. Its reasoning on this point tracks the district court's and is equally erroneous. This Court should decline to follow it.

and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross*, 557 U.S. at 175.

*Second*, the court misplaced reliance on *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995), *cited in* SA13. *Grubart* considered whether federal admiralty jurisdiction covered tort claims alleging that the use of a barge-mounted crane negligently weakened a tunnel structure and caused a flood. By statute, jurisdiction requires "damages or injury . . . *caused by* a vessel on navigable water." *Id*. at 532 (quoting former 46 U.S.C. app. § 740 (1994)) (emphasis added). In holding that the district court had jurisdiction, *Grubart* reasoned that "the phrase 'caused by' . . . requir[es] what tort law has traditionally called 'proximate causation.'" *Id.* at 536.

*Grubart* did not hold and does not imply that "caused by" excludes but-for causation. The plaintiff had alleged that the flood "resulted from" (that is, would not have occurred but for) the negligent use of the crane. *Id.* at 529. *Grubart* is thus fully consistent with reading "caused by" to require proximate causation in addition to (not instead of) but-for causation. That is how *Holmes* and *Rothstein* interpreted "by reason of," *supra* pp.83-84, and is the general common-law approach, *see Aegis*, 737 F.3d at 178.

*Third*, the court erred in following unpersuasive cases construing the phrase "caused by" in § 1605A(a)(1), the FSIA exception that applies to designated state

sponsors of terrorism, and its predecessor § 1605(a)(7). SA13, SA14 n.9 (citing, among others, *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004), and *Rux v. Republic of Sudan*, 461 F.3d 461 (4th Cir. 2006)). *Kilburn*, whose reasoning is typical, observes that in § 1605(a)(7) "the words 'but for' simply d[id] not appear; only 'caused by' d[id]." 376 F.3d at 1128. Yet *Bostock*, *Burrage*, *Nassar*, *Gross*, *Safeco*, and *Holmes* each found a but-for causation requirement in a statute that used ordinary causal language without the words "but for." *Kilburn* also asserts that *Grubart* "interpreted 'caused by' . . . to require *only* a showing of 'proximate cause.'" *Id.* (emphasis added). As shown above, the word "only" misreads *Grubart*.

*Kilburn* also incorrectly asserted that § 1605(a)(7) created a lessened "*jurisdictional* causation" standard because it was "solely a jurisdictional provision" and did not require "proof satisfying a substantive cause of action." 376 F.3d at 1129; *see also* SA13-14 n.8. The assumption that a jurisdictional requirement must not overlap with a merits requirement is the same approach the Supreme Court rejected in *Helmerich*. *Supra* pp.40-41. This Court should instead apply the jurisdictional requirements as Congress wrote them and accept "overlap" between "jurisdiction and merits inquiries," *Robinson*, 269 F.3d at 142, as part of the statutory scheme. *See id.* at 145 (observing the lack of "allegations [or] . . .

evidence suggest[ing]" that "the Malaysian government breached a specific non-delegable duty to Robinson thereby causing his injury").

Also, *Kilburn* and its progeny are not the only authority on the phrase "caused by" in the FSIA. The Sixth Circuit has read the "caused by" requirement in the non-commercial-tort exception, 28 U.S.C. § 1605(a)(5), to require "legal or proximate cause" in addition to (not instead of) but-for causation. *O'Bryan v. Holy See*, 556 F.3d 361, 382 (6th Cir. 2009) ("'[I]t is not enough that the harm would not have occurred had the actor not been negligent. The negligence must also be a substantial factor in bringing about the plaintiff's harm.'") (quoting *Deutsch v. Shein*, 597 S.W.2d 141, 143-44 (Ky. 1980), in turn quoting Restatement (Second) of Torts § 431 cmt. a (1965)) (cleaned up).

*Fourth*, the court erred in invoking JASTA's "stated purpose of providing plaintiffs with 'the broadest possible basis . . . to seek relief against . . . foreign countries . . . that have provided material support, *directly or indirectly*, to'" terrorists. SA13 (quoting JASTA § 2(b)) (ellipses in court order). "'[N]o statute yet known pursues its stated purpose at all costs,'" and "the 'textual limitations upon a law's scope' must be understood as 'no less a part of its purpose than its substantive authorizations.'" *Stanley v. City of Sanford*, 606 U.S. 46, 58 (2025) (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017), and *Kucana v. Holder*, 558 U.S. 233, 252 (2010)). Section 1605B(b)'s requirement

that a plaintiff's damages must be "caused by" the relevant "tortious act or acts" is a textual limit to be given its ordinary meaning.[43]

### B. Bayoumi's and Thumairy's Acts Did Not Cause the 9/11 Attacks Under Any Standard

#### 1. Nothing Bayoumi or Thumairy did was a but-for cause of the 9/11 attacks

Because it erred in construing § 1605B(b), the court never considered whether Plaintiffs had alleged (much less come forward with evidence to show) but-for causation. There is no need to remand for that inquiry because Hazmi and Mihdhar's mission in San Diego failed. They "turned out . . . to have no aptitude for English," and their "efforts to learn proved futile." 9/11 Rep. 221. "This lack of language skills in turn became an insurmountable barrier to learning how to fly." *Id.* Ultimately, Hazmi and Mihdhar became "muscle" hijackers, responsible for "storm[ing] the cockpits and control[ling] the passengers." *Id.* at 231; *see id.* at 239 (showing Hazmi and Mihdhar as hijackers on Flight 77, with Hani Hanjour as the pilot). There is no reason to think the time Hazmi and Mihdhar spent in California made them better muscle hijackers. There is even less reason to think

[43] The court also erred in giving weight to a floor statement by a Senator endorsing *Kilburn*, *Rux*, and *Owens*. SA13-14 (citing 162 Cong. Rec. S2845 (daily ed. May 17, 2016)). "[F]loor statements by individual legislators rank among the least illuminating forms of legislative history," *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017), and cannot change the meaning of enacted text.

the 9/11 attacks would not have succeeded without their minimal interactions with Bayoumi and Thumairy.

The court incorrectly accepted Plaintiffs' causation allegations as true, putting the burden on Saudi Arabia to produce "contrary evidence." SA213. As shown in Part I.A, Plaintiffs bore the burden to come forward with evidence to support their claims. In any event, the allegations the court cited were limited to "meetings" and "assistance" in "Los Angeles" and "San Diego." SA213. Under the correct standard, that fell short as a matter of law.

### 2. Nothing Bayoumi or Thumairy did was a substantial factor in causing the 9/11 attacks

Even on the court's misreading of § 1605B(b), it still could not conclude that Bayoumi or Thumairy was "a 'substantial factor' in the sequence of events that led to" Plaintiffs' damages. SA14. The substantial-factor test began as a negligence-causation standard in § 432 of the Restatement (Second) of Torts.[44] The Restatement version is largely the same as but-for causation, § 432(1), with an exception where "each" of multiple causes "itself is sufficient to bring about harm," § 432(2); *see Basko v. Sterling Drug, Inc.*, 416 F.2d 417, 429-30 (2d Cir. 1969) (applying the substantial-factor test where the " 'but for' test" alone "will

---

[44] *See generally* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26 cmt. j (2010) (discussing " 'substantial-factor' test"; observing it "has proved confusing and been misused"); *June v. Union Carbide Corp.*, 577 F.3d 1234, 1244 (10th Cir. 2009) (more history).

not work" because "two independent forces concur to produce a result which either of them alone would have produced").[45]

For that rule to apply, "each of the potential causes must be independently sufficient to have caused the plaintiff's injury." *RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 209 (S.D.N.Y. 2009); *accord Point Prods. A.G. v. Sony Music Ent't, Inc.*, 215 F. Supp. 2d 336, 342 (S.D.N.Y. 2002). In this case, that would have required Bayoumi's and Thumairy's alleged support for the hijackers to be "independently sufficient" to have caused the 9/11 attacks – independent, that is, from Al Qaeda's other sources of support. Nothing in the record could support such a finding, and the court did not suggest otherwise.

Restatement (Second) of Torts § 433 sets out more "considerations . . . important in determining whether the actor's conduct is a substantial factor in bringing about harm to another." Those considerations include how many "other factors . . . contribute in producing the harm," § 433(a); whether the tort creates "forces . . . in continuous and active operation up to the time of harm," § 433(b); and "lapse in time," § 433(c); *see Mack v. Altmans Stage Lighting Co.*, 470 N.Y.S.2d 664, 667 (App. Div. 1984) (applying § 433 standard under New York law). If that is the standard the court meant to apply, it should have considered

[45] The classic illustration, discussed in comment d to § 432, is two fires, each the result of separate negligence, that combine to burn a house.

how many sources of support Al Qaeda had (and there were many, *see* JA747-50 (Terrorist Financing Monograph); the 19-month lapse between February 2000 and September 2001; and interruptions in the hijackers' plans, such as the hijackers abandoning flight training and Mihdhar returning to Yemen.

Instead, the court failed to explain its application of the "substantial factor" element of its test. In 2018, it mentioned the "substantial factor" requirement in construing the statute, SA14, but omitted it when analyzing Plaintiffs' allegations, SA22. In 2025, after reciting Plaintiffs' allegations, it stated they were "sufficient, as they were in 2018, to satisfy the substantial factor . . . element[] of the proximate causation test." SA213. That conclusory assertion does not meet any causation requirement at all.

## CONCLUSION

This Court should reverse and remand for dismissal or vacate and remand for factual findings under correct legal standards.

Respectfully submitted,

/s/ *Michael K. Kellogg*
Michael K. Kellogg
Gregory G. Rapawy
Andrew C. Shen
Kellogg, Hansen, Todd, Figel
& Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 326-7900
Fax: (202) 326-7999
mkellogg@kellogghansen.com
grapawy@kellogghansen.com
ashen@kellogghansen.com
*Counsel for Defendant-Appellant / Cross-Appellee Kingdom of Saudi Arabia*

July 21, 2026

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limitation of Second Circuit Rule 32.1(a)(4)(A) and this Court's order dated October 24, 2025 because, excluding the items exempted by Federal Rule of Appellate Procedure 32(f), it contains 20,991 words as counted by Microsoft Office Word 365.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

Dated: July 21, 2026

/s/ *Michael K. Kellogg*
Michael K. Kellogg
*Counsel for Defendant-Appellant / Cross-Appellee Kingdom of Saudi Arabia*

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 21, 2026, a copy of the foregoing Opening Brief for Defendant-Appellant Kingdom of Saudi Arabia (Redacted for Public Filing) was served on counsel for Plaintiffs via the ECF/CM electronic system.

/s/ *Michael K. Kellogg*
Michael K. Kellogg
*Counsel for Defendant-Appellant / Cross-Appellee Kingdom of Saudi Arabia*