# 25-2202-cv(L),

25-2320-cv(XAP), 25-2323-cv(XAP), 25-2324-cv(XAP), 25-2334-cv(XAP), 25-2340-cv(XAP), 25-2341-cv(XAP), 25-2355-cv(XAP), 25-2390-cv(XAP), 25-2391-cv(XAP), 25-2392-cv(XAP), 25-2442-cv(XAP), 25-2443-cv(XAP), 25-2448-cv(XAP), 25-2450-cv(XAP), 25-2457-cv(XAP)

## United States Court of Appeals

*for the*

## Second Circuit

IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001

ON APPEAL AND CROSS-APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
NO. 1:03-MD-1570 (S.D.N.Y) (GBD) (SN), HON. GEORGE B. DANIELS

**FINAL FORM BRIEF FOR PLAINTIFFS-APPELLEES AND CROSS-APPEAL APPELLANTS (REDACTED FOR PUBLIC FILING)**

ROBERT T. HAEFELE
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
(843) 216-9000

STEVEN R. POUNIAN
JAMES GAVIN SIMPSON
ANDREW J. MALONEY, III
MEGAN W. BENETT
KREINDLER & KREINDLER LLP
485 Lexington Avenue, 28th Floor
New York, New York 10017
(212) 687-8181

SEAN P. CARTER
J. SCOTT TARBUTTON
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
(215) 665-2000

CARTER G. PHILLIPS
CHRISTOPHER A. EISWERTH
MADELEINE JOSEPH
JACOB STEINBERG-OTTER
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

*Attorneys for Plaintiffs-Appellees and Cross-Appeal Appellants*

*(For Continuation of Appearances See Inside Cover)*

COUNSEL PRESS (800) 4-APPEAL • (390992)

MICHAEL J. QUIRK
MOTLEY RICE LLC
1717 Arch Street, Suite 3610
Philadelphia, Pennsylvania 19103
(610) 579-9932

JERRY S. GOLDMAN
BRUCE STRONG
ETHAN GREENBERG
ANDERSON KILL P.C.
7 Times Square, 15th Floor
New York, New York 10036
(212) 278-1000

DAVID A. PAUL
CANTOR FITZGERALD
110 East 59th Street, 7th Floor
New York, New York 10022
(212) 610-2298

EDWARD M. PINTER
FORD MARRIN ESPOSITO WITMEYER & GLESER, LLP
Wall Street Plaza
88 Pine Street, 16th Floor
New York, New York 10005
(212) 269-4900

JESSICA M. SKARIN
SCOTT KATZ
BUTLER WEIHMULLER KATZ CRAIG LLP
400 North Ashley Drive, Suite 2300
Tampa, Florida 33602
(813) 281-1900

THOMAS G. ROHBACK
AXINN, VELTROP & HARKRIDER LLP
45 Rockefeller Plaza
630 5th Avenue
New York, New York 10111
(212) 728-2200

JOSEPH N. FROEHLICH
TROUTMAN PEPPER LOCKE LLP
875 Third Avenue
New York, New York 10022
(919) 578-6337

NOEL JASON NUDELMAN
HEIDEMAN NUDELMAN & KALIK, PC
5335 Wisconsin Ave, NW, Suite 440
Washington, DC 20015
(202) 463-1818

RICHARD KLINGLER
ELLIS GEORGE LLP
3222 Woodland Drive, N.W.
Washington, DC 20008
(202) 492-4678

ROBERT C. SHEPS
SHEPS LAW GROUP, P.C.
25 High Street
Huntington, New York 11743
(631) 249-5600

STEVEN J. BADGER
ZELLE LLP
901 Main Street, Suite 4000
Dallas, Texas 75202
(214) 749-4207

THORN ROSENTHAL
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
(212) 701-3000

TIMOTHY BRIAN FLEMING
WIGGINS CHILDS PANTAZIS FISHER GOLDFARB PLLC
1211 Connecticut Avenue, N.W., Suite 420
Washington, DC 20036
(202) 467-4489

MADELINE MUNIZ
CANNATA, HENDELE & CANNATA, LLP
60 East 42nd Street, Suite 1460
New York, New York 10165
(212) 553-9205

MELANIE MUHLSTOCK
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, New York 11050
(516) 723-4629

DOUGLAS ALAN LATTO
JEANNE M. O'GRADY
SPEISER KRAUSE P.C.
800 Westchester Avenue, Suite S-608
Rye Brook, New York 10573
(914) 220-5333

DOROTHEA M. CAPONE
BAUMEISTER & SAMUELS, P.C.
200 Vesey Street, 24th Floor
New York, New York 10281
(212) 363-1200

*Attorneys for Plaintiffs-Appellees and Cross-Appeal Appellants*

# TABLE OF CONTENTS

Page

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 4

ISSUE PRESENTED ........ 4

STATEMENT OF THE CASE ........ 5

I. STATEMENT OF THE FACTS ........ 5

A. KSA's Propagation Of Wahhabi Extremism Through Its Ministry Of Islamic Affairs ("MOIA"). ........ 5

B. KSA Rejected U.S. Warnings And Entreaties, Continuing MOIA's Support For Al-Qaeda ........ 7

C. KSA Fomented A Network Of Sunni Extremists In Southern California ........ 8

1. KSA's Los Angeles Operations / Fahad Al-Thumairy ........ 8

a. A Longstanding Hub for Sunni Extremism ........ 8

b. Thumairy's Role as MOIA Mushrif ("Supervisor") ........ 10

c. Thumairy's Installation as Mosque Imam and Leadership of Extremist Cell in Los Angeles ........ 11

2. KSA's San Diego Operations / Omar Al-Bayoumi ........ 12

a. Bayoumi's Role Within MOIA's U.S.-Based Religious Apparatus ........ 12

b. Bayoumi's Recruitment of Sunni Extremists into MOIA's Network ........ 14

c. Establishment of Al-Madinah Mosque with MOIA, the Embassy, and Al-Haramain ........ 15

d. KSA's Funding, Sham Employment, and Student Visa Fraud ........ 16

e. FBI Confirmation of Bayoumi's Saudi Embassy Reporting Role ....17

D. MOIA Prepared Southern California To Receive And Support Al-Qaeda Operatives ....17

1. December 1998-January 1999: MOIA Officials Visit Thumairy and Bayoumi ....18

2. February 1999: Bayoumi's Report to Al-Haramain ....19

3. April–May 1999: Hijacker Visas and Continued MOIA Coordination ....20

4. June-July 1999: Bayoumi's "Washington Trip" to Work With the Embassy ....21

5. December 1999–January 2000: "Set-Up" Calls and Final Coordination Before the Hijackers' Arrival ....22

E. With KSA's Support Network In Place, Al-Qaeda Launches Its 9/11 Operation In Southern California ....24

1. January 2000: Hijackers' Arrival, Reception and Support by MOIA's Network in Los Angeles, with Thumairy as Their Contact ....25

2. Bayoumi's Meeting with the Hijackers ....26

3. The Hijackers' Transfer to San Diego ....28

4. Phone Calls Show Coordination Among MOIA's Network Supporting the Hijackers ....30

5. Bayoumi Executes KSA's Plan to Lodge the Hijackers with Shaikh ....31

6. Bayoumi Hosts Welcome Party to Forge Connections for the Hijackers ....32

7. February–April 2000: Support to the Hijackers Through Bayoumi's Introductions, with KSA Support and Cover ....34

8. May–June 2000: Hijackers Relocate to MOIA-Arranged Safehouse and Visit Thumairy ....37

9. Bayoumi's Airplane Sketch and Flight-Planning Calculations Related to Al-Qaeda's Plot .................................39

10. Bayoumi's Exit Planning and Late-2000 MOIA Coordination .....................................................................40

11. Bayoumi's March 2001 Call to Sudairy and Notes Using Hazmi's Al-Qaeda Codename ...............................................41

12. Final Connections .........................................................41

F. September 11th And Its Aftermath ....................................42

1. The Attacks...................................................................42

2. Bayoumi's Arrest and Thumairy's Continued MOIA Work......................................................................................43

3. May 2003: A Turning Point ...............................................44

4. KSA Officials' Denials and Claimed Lack of Recollection............................................................................44

5. Post-9/11 Investigations ....................................................46

II. PROCEDURAL HISTORY....................................................................49

A. March 2018 Ruling..............................................................50

B. Jurisdictional Discovery On Agency .......................................51

C. February 2023 Ruling..........................................................51

D. KSA's Renewed Motion To Dismiss.........................................52

E. August 2025 Jurisdictional Ruling...........................................53

SUMMARY OF ARGUMENT.............................................................53

STANDARD OF REVIEW..................................................................55

ARGUMENT ......................................................................................55

I. THE DISTRICT COURT CORRECTLY RESOLVED ALL MATERIAL FACTUAL DISPUTES NECESSARY TO FIND SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS ......................................55

A. The District Court Faithfully Applied The FSIA's Burden-Shifting Framework. ....57

B. The Court Considered The Entire Record And Made The Necessary Jurisdictional Findings ....61

II. THE DISTRICT COURT CORRECTLY FOUND THAT KSA'S EMPLOYEES AND AGENTS ACTED WITHIN THE SCOPE OF THEIR EMPLOYMENT AND AGENCY AND THERE IS NO BASIS TO DISTURB THOSE DETERMINATIONS ....65

A. Fact-Bound Findings As To Scope Of Employment Are Not Subject To Collateral Order Review ....65

B. The District Court's Scope-Of-Employment Findings Are Amply Supported By The Record And There Is No Clear Error. ....67

C. The District Court Properly Applied New York Law On Scope Of Employment ....75

1. The Riviello Factors Support the District Court's Conclusion. ....77

2. KSA Had "Control" Over its Employees. ....80

III. THE DISTRICT COURT CORRECTLY FOUND THAT KSA AND ITS AGENTS COMMITTED TORTIOUS ACTS AND THERE IS NO BASIS TO DISTURB THOSE DETERMINATIONS ....81

A. The Statutory Meaning Of "Tortious Act" Does Not Require Violent Conduct By The Foreign State ....81

B. Fact-Bound Findings Are Not Subject To Appellate Review And Proof Of The Ultimate Tort Is Not A Jurisdictional Requirement ....84

C. The District Court's Tortious Act Findings Are Amply Supported By The Record And There Is No Clear Error. ....86

IV. THE DISTRICT COURT CORRECTLY FOUND THAT PLAINTIFFS' INJURIES WERE "CAUSED BY" KSA'S CONDUCT AND THERE IS NO BASIS TO DISTURB THOSE DETERMINATIONS ....93

A. Section 1605B(b) Requires Some Reasonable Connection Between The Defendant's Actions And Plaintiffs' Injuries Which Is Satisfied By A Showing Of Proximate Cause. ....93

B. Any Causal Test is Satisfied Here ....98

PLAINTIFFS-APPELLEES/APPELLANTS' CROSS-APPEAL ....102

CROSS-APPEAL JURISDICTIONAL STATEMENT ....102

ISSUE PRESENTED IN CROSS-APPEAL ....102

ARGUMENT ....102

I. THIS COURT HAS JURISDICTION OVER THE CROSS-APPEAL ....102

A. The Alternative JASTA Predicates Are Inextricably Intertwined With KSA's Appeal ....103

B. Review Of The Alternative JASTA Predicates Is Necessary For Meaningful Review Of KSA's Issues ....104

II. THE DISTRICT COURT HAD JURISDICTION BASED ON THE MATERIAL SUPPORT PROVIDED BY KSA-CONTROLLED CHARITIES ....105

A. KSA's Tortious Acts In Support of Al-Qaeda are Actionable. ....107

B. The Charities' Actions Are Attributable to KSA ....107

1. The District Court Collapsed Agency And Alter Ego. ....108

2. Plaintiffs Adequately Alleged Agency And Scope ....109

3. Plaintiffs Also Pleaded "Extensive Control" Under *Bancec* .. 110

4. Plaintiffs Alleged a Reasonable Connection Between the Charities' Support and September 11th. .... 110

III. THE DISTRICT COURT HAD JURISDICTION OVER PLAINTIFFS' CLAIMS BASED ON MATERIAL SUPPORT BY ADDITIONAL KSA AGENTS ....112

A. Basnan ....112

B. Qudhaeein And Shalawi ....113

C. Abdi Mohamed ....115

IV. THE DISTRICT COURT HAD JURISDICTION BASED ON KSA'S AIDING-AND-ABETTING ....................115

A. JASTA Authorizes ATA Aiding-And-Abetting Claims Against Foreign States. ....................116

B. The District Court's "Person" Analysis Was Incorrect....................117

C. Jurisdiction Exists Based On Secondary-Liability Claims ....................119

CONCLUSION ....................120

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32....................125

CERTIFICATE OF SERVICE....................126

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agyin v. Razmzan*,
986 F.3d 168 (2d Cir. 2021) ....................75, 80

*Anderson v. City of Bessemer*,
470 U.S. 564 (1985) ....................63, 67, 88

*Atchley v. AstraZeneca UK Ltd.*,
165 F.4th 592 (D.C. Cir. 2026) ....................119, 120

*Behrens v. Pelletier*,
516 U.S. 299 (1996) ....................66

*Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*,
999 F.3d 808 (2d Cir. 2021) ....................55

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) ....................83

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
581 U.S. 170 (2017) ....................58, 61, 105

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) ....................96

*Burrage v. United States*,
571 U.S. 204 (2014) ....................96

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*,
239 F.3d 179 (2d Cir. 2001) ....................87

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
596 U.S. 107 (2022) ....................84

*Clubside, Inc. v. Valentin*,
468 F.3d 144 (2d Cir. 2006) ....................103, 104

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
589 U.S. 327 (2020) ....................97

*Doe v. Menefee*,
391 F.3d 147 (2d Cir. 2004) ....................63

*Duncan v. Walker*,
533 U.S. 167 (2001) ....................83

*EIG Energy Fund XIV, LP v. Petroleo Brasileiro, S.A.*,
104 F.4th 287 (D.C. Cir. 2024) ....................66

*Eisenberg v. Permanent Mission of Eq. Guinea to U.N.*,
832 F. App'x 38 (2d Cir. 2020)....................67

*EM Ltd. v. Banco Central De La República Arg.*,
800 F.3d 78 (2d Cir. 2015)....................4, 65, 66

*Ernst v. Carrigan*,
814 F.3d 116 (2d Cir. 2016)....................66

*Fein v. Cook*,
61 N.Y.S.3d 10 (App. Div. 2017) ....................78

*Filetech S.A. v. Fr. Telecom S.A.*,
157 F.3d 922 (2d Cir. 1998)....................58, 61

*Fils-Aime v. Ryder TRS, Inc.*,
837 N.Y.S.2d 199 (App. Div. 2007) ....................75

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983) (*Bancec*)....................*passim*

*Gater Assets Ltd. v. AO Moldovagaz*,
2 F.4th 42 (2d Cir. 2021)....................57

*Gross v. FBL Fin. Servs., Inc.*,
557 U.S. 167 (2009) ....................96

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ....................119

*Hamm v. United States*,
483 F.3d 135 (2d Cir. 2007) .......... 81

*Holmes v. Gary Goldberg & Co.*,
838 N.Y.S.2d 105 (App. Div. 2007) .......... 75

*Holmes v. Secs. Inv. Prot. Corp.*,
503 U.S. 258 (1992) .......... 96

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) .......... 51

*Ierardi v. Sisco*,
119 F.3d 183 (2d Cir. 1997) .......... 80

*In re ALBA Petróleos de El Salvador S.E.M. de C.V.*,
82 F.4th 105 (2d Cir. 2023) .......... 66

*In re Terrorist Attacks on September 11, 2001*,
134 F. Supp. 3d 774 (S.D.N.Y. 2015) .......... 49

*In re Terrorist Attacks on September 11, 2001*,
392 F. Supp. 2d 539 (2005) .......... 105, 111

*In re Terrorist Attacks on September 11, 2001*,
740 F. Supp. 2d 494 (2010) .......... 105, 111

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
513 U.S. 527 (1995) .......... 96

*Johnson v. Jones*,
515 U.S. 304 (1995) .......... 4, 66, 67

*Kaplan v. Lebanese Canadian Bank*,
999 F.3d 842 (2d Cir. 2021) .......... 51, 88, 107, 119

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
376 F.3d 1123 (D.C. Cir. 2004) .......... *passim*

*Lamar Advert. of Penn., LLC v. Town of Orchard Park*,
356 F.3d 365 (2d Cir. 2004) .......... 103

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) .......... 83

*Lore v. City of Syracuse*,
670 F.3d 127 (2d Cir. 2012) .......... 88

*Luna v. Pico*,
356 F.3d 481 (2d Cir. 2004) .......... 103

*Lundberg v. State*,
255 N.E.2d 177 (N.Y. 1969) .......... 78

*Maurillo v. Park Slop U-Haul*,
194 A.D.2d 142 (N.Y. App. Div. 1993) .......... 108

*Mohawk Indus., Inc. v. Carpenter*,
558 U.S. 100 (2009) .......... 65

*Moran v. Kingdom of Saudi Arabia*,
27 F.3d 169 (5th Cir. 1994) .......... 64

*Nam v. Permanent Mission of Republic of Kor. to U.N.*,
118 F.4th 234 (2d Cir. 2024) .......... 57, 58, 61

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
414 U.S. 453 (1974) .......... 118

*O'Bryan v. Holy See*,
556 F.3d 361 (6th Cir. 2009) .......... 94, 96, 104

*Opati v. Republic of Sudan*,
590 U.S. 418 (2020) .......... 93

*Oscarson v. Off. of Senate Sergeant at Arms*,
550 F.3d 1 (D.C. Cir. 2008) .......... 66

*Owens v. Republic of Sudan*,
864 F.3d 751 (D.C. Cir. 2017) .......... *passim*

*Pfizer, Inc. v. Gov't of India*,
434 U.S. 308 (1978) .......... 117

*Rausman v. Baugh*,
682 N.Y.S.2d 42 (App. Div. 1998) ........................................................................75

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
162 F.3d 748 (2d Cir. 1998) ..............................................................................104

*Republic of Austria v. Altmann*,
541 U.S. 677 (2004) ..........................................................................................84

*Riviello v. Waldron*,
391 N.E.2d 1278 (N.Y. 1979) ...................................................................*passim*

*Robinson v. Gov't of Malaysia*,
269 F.3d 133 (2d Cir. 2001) ......................................................................*passim*

*Rowland v. Cal. Men's Colony*,
506 U.S. 194 (1993) ........................................................................................118

*Royal Canin USA, Inc. v. Wulschleger*,
604 U.S. 22 (2025) ............................................................................................67

*Rux v. Republic of Sudan*,
461 F.3d 461 (4th Cir. 2006) ....................................................................*passim*

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007) ............................................................................................96

*SantaMarina v. Citrynell*,
609 N.Y.S.2d 902 (App. Div. 1994) .................................................................75

*Stolt-Nielsen SA v. Celanese AG*,
430 F.3d 567 (2d Cir. 2005) ..............................................................................103

*Swarna v. Al-Awadi*,
622 F.3d 123 (2d Cir. 2010) .........................................................................57, 76

*Swint v. Chambers Cnty. Comm'n*,
514 U.S. 35 (1995) ..........................................................................................102

*Tolbert v. Queens Coll.*,
164 F.3d 132 (2d Cir. 1999) ................................................................................66

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) ....................97, 119

*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*,
199 F.3d 94 (2d Cir. 1999) ....................103

*United States v. Anderson*,
747 F.3d 51 (2d Cir. 2014) ....................69, 70

*United States v. Bastian*,
770 F.3d 212 (2d Cir. 2014) ....................82

*United States v. California*,
297 U.S. 175 (1936) ....................118

*United States v. Davidson*,
308 F. Supp. 2d 461 (S.D.N.Y. 2004) ....................87

*United States v. Friedman*,
998 F.2d 53 (2d Cir. 1993) ....................89

*United States v. Jayyousi*,
657 F.3d 1085 (11th Cir. 2011) ....................90

*United States v. McDermott*,
245 F.3d 133 (2d Cir. 2001) ....................73

*United States v. Rahman*,
189 F.3d 88 (2d Cir. 1999) ....................8

*United States v. Rizzo*,
349 F.3d 94 (2d Cir. 2003) ....................70

*United States v. Wells*,
519 U.S. 482 (1997) ....................82

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
570 U.S. 338 (2013) ....................96

*USAA Cas. Ins. Co. v. Permanent Mission of Rep. of Namib*,
681 F.3d 103 (2d Cir. 2012) ....................85

*Usoyan v. Rep. of Turkey*,
6 F.4th 31 (D.C. Cir. 2021) .......... 85

*Walczyk v. Rio*,
496 F.3d 139 (2d Cir. 2007) .......... 102, 104, 105

*Watson v. Kingdom of Saudi Arabia*,
159 F.4th 1234 (11th Cir. 2025) .......... 76, 94, 96

*Weiss v. Nat'l Westminster Bank, PLC*,
993 F.3d 144 (2d Cir. 2021) .......... 83

*Will v. Hallock*,
546 U.S. 345 (2006) .......... 4, 65

**Statutes**

Pub. L. No. 104-132 § 221(a)(7), 110 Stat. 1214, 1241-43 (1996) .......... 94

Pub. L. No. 114-222, § 2(b), 130 Stat. 852 (2016) .......... 2, 83

18 U.S.C. § 2331(1) .......... 82

18 U.S.C. § 2331(3) .......... 118

18 U.S.C. § 2333(a) .......... 116

18 U.S.C. § 2333(d) .......... *passim*

28 U.S.C. § 1291 .......... 65

28 U.S.C. § 1605(a)(7) .......... 94

28 U.S.C. § 1605B .......... *passim*

Justice Against State Sponsors of Terrorism Act, Pub. L. No. 114-222,
130 Stat. 852 (2016) (codified at 28 U.S.C. § 1605B) .......... *passim*

Foreign Sovereign Immunities Actof 1976, Pub. L. No. 94-583, 90
Stat. 2891 (codified as amended as 28 U.S.C. §§ 1330, 1332,
1391(f), 1441(d), 1602-1611) .......... *passim*

**Other Authorities**

*Black's Law Dictionary* (12th ed. 2024) ....................................................................95

Prosser & Keeton, *The Law of Torts* (1984)............................................................98

Restatement (Third) of Torts: Physical & Emotional Harm § 27
(2010) ......................................................................................................98

*Webster's Third New International Dictionary* (1993) ............................................95

## GLOSSARY

| | |
|---|---|
| ATA | Antiterrorism Act, Pub. L. No. 102-572, tit. X, § 1003, 106 Stat. 4506, 4521 (1992) (codified as amended at 18 U.S.C. § 1331 *et seq*.) |
| CAC | Consolidated Amended Complaint DistCtECF3463 (S.D.N.Y. March 17, 2017) |
| EO | Executive Order (prefix to documents released by the FBI under Executive Order 14040 of September 3, 2021) |
| EC | FBI Electronic Communication |
| FBI | Federal Bureau of Investigation |
| FSIA | Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (codified as amended at 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602-1611) |
| JA | Joint Appendix |
| JASTA | Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) (codified at, inter alia, 28 U.S.C. § 1605B) |
| KSA | Kingdom of Saudi Arabia |
| KSABr | Opening Brief for Defendant-Appellant KSA Case No. 25-2202(L) (2d Cir.) |
| MOIA | Ministry of Islamic Affairs |
| MPS | U.K. Metropolitan Police Service |
| SA | Special Appendix |

# INTRODUCTION

Plaintiffs are family members and estates of the 2,977 victims killed in the September 11, 2001 terrorist attacks ("9/11"), along with personal-injury survivors and commercial entities that sustained property damage.

These appeals focus on a narrow but consequential question of subject matter jurisdiction: whether the Justice Against Sponsors of Terrorism Act ("JASTA") allows Plaintiffs to proceed against the Kingdom of Saudi Arabia ("KSA") for the support it provided to Al-Qaeda and to Nawaf Al-Hazmi and Khalid Al-Mihdhar, the first two hijackers to arrive in the United States. In the years before 9/11, KSA's Ministry of Islamic Affairs ("MOIA") financed, operated, and controlled a network whose mission was to spread radical and anti-Western ideology beyond Saudi Arabia's borders, including in the U.S. KSA government officials were expressly warned by their U.S. counterparts that MOIA's activities were empowering violent jihadists, but the program continued unabated. Members of MOIA's network were extensively involved in providing material support to Al-Qaeda, including coordinated logistical assistance to the 9/11 hijackers inside the U.S.

In 2016, in response to prior dismissals of claims against KSA, Congress enacted JASTA to ensure that 9/11 victims could seek justice by establishing "the broadest possible basis" to seek relief against foreign states that provide material support "directly or indirectly" to those engaged in terrorist activities against the

United States. Pub. L. No. 114-222, § 2(b), 130 Stat. 852 (2016). To that end, JASTA established a new exception under the Foreign Sovereign Immunities Act ("FSIA") for suits seeking damages for injuries caused by acts of international terrorism and by the tortious conduct of a foreign state or its agents and employees. 28 U.S.C. § 1605B. JASTA further created a new cause of action for aiding-and-abetting liability. 18 U.S.C. § 2333(d).

After targeted jurisdictional discovery, the district court made detailed factual findings and determined that JASTA provided jurisdiction over Plaintiffs' claims based on the tortious conduct of KSA, acting through it employees and agents in the U.S.—including Fahad Al-Thumairy and Omar Al-Bayoumi—and officials at the Saudi Embassy in Washington, D.C., and the Saudi Consulate in Los Angeles. The court found that Thumairy and Bayoumi, within the scope of their KSA employment, worked together and coordinated with Embassy and Consulate officials to provide material support to the 9/11 hijackers.

Al-Qaeda's *modus operandi* was to arrange trusted contacts in advance to receive and assist its mission operatives. KSA provided those contacts—through Thumairy and Bayoumi—and with its agents and subagents, coordinated the hijackers' reception, relocation, housing, banking, transportation, and other logistical assistance—precisely the support they needed to carry out their mission in

the United States. The court concluded that such support was a substantial factor in Plaintiffs' injuries and that the attacks were a foreseeable risk of assisting Al-Qaeda.

The district court correctly applied the settled FSIA burden-shifting framework, made the findings of jurisdictional fact on the record developed for that purpose, and explained why KSA's competing account did not carry the day. The court therefore denied KSA's motion to dismiss for lack of jurisdiction.

In the present interlocutory posture, the question is not whether this Court may have weighed the evidence differently; it is whether the district court properly applied the governing FSIA framework in reaching its jurisdictional findings and, to the extent subject to review under the collateral-order doctrine, whether its jurisdictional findings are sustainable under the applicable standard of review. It did and they are.

* * *

The CAC Plaintiffs' cross-appeal concerns the district court's March 2018 Order declining to exercise jurisdiction on additional, independently-pleaded theories—based on Saudi-controlled "charities" and other Saudi-linked agents, and on aiding-and-abetting liability. Plaintiffs seek reversal of that narrowing ruling, because JASTA was enacted to reach material support provided "directly or indirectly," and because the complaints' detailed allegations were sufficient, at minimum, to warrant jurisdictional discovery on those alternative bases.

## JURISDICTIONAL STATEMENT

The collateral order doctrine authorizes appellate jurisdiction for a small class of interlocutory orders that "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] [are] effectively unreviewable on appeal from a final judgment." *Will v. Hallock*, 546 U.S. 345, 349 (2006) (citation omitted). Although an order denying sovereign immunity "generally satisfies the conditions necessary to invoke the collateral order doctrine," *EM Ltd. v. Banco Central De La República Arg.*, 800 F.3d 78, 87 (2d Cir. 2015), the doctrine does not permit interlocutory review of a "fact-related district court determination." *Johnson v. Jones*, 515 U.S. 304, 307 (1995).

## ISSUE PRESENTED

Whether the district court correctly determined that Saudi Arabia is subject to jurisdiction under 28 U.S.C. § 1605B, where Plaintiffs presented evidence that their injuries were caused by tortious acts of Saudi government agents or employees, acting within the scope of their agency or employment, in knowingly or with deliberate indifference providing material support to the 9/11 hijackers, and where Saudi Arabia failed to carry its burden of persuasion.

# STATEMENT OF THE CASE

## I. STATEMENT OF THE FACTS

### A. KSA's Propagation Of Wahhabi Extremism Through Its Ministry Of Islamic Affairs ("MOIA").

In the years leading up to 9/11, KSA promoted its religious agenda of "*Da'wah*"—"the propagation of [its] conservative Wahhabi-Salafi sect of Sunni Islam"—through its Ministry of Islamic Affairs ("MOIA"), including in the United States. JA1139; JA2754(¶15).

U.S. government assessments describe Wahhabism as an extremist creed that "follows a rigid interpretation of seventh-century Islam, calls for a rigorous and literal application of Shari'ah (Islamic law)[,] and espouses breaking with Western values and modernization." JA1153. Terrorists, including Al-Qaeda, have drawn on elements of Wahhabi ideology to cast the U.S. as an enemy of Islam, and justify violent jihad against Western targets. *E.g.* JA1139; JA2754-55(¶¶14-16,20); JA3308-14.

MOIA, a cabinet-level Saudi government ministry, deployed scores of religious officials into the U.S., including *duah* ("propagators"), imams and other delegates, who operated under the supervision of the Saudi Embassy in Washington, D.C. ("Embassy") and reported through a chain of command extending to MOIA headquarters in Riyadh. JA4231-34; JA2934-35. These KSA employees and agents worked within consulates, mosques, and Islamic institutions

in the U.S., assuming positions of religious and community authority. MOIA personnel also helped establish and lead *waqf* ("endowment") organizations—often described as "charities"—that further augmented KSA's machinery for propagating Wahhabi extremism. JA1153.

KSA facilitated MOIA's operations in the U.S. by providing religious officials with false or misleading diplomatic accreditation and visas, and by concealing the true nature of those officials' government status and duties. JA2727-29(§I), JA2736-40(§§II.C-D). Khalid Al-Sowailem, Head of MOIA's *Da'wah* Office at the Embassy, was among the officials fraudulently accredited. *Id.*; JA4160(no.31).

MOIA's activities in the U.S. encompassed "support and direction for a network of offices and personnel involved with militant Salafi Islamic activities." JA1171. MOIA's "Salafi militant network" was "created, funded, directed and supported by the KSA and its affiliated organizations and diplomatic personnel within the U.S." JA1169. And MOIA's many branch organizations not only "provide[d] financial and logistical support to individuals in [America]… associated with terrorism-related activity," but even "employed individuals directly involved in terrorist acts" and "provided lodging and other logistical support" to jihadist operatives. JA1139,1153.

Among those branches, Al-Haramain Islamic Foundation ("Al-Haramain") was, as KSA later acknowledged, "one of the biggest terror-financing operations in the world" and provided sustained support to "Al-Qaeda's terror campaigns," including the August 1998 bombings of U.S. Embassies in East Africa. JA3392,3403.

### B. KSA Rejected U.S. Warnings And Entreaties, Continuing MOIA's Support For Al-Qaeda.

In the late 1990s, U.S. officials repeatedly warned KSA that it was "empowering jihadists" through MOIA, and that "more Americans would end up being the victims of terrorist attacks" if it did not stop. JA2754-55(¶¶15-20).

Yet KSA rejected U.S. requests for meaningful counterterrorism cooperation. Instead, KSA continued exporting MOIA propagators and funding organizations such as Al-Haramain, which "poured more gasoline into the inferno." JA2755(¶20). In 1999, KSA appointed Saleh Al Ash-Shaikh, Al-Haramain's *Mushrif Al-Alaam* ("General Supervisor"), as MOIA's Minister. JA1390-91; JA1158; JA3367-68; JA3370-71.

Throughout this pre-9/11 period, KSA "disregarded U.S. interests" and "refused" to counter Al-Qaeda's "direct and burgeoning threat" to the U.S. JA2754-55(¶¶14,16,19). Rather, KSA opted "to advance its own political goals," JA2754(¶14), treating Al-Qaeda "with special consideration" and using a strategy of

"cooptation and accommodation"—based on KSA's "understanding that al-Qa'ida would not strike on Saudi soil." JA1140. That "truce" between Al-Qaeda and KSA held through 9/11. JA2615-16(83:4-84:6), JA2624-25(106:1-107:3); JA1784(104:6-16)("not Al-Qaeda…[but] Hezbollah.").

### C. KSA Fomented A Network Of Sunni Extremists In Southern California.

#### 1. KSA's Los Angeles Operations / Fahad Al-Thumairy

##### a. A Longstanding Hub for Sunni Extremism

From the early 1990s, KSA funded, operated and controlled Ibn Taymiyah Mosque, whose imam was a radical cleric employed by KSA and whose governing foundation was chaired by an official in the Embassy's Islamic Affairs Department. JA3836-37,3841,3844; JA1978-80(27:3-29:10). The mosque was a hub for extremists, including associates of "Blind Sheikh" Omar Abdel Rahman, who lectured at the mosque multiple times, last in April 1993. JA3840-41. Rahman was later convicted in New York on terrorism charges related to the February 1993 World Trade Center bombing. *United States v. Rahman*, 189 F.3d 88, 107-08, 123-26 (2d Cir. 1999).

From 1995, KSA increased its investment in the Los Angeles area, making its first $4 million payment towards construction of the King Fahad Mosque ("KFM") in nearby Culver City to replace Ibn Taymiyah Mosque. JA2847-54.

In May 1996, MOIA deployed Fahad Al-Thumairy to Los Angeles. KSA falsely accredited him as an "Administrative Official" at the Embassy. JA4159(no.30); JA2739-40. Thumairy functioned as a senior MOIA representative, directing MOIA's *Da'wah* programs in California and supervising the mosque's operations despite his lack of training, experience, or English proficiency. JA2869-70; JA2911-12; JA1796-97(75:24-76:9), JA1866-67(475:14-476:1). Thumairy reported through MOIA's U.S. leadership at the Embassy, where Sowailem was his direct supervisor and "boss." JA3848-51; JA4018-28; JA1832-33(305:6-306:1). Thumairy also reported to Musaed Al-Jarrah, the Embassy's Deputy Director for Islamic Affairs. JA2661-63(30:15-32:12); JA1154. Thumairy maintained a close personal connection with MOIA's Minister in Riyadh. JA1394(¶6).

Between 1999 and 2001, KSA Minister of State Prince Abdulaziz wired over $360,000 to Thumairy's Los Angeles bank account, furthering a KSA scheme—initiated under Thumairy's MOIA predecessor—to fund stipends for extremist individuals and organizations in California. JA3255-60; JA2937-40; JA990-91.

Thumairy coordinated closely with the Saudi Consulate in Los Angeles ("Consulate") and its Islamic Affairs Department, including its Secretary Ismail Mana. Thumairy claimed he "reported to" the Consul General. JA1482-83, JA1461-62; JA2778-79; JA1396(¶¶19-20).

From 1996 to 2001, numerous Saudi government officials—including MOIA leadership and senior Embassy personnel—visited Thumairy on government-sponsored business in California. JA2864,2867; JA2914-15; JA2920-29; JA3321-22; JA3376-77. In January 1997, seven senior Saudi government officials representing MOIA, the Embassy, Consulate, and Saudi religious institutions, were added to the mosque's Foundation, which oversaw Thumairy's work. JA2843-45.

#### b. Thumairy's Role as MOIA *Mushrif* ("Supervisor")

In January 1998, MOIA appointed Thumairy as its *Mushrif* ("Supervisor") for California, instructing other MOIA propagators in the State to report to him, and directing him to submit periodic activity reports. JA3077-78; JA3024-25; JA2911-12. At least five MOIA propagators who reported to Thumairy had ties to terror organizations and Al-Haramain. JA4231-34; JA1011-13 (propagators Abdi Mohamed, Battikhi, and Omar in San Diego); JA1244-46 (propagators Shuaib and Muhanna); JA3588; JA580-82. KSA's failure to register its MOIA propagators as foreign agents operating inside the U.S. was acknowledged by the Department of Justice after 9/11, but no criminal prosecutions were brought "[d]ue to concerns of diplomatic relations." JA579-80.

Sowailem prepared MOIA job evaluations awarding Thumairy the highest possible scores, a February 2000 promotion, and an extension of his assignment in November 2000 "in line with the Ministry's directives." JA2872-77; JA2942-47; JA2869-70; JA2931-32.

#### c. Thumairy's Installation as Mosque Imam and Leadership of Extremist Cell in Los Angeles

KSA installed Thumairy as imam of Ibn Taymiyah Mosque and later of its successor, King Fahad Mosque, in 1999. JA1481-83. Thumairy led the Sunni extremist cell operating within that mosque community. JA3844-46. Cell members included Consulate official Mana, who harbored a "fierce hatred of non-Muslims"; Thumairy's MOIA propagator-assistant and "devoted follower" Mohamed Al-Muhanna, described as "hot-headed" and "radical;" Khalid Cherif (a/k/a Abu Sulaiman) and Abdo Ghanem, who assisted Rahman during his 1993 visit; and at least four others. JA1396(¶¶19-21); JA1987-92(56:6-61:18); [redacted]. The cell held closed meetings in the mosque library and communicated exclusively in Arabic to maintain confidentiality and vet participants. *Id.*: JA3853-54.

The mosque's long-serving business manager, who attended daily services, testified that Thumairy was "closeminded," "hostile to Americans," and surrounded himself with men "who shared his particular extreme worldview" and who

"espoused a strict, virulent form of Wahhabist dogma." JA1396(¶18). Thumairy's associates included Sheikh Muqbil Al-Wadi, designated by U.S. authorities as an "Al-Qaeda Key Player[]." Thumairy hosted Wadi for lunch in 2000, met with him in KFM's library, and repeatedly called while Wadi was in California; but later denied knowing him. JA2814-16; JA1709-11(125:23–127:5); JA3858-59; JA1847-48(351:18–352:18). Thumairy also had links with Los Angeles-based extremist networks under active counterterrorism investigation. JA3344-47.

### 2. KSA's San Diego Operations / Omar Al-Bayoumi

KSA posted Bayoumi to San Diego in 1994, where he operated as a government agent under student cover and reported to senior MOIA officials. JA1122-23; JA4231-34.

#### a. Bayoumi's Role Within MOIA's U.S.-Based Religious Apparatus

Bayoumi's handwritten address book and several annotated contact ledgers reveal how he documented his extensive work contacts with more than 100 Saudi government officials, including MOIA leadership, Embassy and Consulate personnel, MOIA propagators, and senior Sheikhs and clerics. *E.g.*, JA4065-77 (MPS738_5,12,14,24,25,35,48,52;60;75,79,82); JA4079-4112. Bayoumi maintained and regularly updated listings for KSA coworkers with new contact information and assignments. *E.g.*, JA4069(MPS738_24R).

Bayoumi produced detailed video reports and correspondence describing his work activities for KSA. *E.g.*, JA3441-47; JA3448-51; JA3452-55; JA3456-64; JA3465-73; JA3474-79; JA3480-81; JA3482-85; JA3486-87; JA3488-90; JA3491-94; JA3495-6; JA3497. His communications show frequent reporting to and coordination with KSA officials, including Islamic Affairs diplomats at the Embassy and Consulate, and collaboration with Thumairy and other MOIA officials in operating the U.S.-based network and hosting visits of over 25 MOIA religious representatives. JA4231-34; JA3074-75; JA3071-72; JA3044-45; JA3056-63; JA3003-04. Senior Embassy official Soliman Al-Ali—who headed Saudi *waqf* organizations with "connections…to terrorism"—lived and worked closely alongside Bayoumi in San Diego in 1998-99. JA4166(no.41); JA1221-22, JA1241-43; JA1323-24(¶13).

In August 1998, Bayoumi was confirmed as *Mushrif al-Alaam* ("General Supervisor") of Al-Madinah Mosque, overseeing and reporting on activities for MOIA. JA3083. That title—shared with heads of other Saudi religious institutions, including Al-Haramain—conferred authority over mosque operations, *Da'wah*, visiting preachers, and video recording. JA3009. Bayoumi regularly signed as "General Supervisor" when corresponding with MOIA officials, including the Minister, regarding his work in San Diego. *E.g.* JA3074-75; JA3065-66; JA3071-72.

#### b. Bayoumi's Recruitment of Sunni Extremists into MOIA's Network

Bayoumi's recorded statements, conduct, and seized materials, show he held extremist, anti-American and anti-Semitic beliefs. *E.g.*, JA3308-14; JA4172-80; JA1455.

Upon arriving in September 1994, Bayoumi's first contact was Omar Hamerman. JA4163(no.36); JA2356-60(60:15-64:17). Hamerman led the Sunni extremist cell at the Islamic Center of San Diego ("ICSD")—whose members traveled to fight jihad on foreign warfronts—and Bayoumi signified Hamerman's status by referring to him as "Emir." [redacted]; JA3592-99; JA2714-18(¶¶25-34). Bayoumi helped Hamerman move to Saudi Arabia and integrate into MOIA's religious apparatus. JA4138-39. Hamerman was also an Al-Haramain operative. JA1378,1381-82.

Bayoumi worked closely with Anwar Al-Aulaqi, American-born radical cleric with active Al-Qaeda ties, who served as imam of Al-Ribat Mosque in San Diego. JA4165(no.40); JA3885,3904-06; JA2722-23(¶¶46-47). In early 1998, Bayoumi videotaped a paintball event he co-organized with Aulaqi, involving a visiting MOIA propagator, where young recruits from San Diego mosques wore military gear and engaged in simulated combat. JA3441-47.

#### c. Establishment of Al-Madinah Mosque with MOIA, the Embassy, and Al-Haramain

Bayoumi obtained approval for the project to establish and operate Al-Madinah Mosque from four MOIA propagators who visited in 1998. JA3015-16; JA3448-51. Bayoumi secured principal funding through Al-Haramain representative Saad Al-Habib, and additional donations from the Embassy and Thumairy. JA3015-16; JA3003-04; JA3875-78. Another MOIA propagator came from Saudi Arabia to deliver the sermon at the mosque's inauguration in early August 1998. JA3452-3455; JA3036-39.

August 14, 1998: one week after Al-Qaeda's bombings of U.S. Embassies in East Africa—facilitated by Al-Haramain—Bayoumi welcomed three Al-Haramain delegates from Saudi Arabia to the mosque, including one whom the U.S. Treasury later designated a Global Terrorist, citing "direct links" to Bin Laden. JA3047-54; JA2383-85(190:1-192:2); JA3499(MPS704_70); JA1332-35. Bayoumi worked through Habib to maintain Al-Madinah Mosque as an Al-Haramain outpost, with ongoing supervision of *Da'wah* activities and regular visits of preachers. JA3048.

January 1999: Bayoumi arranged the Eid sermon to be delivered by radical cleric Abdulrahman Barzanjee, videotaping and photographing Barzanjee's meetings with MOIA propagators and "Emir" Hamerman. JA3944-53; JA974; JA1080-81. Thereafter, Bayoumi coordinated with MOIA, Al-Haramain, and

the Embassy to install Barzanjee as imam of Al-Madinah Mosque. JA3427-28(Tr.13:28-13:43).

#### d. KSA's Funding, Sham Employment, and Student Visa Fraud

Bayoumi was nominally employed by KSA's Presidency of Civil Aviation ("PCA"), but contemporaneous records show that he was paid through a contractor, Dallah Avco, for work he never performed. JA3329-30; JA1454; JA2583-85(58:25-60:12). Saudi officials directed Dallah Avco to keep Bayoumi on its payroll so Bayoumi could "complete the task" assigned to him by KSA in the United States. JA3111-12. The PCA's accountant challenged Bayoumi's benefits—$90,000 annually by 1996, plus car and travel allowances—as "unusual" and "exorbitant" for a "student," but was told not to ask questions. JA2588(131:14-20), JA2591(139:9-20).

From 1997 onwards, Bayoumi attended no regular classes; sat for no exams; and earned no academic credit. JA2995-99. He nonetheless registered for academic courses and pressed university administrators for paperwork to create the appearance of pursuing studies. *Id.*; JA2886,2903. Bayoumi worked with the Embassy and KSA's California-based contractor, Ercan, to furnish reference letters and fill out immigration forms falsely claiming student status. JA3549; JA3532; JA3535; JA2957; JA2904.

#### e. FBI Confirmation of Bayoumi's Saudi Embassy Reporting Role

The FBI concluded that during this period "Bayoumi was living in San Diego on a student visa, despite not attending classes, and receiving a salary from [KSA] for job duties he never performed." JA1122. In 2017, the FBI "confirm[ed]" that Bayoumi had received a monthly Saudi government stipend as a "cooptee" who made intelligence reports to Saudi Ambassador Prince Bandar. JA1044-45. The FBI stated this information had not yet been confirmed by the time of the 9/11 Commission Report in 2004. JA1045.

### D. MOIA Prepared Southern California To Receive And Support Al-Qaeda Operatives.

MOIA took key preparatory steps in parallel with Al-Qaeda's own yearslong, meticulous plotting of its "planes operation," which became the 9/11 Attacks. JA1431-50. In December 1998, the CIA warned President Clinton that Bin Laden was preparing attacks inside the U.S., including an aircraft hijacking. JA328-29. Bin Laden's decision to activate the "planes operation" was made no later than March-April 1999. JA333-34.

### 1. December 1998-January 1999: MOIA Officials Visit Thumairy and Bayoumi

December 1998: KSA deployed three MOIA officials to California. Majed Al-Mersal was assigned to Ibn Taymiyah Mosque in Los Angeles and hosted by Thumairy, who provided "coordination" and "follow-up." JA2949-52.

Two other MOIA propagators, Adel al-Sadhan and Mutaeb al-Sudairy, followed an itinerary that mirrored the path the hijackers would take a year later: they entered through Los Angeles; spent time with Thumairy (whom Sadhan listed on his immigration form as his prearranged U.S. point of contact): and then transferred to San Diego, where Bayoumi's photographs, video, and correspondence show he hosted them for several weeks. JA1109-10; JA3944-53.

In Los Angeles, Sadhan and Sudairy visited KFM (then under construction) and Ibn Taymiyah Mosque, and Thumairy hosted them for dinner. JA1612(66:2-5); JA2316-20(100:21-104:13), JA2321(105:8-21). When deposed, both men claimed they met Thumairy by chance. *E.g.*, JA1622(151:10-19). Before their transfer to San Diego, Bayoumi called Thumairy, the Embassy, the Consulate, his Al-Haramain contact Habib, and Aulaqi. JA3879-80; JA1068-69.

In San Diego, Sadhan and Sudairy attended the same mosques—and were introduced to the same associates—as the hijackers: Al-Ribat (Aulaqi), Al-Madinah (Barzanjee), ICSD (Hamerman, Mezgouri), and the small Uthman Mosque in Lemon Grove led by Abdusattar Shaikh. JA3074-75; JA4148(no.2), JA4150(no.11), JA4161(nos.32-3), JA4163(no.36), JA4164-65(nos.38,40). They were lodged at Shaikh's secluded Lemon Grove residence—the same boarding house where the hijackers later moved in, with Bayoumi's assistance. JA2797(line916); JA783-844(¶¶17-19).

Signing as "General Supervisor," Bayoumi reported to MOIA's Minister, Sowailem, Thumairy, and the Embassy regarding the "advance cooperation" and "complete coordination" among MOIA, Embassy and Consulate officials in support of the mission. JA3080-81; JA3071-72; JA3522-23; JA3065-66.

### 2. February 1999: Bayoumi's Report to Al-Haramain

February 12: Bayoumi faxed an "extremely urgent" letter to Habib in Saudi Arabia, urging him to contact MOIA officials Sadhan and Sudairy for a detailed report on their visit. Bayoumi wrote: "*Wakanat qaedatuhum masjidana*" ("Their base was our mosque"), incorporating the Arabic word "*qaeda*" (base). JA3027-28.

### 3. April–May 1999: Hijacker Visas and Continued MOIA Coordination

Veteran Saudi *mujahideen* Nawaf Al-Hazmi and Khalid Al-Mihdhar, handpicked by Bin Laden, were the first two Al-Qaeda operatives assigned to the "planes operation." JA1432,1436,1444. April 3 and 7: Hazmi and Mihdhar obtained U.S. entry visas listing Los Angeles as their destination. JA2782(lines478,483).

April 7: The day the visas issued, Bayoumi sent urgent faxes to Sadhan and Sudairy at MOIA headquarters seeking the Minister's approval for a proposal concerning Shaikh's Uthman Mosque. JA3030-31; JA3033-34. Bayoumi addressed them as "*Al-Mujtahideen.*" *Id*. FBI investigators later determined that both Sadhan and Sudairy had a "nexus" to Al-Qaeda. JA1001-06; JA1090; JA1113.

April 11: Four Saudi government officials—Thumairy, Bayoumi, Khalil, and Al-Ali—held a recruitment and training seminar at KFM, which Bayoumi videotaped. Participants included Ramez Noaman, who later assisted Hazmi and Mihdhar with translation, flight lessons, and assimilation. JA3465-69,3472; JA4159(no.30), JA4166-67(nos.41-43); JA958-59.

May 10: Bayoumi brought Shaikh to Los Angeles to meet Khalil and Thumairy, photographing their visits to both Ibn Taymiyah Mosque and the newly-built KFM. JA3470-71; JA949; JA1475.

### 4. June-July 1999: Bayoumi's "Washington Trip" to Work With the Embassy

June 14: Sadhan and Sudairy took up postings at the Embassy under false diplomatic cover, reporting to MOIA's U.S. Director, Sowailem. JA2745-46. One week later, Bayoumi traveled to Washington on Embassy business: on his travel itinerary, Bayoumi wrote Sudairy's contact number at a hotel near the Pentagon. JA2959; JA4141-42.

June 23 to July 4: Bayoumi's "Washington trip" videotape shows him navigating the city with Sadhan and Sudairy and visiting the Embassy, where he met Sowailem. JA3943(Ex. 10F Video File); JA4172-80; JA3236. Bayoumi called Sudairy "the leader… our Emir for this trip." JA4179.

Over several days, Bayoumi filmed the Mall and, in narration addressed to his "esteemed brothers," promised to "report… in detail" and deliver "results" according to "the plan." JA4172-80. Bayoumi surveilled the U.S. Capitol—in his words, the "most important building"— focusing on its layout, structural features, and security arrangements. He described the Capitol's "500 plus" occupants as "deciding the fate of the nation," and recorded multiple vantage points of the building, including a scale model viewed from above. JA4172-80. At the time, Al-Qaeda was actively casing potential U.S. targets. JA334.

Bayoumi used jihadist rhetoric in referring to "demons of the White House" and declared "[t]here is no Power nor Strength except through Allah!" He signed off

the video footage by name with a religious greeting directed overseas. JA4174,4178.

#### 5. December 1999–January 2000: "Set-Up" Calls and Final Coordination Before the Hijackers' Arrival

In the lead-up to January 15, 2000, phone activity spiked between Thumairy, Bayoumi, Embassy, Consulate, and MOIA officials, and the sub-agents in Los Angeles (Johar) and San Diego (Aulaqi, Aidarus, and Yafai) they recruited to assist the hijackers. The phone calls were paired with intensified in-person coordination meetings. The timing and pattern of the phone calls—which continued into February—tracked with key junctures in the preparation and provision of support to the hijackers, were not duplicated before or afterward, and "cannot be attributed to random events or happenstance." JA3899-3902,3908-09,3913-19; JA1128-30; JA1111; JA4246-58.

December 1999: KSA deployed MOIA propagators to California: Mersal (second successive year) with Abdullah Al-Jaithen. JA1571-72(84:8-85:9), JA1576-77(102:2-103:9). JA4162(nos.34-35). Jaithen had ties to Al-Qaeda leadership and Al-Haramain. JA3343-44.

December 7–8: Before the propagators' visit, Thumairy initiated a "call circle," calling Mersal, Sowailem, Bayoumi, Mana, and MOIA's Deputy Minister. JA3906-07. Thumairy and Bayoumi then exchanged twenty calls prior to the hijackers' arrival. JA1066.

December 12: Mersal and Jaithen arrived in Los Angeles and were hosted by Thumairy. JA3362-63; JA1571-72(84:8-85:9),1576-77(102:2-103:9). Bayoumi videotaped a meeting in his Al-Madinah Mosque office with two men he later introduced to help the hijackers: Fathi Al-Aidarus and Khalid Al-Yafai. JA3480-81.

December 18: As Mersal and Jaithen traveled to San Diego, Thumairy placed a chain of linked calls—to Bayoumi (first of three that week), to Mersal and Jaithen, and to Al-Qaeda operative Aulaqi. JA3908-10. JA4250(4:08PM-4:27PM).

Bayoumi hosted Mersal and Jaithen at Al-Madinah Mosque with Yafai. JA3021-22; JA3365. Bayoumi also videotaped Mersal reciting extremist dogma about rewards awaiting "us" in the afterlife, echoing Al-Qaeda ideology and jihadist justifications for suicide attacks. JA3484-85.

December 20-21: Bayoumi traveled with Jaithen to Los Angeles, checked into a hotel near KFM, and checked out the following day. JA3373-74.

December 27-29: Thumairy placed 20 further phone calls linking key participants, including Sowailem and the Embassy (six); Bayoumi (two); Aulaqi (four); and Aidarus (eight). The FBI identified these as "set-up calls," i.e. Thumairy primed "individuals who would later play an important role in assisting the hijackers." JA1111; JA3915,3919. Thumairy's eight

calls to Aidarus went to the same landline that exchanged calls nine weeks later with Al-Qaeda's Yemen switchboard used to facilitate the 1998 Embassy bombings. JA1128-30; [redacted].

January 5: Mana made an eight-minute call at 12:12am to Thumairy's cellphone, and at 12:17am conferenced Bayoumi into the call for about two minutes. JA1100. The call occurred as Hazmi and Mihdhar arrived in Malaysia for high-level Al-Qaeda planning meetings immediately preceding their travel to the U.S., via Thailand. JA338.

January 9–10: Bayoumi traveled to Los Angeles with Yafai and another San Diego associate. They visited the Consulate and KFM, met privately with Thumairy, stayed overnight together at a nearby motel, and purchased and activated calling cards. JA4181-83; JA3918; JA1111.

**E. With KSA's Support Network In Place, Al-Qaeda Launches Its 9/11 Operation In Southern California.**

The 9/11 Commission found that Hazmi and Mihdhar were "ill-prepared for a mission in the United States"—they did not speak English and had never been to the West—and Al-Qaeda would not have sent them without trusted individuals in place awaiting their arrival. JA343; JA1460-61(¶8). November 2000 CIA reporting found Al-Qaeda's "*modus operandi*" depended on "exhaustive field preparations" as a "prerequisite for [its] terrorist operations," and "meticulous contingency planning completed far in advance." JA1414, JA1418.

Consistent with that practice, Al-Qaeda's operatives for its 1998 Embassy bombings plot were hosted by "a potent local network in place for almost a decade." JA1423, JA1426-28. Hazmi and Mihdhar were likewise supported in Malaysia by a local extremist network prepared for their arrival, airport pickup, lodging in a private apartment, and travel assistance. JA1441; JA331,338,343&361(n.5).

### 1. January 2000: Hijackers' Arrival, Reception and Support by MOIA's Network in Los Angeles, with Thumairy as Their Contact

January 15: Once Hazmi and Mihdhar landed at LAX, Bayoumi and Thumairy engaged in further call chains. Bayoumi maintained a second cellphone (ending in -6662) that he used and loaned to others in the hijackers' support cell. JA1079-81; JA347&363(n.26). Within minutes of the hijackers' landing, Bayoumi received two calls from the -6662 number. Thumairy then called Consulate official Mana. JA4259(1:35PM-1:59PM).

Mana served as Thumairy's conduit to KFM congregant Mohamed Johar. The FBI found that Mana and Johar had "significant phone connectivity" occurring "prior to and directly following key events of logistic assistance provided by Johar to Hazmi and Mihdhar." JA3340.

The first place Hazmi and Mihdhar went on U.S. soil was King Fahad Mosque, where Johar brought them to meet privately with Thumairy.

JA1112; JA2085-86(93:15-94:23), JA2088-91(96:2-99:14). Johar testified that he then showed the hijackers around the neighborhood, met with them regularly during their first two weeks in Los Angeles, and held a bag they entrusted to him for safekeeping. *E.g.*, JA2097(105:7-22), JA2139(239:13-23), JA2147-50(284:20-287:10). Johar admitted he was "relieved" when they left as he finally had "free time." JA2149(286:1-11).

At the time, Johar discussed the hijackers with his best friend Akram Alzamari, who later assisted Hazmi. Johar told Alzamari that the two men were "stay[ing]… spend[ing] the night in his house" and that his younger sister went to stay with her older sister so that Johar could accommodate the visitors in his small apartment. JA1694-96(57:20-59:2), JA1698(61:7-13). When Alzamari asked Johar "what's so special" about the two men, Johar replied: "[t]hey [the hijackers] came through Sheikh Fahad [Thumairy]." JA1716(132:2-18).

The FBI found that "MOHAMED JOHAR was tasked by THUMAIRY to assist HAZMI and MIHDHAR while they were in Los Angeles." JA3340.

### 2. Bayoumi's Meeting with the Hijackers

Bayoumi searched for an apartment in San Diego for the hijackers before going to Los Angeles to meet them. JA780(¶¶5-6); JA772(¶25).

Ahead of the trip, Bayoumi invited Kaysan Morgan, a young Muslim convert, to accompany him, claiming he needed to visit the Consulate to resolve a "visa" issue. JA767(¶8); JA3202(687:20-24). Bayoumi promised to stop at a "nearby Halal restaurant" and the new KFM, which Bayoumi said was "close to the Consulate and the restaurant." JA767(¶9).

January 31 (without Morgan): Bayoumi drove his wife and three children to Los Angeles, where they attended the Consulate to submit their passport applications, and went to KFM. JA4181,4184-89. KSA records confirm that Bayoumi met at the Consulate with Deputy Consul Abdullah Al-Awad. JA2881-82; JA1543(57:5-20), JA1544-45(74:14-75:23). Bayoumi's notes reflect that he knew Awad "through Khalid Al-Sowailem." JA3537-38.

February 1: Bayoumi again drove to Los Angeles, this time with Morgan. JA345; JA1364. They accessed the Consulate through a nonpublic entrance, and Bayoumi met alone with Mana for 20 minutes, inside restricted diplomatic offices. JA767-69(¶¶11-15); JA1931-32(169:3-170:20); JA1554(121:3-16). This second Consulate visit had no passport-related purpose: the family's applications were already filed; the passports would be mailed to Bayoumi. JA3533. Bayoumi's renewed passport used an identical photo to his old passport. JA4189.

Upon leaving the Consulate, Bayoumi took Morgan, as planned, to the nearby halal restaurant; Hazmi and Mihdhar arrived, joined them at their table, and Bayoumi and the hijackers conversed in Arabic for at least 30 minutes. Bayoumi translated portions of the conversation for Morgan. JA769-70(¶¶15-17); JA1968-69(97:15-98:4). Morgan testified that the hijackers said they were staying at an apartment "around the corner" from the restaurant, consistent with the location of Johar's apartment. JA770-71(¶¶18-19); JA3502. Bayoumi invited the hijackers to San Diego, offered them assistance, and gave them his phone number. JA3156(193:2-16); JA770(¶18).

After the meeting, Bayoumi took Morgan, as planned, to KFM. Bayoumi met privately again with Mana and separately with Thumairy. JA771-72(¶¶20– 23).

At 7:11p.m., Bayoumi called home from his cellphone on the drive back to San Diego. JA771(¶22); JA4267(2/1/2000,7:11PM).

#### 3. The Hijackers' Transfer to San Diego

February 2: Hazmi and Mihdhar traveled to ICSD Mosque in San Diego, where they met Bayoumi, who drove them "by [his] car" to the Parkwood Apartments. JA1472-74; JA3189-90(564:11-565:15). The hijackers came in the afternoon or evening, went to the rental office the following day,

and stayed at Bayoumi's home while he secured an apartment for them. JA3211-12(698:12-699:9); JA780-81(¶7)&789-80.

February 3: At the Parkwood rental office, Bayoumi introduced the hijackers as "friends" "staying with him" who needed an apartment "right away." JA780-81(¶7). Bayoumi also connected them with Aulaqi, who translated for the hijackers at the rental office, and whom the manager identified and recalled having previously seen with Bayoumi. JA780-81(¶¶7,8)&824-25(ExhB).

February 4: Bayoumi prepared the hijackers' lease forms, confirming his own apartment as their "present address" and identifying himself as their "friend," personal reference, and emergency contact. He escorted the hijackers to a bank and helped them open an account; obtained a certified check for their security deposit; and paid for his own credit report to secure their apartment. JA2443-51(432:19-440:6), JA2451-52(440:14-441:24), JA2453-55(442:3-444:1); JA782-83(¶¶11-16)&785-823(ExhA). Bayoumi was not eligible for a "referral fee," nor was any fee paid to him. *Id.*

February 5: Bayoumi co-signed the hijackers' lease, and committed to serve as their guarantor. JA783(¶¶15-16)&803,810-11,821(ExhA). Bayoumi could identify no-one else he had assisted in this manner, and testified that he would only do so for Saudis he knew "well." JA2392-93(229:13-230:6), JA2557-58(823:5-824:3).

### 4. Phone Calls Show Coordination Among MOIA's Network Supporting the Hijackers

From mid-January through February 2000, the timing and pattern of phone calls among Bayoumi, Thumairy, and Embassy and Consulate officials showed continuous coordination of support for the hijackers. JA3921-27.

January 19: Bayoumi made "unusual and intensive" calls to MOIA's Embassy office, including on six consecutive workdays from January 27 through February 3, overlapping the hijackers' transfer to San Diego. JA3925-26. Bayoumi's Embassy calls were interspersed with his calls to Thumairy and the Consulate. JA3926. Bayoumi's handwritten address book listed the Consulate's number alongside the names of Islamic Affairs officials Mana, Awad and Jabreen. JA4163(no.37); JA4073(MPS738_52L).

Bayoumi also called MOIA Embassy official Sudairy on January 24, 26, and 30, and February 2 and 7—which the FBI deemed "significant" and corresponded to "significant logistic support of the hijackers." JA1000,1005; JA3922-25. Bayoumi testified that "it could have been another person who called" Sudairy, JA2481-82(585:2-586:2), but the calls originated separately from Bayoumi's mosque office phone and his cellphone, and there is no evidence anyone else had access to both. JA3924.

Thumairy likewise maintained frequent contact with MOIA superiors, placing fifteen calls to Sowailem and Embassy Islamic Affairs officials between January 24

and February 16. JA3925-26,3932; JA4022. Bayoumi and Thumairy both also called MOIA propagator Mersal in January, with additional calls by Thumairy into March and April. JA3923.

February 3: Thumairy made two late-evening calls to ICSD Imam Abdeljalil Mezgouri, "timed precisely with [the hijackers'] attendance at the ICSD Mosque." JA3937; JA4150(no.11).

February 4: Aulaqi called the Bank of America branch to which Bayoumi brought the hijackers, shortly before they arrived around 3:30p.m. JA1103; JA4136. After opening the hijackers' bank account, Bayoumi rapidly placed three calls to Aulaqi and his mosque at 4:40, 4:42, and 4:43p.m., followed by a 4:55p.m. call to Thumairy. JA4269(4:40PM-4:55PM). That call was the culmination of a total of 27 Bayoumi-Thumairy calls over the preceding weeks in which Hazmi and Mihdhar travelled to, entered, and were received and settled in the U.S. JA3506-07.

### 5. Bayoumi Executes KSA's Plan to Lodge the Hijackers with Shaikh

February 13: Bayoumi gave the Parkwood Apartments manager advance notice, on behalf of Hazmi and Mihdhar, that the hijackers' next residence would be at Shaikh's address in Lemon Grove, CA. JA783-84(¶17)&822-23(ExhA).

Shaikh maintained close relations with Bayoumi and—through him—with Thumairy, Khalil, Sadhan, and Sudairy. Bayoumi documented Shaikh on video for at least three years, wrote to MOIA's Minister about Shaikh, and stayed in touch when Shaikh later visited Sudairy in Saudi Arabia. JA4164(no.38); JA3470-71; JA3497; JA4074(MPS738_60R). Shaikh has been depicted as an FBI "asset," but any pre-9/11 information he ever shared was on an informal, arbitrary basis: he was unpaid and never underwent requisite oversight and foreign-intelligence vetting. JA2675&n.197, JA2681-83&n.269. Despite ample opportunity to report through local law enforcement, Shaikh withheld the hijackers' identities, gave conflicting accounts of what information he shared and when, and invoked the Fifth Amendment when questioned by the FBI's OIG. JA2675-77&n.194.

#### 6. Bayoumi Hosts Welcome Party to Forge Connections for the Hijackers

February 17: Bayoumi hosted a welcome party for Hazmi and Mihdhar at their apartment and directed Morgan to videotape the event. JA3491-94 JA772(¶27).

The video identifies 29 attendees, including Bayoumi and both hijackers. JA3045(Ex. 10K Video File); JA4146-56. Bayoumi introduced Hazmi and Mihdhar—standing at the front of the room—by declaring: "we are welcoming the brothers… whom we have not yet had the pleasure of meeting. And as time goes by, they too will soon be travelling." JA3428-39(Tr.14:19); JA3491.

Bayoumi called on each attendee to "introduce himself to the brothers by name," JA3431(Tr.16:28-16:45). All appear in Bayoumi's handwritten address book and/or elsewhere in the record. JA4146-56. Except for the hijackers—the newly-arrived "travelling brothers"—the attendees already knew one another, as documented in Bayoumi's videos and photos of inter-mosque events dating back to 1995. JA4210-24.

The welcome party video shows both hijackers participating as co-hosts: preparing food, serving and moving among the guests, engaging in conversation. JA3045(Ex. 10K Video File); JA4154(nos.22,25). Hazmi sat beside Bayoumi's son and Yafai, JA4154-55(nos.25-27), interacting warmly in ways that showed they already knew one another. JA3492-93. Bayoumi specifically addressed Hazmi: "Nawaf, may God greet you, Nawaf." *Id.*; JA3438-39(Tr.18:39-41,18:54).

Addressing the whole gathering, Bayoumi endorsed radical Sheikh Barzanjee, JA4148(no.2), announcing that "we" had tried for more than a year to install him as imam of Al-Madinah Mosque and had finally succeeded. JA3491; JA3427-28(Tr.13:28-13:43). Barzanjee served as imam throughout the hijackers' stay in San Diego, paid in checks from Bayoumi and reporting to Habib. JA3525-27; JA3085-90.

The party was also attended by visiting MOIA religious official Sheikh Muhammad Al-Qahtani, JA4151(no.14), who introduced himself as "from Saudi Arabia." JA3430,3435(Tr.14:27-33,17:50). Bayoumi instructed Morgan "don't film here" while gesturing toward Qahtani's side of the room, JA3434(Tr.17:27,29-30), but his image was nonetheless captured. Qahtani received funding from KSA through the Embassy. JA2963; JA1225; JA1230-31; JA1323-26(¶¶12-16).

February 18 and 19: Immediately after the welcome party, Bayoumi made two "unique" calls to Sowailem's cellphone, consistent with reporting on a work project, late Friday night and on Saturday. JA3926-27.

#### 7. February–April 2000: Support to the Hijackers Through Bayoumi's Introductions, with KSA Support and Cover

In the ensuing months, people to whom Bayoumi introduced the hijackers—including many of the welcome-party attendees—provided key forms of support. JA3491-94; JA4146-56; JA4164-66(nos.38,40,42), JA4169(nos.47-48); JA2783-2800(lines668-951).

Late February: Welcome-party attendee Maen Alkhawaja, Bayoumi's "doctor of cars," JA4155(no.24), helped the hijackers purchase the car they drove until September 11, 2001. JA2786(lines698-703); JA4169(no.48); *see* SA203.

Party attendees Yafai, JA4155(no.27), and Aidarus, JA4151(no.15), both videotaped in Bayoumi's mosque office, JA3480-81, and introduced to Thumairy, assisted the hijackers' assimilation in San Diego while

receiving frequent calls from Bayoumi. JA4048-49; JA3517. Early March: Aidarus allowed the hijackers to use his apartment phone for calls to/from Al-Qaeda's operations switchboard. JA1085.

March: Bayoumi arranged for party attendee Ahmad Mustafa, JA4153(no.23), to become the hijackers' roommate for two weeks. Mustafa helped them set up and operate a computer, internet, and phone—used to contact Al-Qaeda—and stated that Bayoumi visited frequently and often brought food. JA1035-41.

Bayoumi introduced the hijackers to Al-Mohdar Abdullah Zeid, who helped them with translation, driver's licenses, and applications to language and flight schools. JA4169(no.47); JA348. In interviews starting days after 9/11, Zeid repeatedly told the FBI that Bayoumi tasked him to assist Hazmi and Mihdhar. JA3240-41; JA1121-22. At his deposition, Zeid recalled first meeting the hijackers at Al-Madinah Mosque and identified Bayoumi—whom he knew as the mosque's "religious leader"—as the only person he remembered present. JA2173-74(126:13-127:5),2231-32(374:24-375:5). Zeid otherwise deferred to the FBI's account, explaining the seriousness of the matter affected his memory. JA2197-98(178:4–179:8). Zeid expressed fear of KSA and declined to answer many questions on self-incrimination grounds. *E.g.*, JA2227(361:14-22), JA2227-28(361:24-362:21), JA2235-37(415:24-417:21).

Although Bayoumi claimed he left San Diego for several weeks after the welcome party to attend a study program, records show the three-day course was held in San Diego. Bayoumi remained home, a short walk from the hijackers' apartment, through end of March 2000 when he traveled to Saudi Arabia. JA3540-43,3546; JA3582; JA2467-69(474:21–476:16); JA1474-75.

April 19: Party attendee and Bayoumi's longstanding ICSD associate Adel Rafeea, JA4152(no.18), received a $5,000 Al-Qaeda wire transfer for the hijackers. JA1023-26; JA3358-60; JA3355-56. That same day, the hijackers obtained California driver's licenses—U.S. State-issued IDs to avoid suspicion during check-in on 9/11. JA2793(line841); JA3567-77; JA1448. Bayoumi's -6662 cellphone was used to call Aulaqi. JA1068. Several days later, Thumairy called Aulaqi, consistent with monitoring support while Bayoumi was abroad. JA3515(4/25/2000,11:16PM).

April 2000: Bayoumi's PCA performance review for 1999-2000 described him, incongruously, as an "accountant" who was "persistent and hard working." JA2856-57; JA2859-60. KSA directed that Bayoumi's compensation be more than doubled, from $3,078 per month to $6,420 in April 2000—followed by another pay raise to $7,014 in July 2000. JA3095; JA3097-3106; JA3866-67. The reason given for the pay increases was Bayoumi's "promotion" to "Senior DSS Programmer," albeit in name only. JA3108-09.

### 8. May–June 2000: Hijackers Relocate to MOIA-Arranged Safehouse and Visit Thumairy

May 31: Bayoumi returned to San Diego in time for the hijackers' planned move from the Parkwood Apartments to Shaikh's boarding house. Bayoumi's first call upon landing in the U.S. was to his -6662 cellphone. JA3812(line1). Airline records confirm Bayoumi's May 31 arrival in San Diego, having transited through London, and contradict Bayoumi's testimony of a false alibi that he stayed in a U.K. dormitory throughout June 2000. JA2530-31(751:17-752:19); JA3551-53; JA3555.

Shaikh provided a safehouse for both hijackers through June 9, and for Hazmi until December. Shaikh told the FBI Hazmi's visa was "valid," despite knowing it expired on July 12. Shaikh assisted Hazmi by preparing and filing an extension request, allowed Hazmi to depart before approval, and withheld those facts from the FBI. JA3602-05, JA2677.

June 9: Zeid drove Hazmi and Mihdhar to Los Angeles to meet Thumairy, ahead of Mihdhar's flight from LAX to Yemen the following day. JA4169(no.47). Zeid said he was "in a state of shock" upon realizing the hijackers and Thumairy knew each other from prior dealings in Los Angeles. JA2201-15(206:11-220:23), JA2218(223:11-19), JA2265(478:15-20).

Both Zeid and Alzamari observed Thumairy meeting privately with Hazmi and Mihdhar that evening. JA2210-16(215:5-221:21),2218-19(223:23-224:20); JA1712(128:17-23). Thumairy was also preparing to travel: his passport shows he arrived in Riyadh on June 11, indicating he departed LAX on June 10, the same day as Mihdhar. JA1329-30(8Rabi'Al-awwal1421); JA2818-41. Thumairy did not visit the Embassy *en route* to Saudi Arabia in June 2000. JA1863(444:4-8); JA1362-63. Bayoumi called Sowailem three days after Mihdhar left. JA4046(6/13/2000,12:44PM).

August 2000: Bayoumi placed three calls to Shaikh's landline, on which Hazmi "received calls." Bayoumi arranged for the PCA Director's nephew to move into Shaikh's house. The nephew gave Hazmi $1,900 in travelers' checks. JA3263(line205); JA3266(lines12-13); JA350&365(n.40-41). That summer, Thumairy made calls to four attendees of Bayoumi's welcome party who each helped the hijackers in San Diego. JA3519-20; JA4150(no.11), JA4152(no.16), JA4155(nos.24,28).

### 9. Bayoumi's Airplane Sketch and Flight-Planning Calculations Related to Al-Qaeda's Plot

In a U.S.-purchased yellow notepad, Bayoumi handwrote an airplane sketch, equation, and numerical inputs that Plaintiffs' expert Schiff—a highly-qualified commercial pilot and flight instructor—concluded were flight-planning calculations supporting Al-Qaeda's "planes operation." JA3498; JA2686-96; JA2698-2706. Schiff explained that Bayoumi used 50- and 70-mile distances—ranges pilots use as visual- cues when approaching a target from altitude—and those values are consistent with the geometry of flight paths flown by the 9/11 hijacker-pilots. JA2688-90. For example, Flight 11 began its descent toward the World Trade Center from approximately 67 miles away. JA2690-93. Schiff further determined that Bayoumi had calculated the distance between a New Jersey navigation beacon and the World Trade Center—an input relevant to target acquisition and flight planning. JA1756-60(118:2-119:22), JA1774-75(181:6–182:21).

Bayoumi admitted he prepared the document himself, said he wanted "to remember, memorize the equation," and suggested it related to "Washington," one of Al-Qaeda's intended targets. JA2398-2400(290:13-292:9). KSA declined to question Bayoumi about his calculations.

Bayoumi also possessed flight-simulator software he purchased in the U.S. "to get [an] idea" of flight functions. JA3145-47(177:3-179:15). The

hijackers used similar software in the training for their mission. JA336-37.

### 10. Bayoumi's Exit Planning and Late-2000 MOIA Coordination

October 2000: Bayoumi traveled to the U.K. and enrolled at a research university in Birmingham, England where he spent approximately seven weeks. He emailed a California professor, offering payment to ghost-write assignments, as he had done years earlier. JA3353. Bayoumi returned to San Diego on November 30.

December 2: Bayoumi went to his mosque office and called Sowailem and Thumairy. Twenty more Bayoumi-Thumairy calls followed over the ensuing weeks. JA3507-3508; JA4046. This "sharp spike" in communications reflected continued hijacker-coordination: pilot-hijacker Hani Hanjour arrived in San Diego on December 8; then Hazmi and Hanjour departed together to Arizona on December 11. JA3938-3939.

After the hijackers left San Diego, Bayoumi hosted Shaikh for dinner and recorded a video report. JA3497. Shaikh subsequently emailed Hazmi, including greetings to "Hani"—Hanjour. JA3326.

Late December: Bayoumi placed three calls to Aulaqi's mosque. JA3515(12/18/2000). Aulaqi soon left California and, by early 2001, was installed as imam of Dar Al-Hijrah Mosque in Falls Church, Virginia. JA349&364(n.35).

### 11. Bayoumi's March 2001 Call to Sudairy and Notes Using Hazmi's Al-Qaeda Codename

MOIA assigned Sadhan to Oklahoma and Sudairy to Missouri from summer 2000 through April 2001. JA1385-88. In Columbia, Missouri, Sudairy lived together for four months with an Al-Qaeda operative directly tied to Bin Laden. JA2719-21(¶¶37-41).

March 31, 2001: Bayoumi called Sudairy in Missouri. JA4237-38; JA2961. Hazmi and Hanjour left Arizona that same day and began driving cross-country towards Virginia; they listed Aulaqi's mosque in Falls Church, VA as their destination and forwarding address. Their route passed through Oklahoma and Missouri. JA2802-03(lines1170,1775,1778,1782); JA4235-38.

In handwritten Arabic, Bayoumi noted two names he outlined in boxes: Hazmi's Al-Qaeda codename ("Rabi'ah Ibn Ka'ab"), linked to Sudairy's location, "Columbia, Missouri." Bayoumi also wrote Sudairy's and Sadhan's cellphone numbers, alongside three cities—Kansas City, Kansas; Columbia, Missouri; [East] St. Louis, Illinois—corresponding to waypoints on the hijackers' route east. JA4236-38.

### 12. Final Connections

June 14, 2001: KSA Consulate official Mana received a call from the Virginia apartment of two congregants of Aulaqi's mosque who helped Hazmi and other hijackers. The call linked the hijackers' East Coast support network to Mana

in Los Angeles. JA3942; JA1051-54; JA3339-40; JA352. It occurred as a "second wave" of 9/11 hijackers congregated on the East Coast, JA1448, and shortly before Mihdhar's July 4 return from Saudi Arabia—the last to (re)enter the country. JA2806(line2244-45).

June-July: Bayoumi moved his family out of San Diego and went to Saudi Arabia for a short visit. JA3219-20(887:8-888:10).

July–August 2001: Thumairy hosted three Saudi extremists in Los Angeles, including a MOIA official. JA2005-13(78:10–86:12). Khalil reported the visit to MOIA's Deputy Minister, reflecting KSA's "detailed…oversight practices" that kept MOIA "intimately aware…of the work of its officials…inside the U.S." *Id.*; JA3861. In July 2001, KSA had "fifty propagators all over the United States." JA2934-35.

September 2: Bayoumi called Thumairy from the U.K. using a calling card. JA4195,4198,4203. Shortly before 9/11, Thumairy abruptly left Los Angeles for Saudi Arabia. JA1394,1397(¶¶7,24).

## F. September 11th And Its Aftermath

### 1. The Attacks

On September 11, 2001, Al-Qaeda hijacked four passenger aircraft in coordinated attacks. Two struck the World Trade Center towers; AA Flight 77

hijacked by Hazmi, Mihdhar, and Hanjour struck the Pentagon; and United Flight 93, targeting the U.S. Capitol, crashed in Pennsylvania after passengers fought back. Hazmi and Mihdhar occupied "key roles" throughout the "planes operation," undertook intensive hijacker-training, and knew their martyrdom mission to crash hijacked aircraft into U.S. targets. JA334-37; JA3092-93(¶¶6-11). Hazmi was second-in-command of the operation and the sole non-pilot hijacker in final mission-planning meetings. JA1432,1443-44. Mihdhar likely coordinated the non-pilot hijackers. JA2810.

#### 2. Bayoumi's Arrest and Thumairy's Continued MOIA Work

September 21: Bayoumi was arrested in Birmingham, U.K. for 9/11-related terrorism offenses. JA3130-32(17:15-19:11). The MPS seized extensive evidence from Bayoumi's possession. He was questioned for a week and released on September 28.

October 2001: MOIA's Deputy Minister was informed that U.S. investigators questioned a MOIA propagator in Los Angeles about Thumairy and showed him a photo of Thumairy with the hijackers. JA1995-99(68:20-72:5), JA2003-04(76:8-77:8). Yet KSA conducted no meaningful investigation of Thumairy's ties to the hijackers: MOIA's Minister merely directed Thumairy to submit a written denial for the file. JA2917-18; JA1853(407:5-20). MOIA redeployed Thumairy to California, where he resumed close contact with the Embassy and

extremist cell members, but never returned to KFM. JA1394,1397(¶¶8,25); JA1995-96(68:20-69:4); JA3841,3846,3850,3858; JA3510-13; JA4030-39. In May 2003, U.S. authorities barred Thumairy from reentering the U.S. on suspicion of terrorist activity. JA345&361(n.12).

### 3. May 2003: A Turning Point

Al-Qaeda's May 12, 2003 Riyadh bombings—its first attack on Saudi soil—marked a self-described "turning point" in the Saudi government's approach to terrorism. Only after that attack did KSA begin to accede to U.S. counterterrorism demands and enact meaningful measures to curb extremism. MOIA fired or suspended over 1,500 officials who "preach[ed] intolerance or hate." JA3389-91, 3395,3396-97]; *see* JA2645-46(127:8-128:13).

By August 2003, MOIA closed its U.S. operations and recalled senior personnel, including Sowailem. JA2744.

### 4. KSA Officials' Denials and Claimed Lack of Recollection

MOIA's Minister Ash-Shaikh, Al-Haramain's long-serving "General Supervisor," claimed he had no relationship with Al-Haramain. JA2564-65(137:14-138:10), JA2566-2567(139:21–140:6).

The Embassy's Deputy Chief Al-Qattan disowned any knowledge of Thumairy or Sowailem; and denied that MOIA had an office in the Embassy, or that MOIA employed propagators inside the U.S. JA1647-48(24:22-25:20), 1651(30:1-7),

JA1655(36:6-18), 1663-64(44:22-46:19), 1666(47:13-20). The State Department's former Assistant Chief of Protocol found Qattan's denials "incredible." JA2747-48.

Sowailem told the FBI in October 2001 that he knew Bayoumi "professionally" as a "student in San Diego studying for his Masters…." JA1021.

Bayoumi claimed not to know Sowailem, or any other MOIA officials in the Embassy or Consulate, or that Thumairy worked for MOIA or KSA. JA2379-81(169:13–171:7), JA2412(320:2-9), JA2403(297:3-7), JA2387-88(220:14-221:1). Sadhan and other MOIA propagators whom Bayoumi hosted—and videotaped—in San Diego denied knowing Bayoumi. JA1625-26(186:11-187:7). JA1586-87(131:12-132:4); JA2063-64(231:19-232:7).

Thumairy denied knowing Bayoumi and also claimed not to remember Mana, Jarrah or any other Islamic Affairs officials at the Consulate or Embassy—other than Sowailem—or any visiting MOIA propagators. JA1822-26(216:23-218:2, 219:14-220:1), JA1833-34(306:20-307:19), JA1844(348:20-23), JA1856-59(424:23-427:2), JA1862(443:5-15). Despite accepting Sowailem was his "boss," Thumairy characterized Sowailem's role as "administrative" and limited to approving "vacations." JA1793(52:1-21), JA1804-05(114:23-115:10), JA1807(117:16-23), JA1832-33(305:6-306:1).

Mana and two senior Consulate officials—all of whom Thumairy told 9/11 investigators were his KSA co-workers—claimed not to know that Thumairy

worked for MOIA or KSA. JA1482-83; JA2778-79; JA1904-05(66:23-67:4); JA1532(41:8–15), JA1535(48:7–13), JA1538-39(52:6–53:18), JA1542(56:8–19), JA1550-51(84:23–85:20), JA1557-58(217:24–218:11); JA2578(59:3–18). Mana claimed Thumairy was a mosque employee supervised by a KFM imam, despite knowing Thumairy was paid by KSA. JA1908-09(89:4-90:5); JA1395(¶13).

KSA's Khalil similarly claimed he did not know Thumairy was working for KSA in California. JA2015-17(96:21-98:24).

**5. Post-9/11 Investigations**

The FBI conducted its "PENTTBOM" 9/11 investigation and classified substantial portions of the evidence on national security grounds. Much remains classified today.

The 9/11 Commission did not review Bayoumi's videos, handwritten address book, contemporaneous notes, or correspondence detailing his ties to MOIA officials and the hijacker-support network—nor his airplane sketch with flight-planning calculations. Although the FBI gave the Commission a copy of Bayoumi's welcome-party video, it lacked relevant footage, identifications, and analytical assistance to interpret the gathering accurately. *Compare* JA347&363(n.25) & JA3491-94 & JA4146-56.

Investigators recognized that the 9/11 plot's "formidable complexity" made it imperative to investigate foreign government assistance, yet Embassy and Consulate

immunity largely shielded KSA evidence. JA1460(¶7). Sowailem asserted immunity and permitted only one brief FBI interview. JA1271.

Despite extensive searches, investigators could not determine where Hazmi and Mihdhar went upon arriving in Los Angeles. JA3243-45; JA2954-55. The Commission acknowledged the answer would point to the hijackers' support network, but was unable to "pick up their trail" until they met Bayoumi on February 1. JA345.

The FBI opened Operation Encore in 2007 to continue the 9/11 investigations for "intelligence gathering not criminal [prosecution]" purposes. JA1019; JA1108. Encore found that Thumairy met the hijackers upon arrival, that Johar was tasked to assist them, and that Thumairy and Bayoumi furnished material support in Los Angeles and San Diego while in "significant telephonic contact" with Embassy officials. JA1122-23; JA3341-422,3348. The FBI analyzed their telephone usage in detail.

The FBI (and Youssef) determined that Bayoumi placed the calls on the single-line phone in his private, locked mosque office, with call patterns matching his other phones and tracking his presence in San Diego; Bayoumi paid the bills by personal check and annotated them when visitors (e.g. Al-Haramain) used the line. JA4051-63; JA3316-19; JA1028-30; JA4225-30, JA3863&n.295, JA3868-69&n.325, JA3879-80&n.417, JA3923-24; JA3529-30.

Likewise during relevant periods Thumairy made and received calls on cellular numbers -3362 (December 1999-February 2000) and -0777 (December 2000-August 2001). Bayoumi identified -3362 as Thumairy's number in his phone listings; Thumairy's lease and Zeid's listing confirmed -0777; and expert analyses showed matching call patterns. JA4071(MPS738_35L); JA3333; JA3379-80. Both numbers were subscribed at the same Long Beach address by two individuals claiming Embassy or Consulate employment, whom Youssef assessed as "front men." JA3886-92. FBI investigators confirmed 67 Bayoumi-Thumairy calls, JA1066-68, JA3879&n.413, with contemporaneous phone records obtained by the MPS reflecting additional calls. KSA does not dispute that the calls occurred or identify any other known caller or recipient.

Encore largely concluded by 2016 and was administratively closed in a May 2021 EC. Although Encore was an intelligence-gathering effort, the EC purported to consider charges against Thumairy and Bayoumi, neither of whom could be extradited from Saudi Arabia. It reflected political and prosecutorial discretion, not investigative fact-finding. JA932-42.

The EC referenced the "Southern California based network" of "Saudi Sunni extremists" led by Thumairy, but focused narrowly on Thumairy's ties to Jarrah, and did not address evidence concerning Thumairy's and Bayoumi's coordination with Sowailem, Sudairy, Sadhan, Mana, and other KSA officials.

The EC also noted an FBI financial investigation of Thumairy in 2005-2006; however, when Plaintiffs sought underlying bank records, the FBI advised it had destroyed them in August 2005. JA3001; JA936-37.

From 2002, the "Arabian Peninsula Squad" in the FBI's Washington Field Office ran a parallel, classified investigation into KSA's activities in the U.S. JA1167-70; JA1320-24(¶¶4-13&Exh1). After Encore was closed, the Squad issued a July 2021 EC setting forth detailed findings regarding the operations of KSA's "Wahhabi/Salafi/militant network…in the U.S." *Id.*

## II. PROCEDURAL HISTORY

Plaintiffs have brought this suit against KSA under the ATA and state common law, alleging that KSA provided material support to Al-Qaeda and the 9/11 hijackers that was essential to and caused the attacks.

In 2015, the district court dismissed then-pending claims against KSA for lack of subject-matter jurisdiction, concluding that the non-commercial tort exception did not apply and that the claims therefore were barred by sovereign immunity. *See In re Terrorist Attacks on September 11, 2001*, 134 F. Supp. 3d 774, 779-80 (S.D.N.Y. 2015). While Plaintiffs' appeals were pending, Congress enacted JASTA, which created a new exception to the FSIA and an ATA cause of action for aiding-and abetting and conspiracy liability. *See* JASTA §§ 3-4.

### A. March 2018 Ruling

On remand, the existing Plaintiffs amended their complaints, and additional Plaintiffs filed new complaints against KSA pursuant to JASTA, *see* JA5-108, JA4519-4562, whereupon KSA renewed its motion to dismiss. In 2018, the district court reviewed the pleadings and granted KSA's renewed motion in part and denied it in part. *See* SA41. The court held that Plaintiffs' claims based on Thumairy's, Bayoumi's, and their subagents' material support to the hijackers were "unrebutted by any contrary evidence from Saudi Arabia," were "sufficient" to establish jurisdiction, and provided a basis to hold KSA responsible for the tortious acts of Thumairy, Bayoumi, and their subagents. SA22-23. Because the court found "the nature and scope of the agency … somewhat unclear," it authorized "limited and targeted jurisdictional discovery" to determine "whether and to what extent Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Hazmi, Mihdhar, and other 9/11 hijackers." *Id.* At the same time, the court declined jurisdiction and disallowed discovery related to Plaintiffs' alternative theories—relating to the actions of KSA in funding and providing other support to Al-Qaeda through its state-supported "charities," the attributable tortious conduct of those charities' agents, and torts of certain other individual agents. SA17-37.

### B. Jurisdictional Discovery On Agency

At KSA's insistence, jurisdiction discovery was limited to the "narrow area" of whether Thumairy and Bayoumi acted as KSA agents, rather than addressing "whether or not Saudi Arabia [wa]s complicit." JA586-89; JA590-93. KSA failed to produce relevant records showing MOIA supervision and reporting, MOIA officials' visits to California, and Bayoumi's assignments and work activities. *Compare* JA3024-25; JA3018-19; JA3071-72; JA3065-66 (DOJ and MPS records). And key evidence—FBI records declassified and released under Executive Order 14040 and materials MPS seized from Bayoumi in September 2001—became available only after the court's deadlines for declarations and depositions. *See* e.g., JA601-02; JA615-18&619-36; JA903-05&906-11.

### C. February 2023 Ruling

After this Court issued its decisions in *Kaplan v. Lebanese Canadian Bank*, 999 F.3d 842 (2d Cir. 2021), and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021), Plaintiffs asked the district court to reconsider its rejection of their alternative jurisdictional theories relating to the tortious conduct of the ostensible "charities" and additional KSA agents. The court denied that request, holding that JASTA did not create aiding-and-abetting liability for foreign states, SA53-69, and later denied Plaintiffs' motion to certify an interlocutory appeal. SA74-79.

### D. KSA's Renewed Motion To Dismiss

Following jurisdictional discovery, SA23, KSA again moved to dismiss for lack of subject-matter jurisdiction. JA3662-64; JA643. KSA did not request an evidentiary hearing and argued that the court had "ample leeway to decide whether an evidentiary hearing" would be useful. JA3663.

In December 2023, MPS produced additional Bayoumi materials, including footage of his "Washington trip." Plaintiffs submitted a supplemental declaration with expert opinion that Bayoumi's footage bore the hallmarks of an Al-Qaeda "casing video" of the U.S. Capitol. JA3607-12(¶¶5-28). The magistrate judge struck the declaration as untimely. SA91-92. Plaintiffs objected, JA3638-61, but the district court did not consider the evidence.

The court heard extensive oral argument on the motion, during which KSA's counsel conceded that evidence showed it was unlikely the hijackers arrived without a plan. JA4336(lines10-17). And when asked to identify "someone else other than Bayoumi and Thumairy" who was "ready, willing and able" to support Hazmi and Mihdhar, its counsel pointed to the same subagents whom Bayoumi and Thumairy introduced, tasked, and worked through when providing them assistance. JA4336-37, 4349.

### E. August 2025 Jurisdictional Ruling

After considering the parties' submissions, the district court held that Plaintiffs had met their burden of production by offering evidence showing that Bayoumi, Thumairy, and their employer, KSA, knowingly or with deliberate indifference assisted the 9/11 hijackers while acting within the scope of their agency and employment. SA213-23. The court further held that KSA failed to carry its burden of persuasion that the FSIA exception did not apply, finding KSA's evidence to be "self-contradictory or not strong enough to overcome the inference[s]" the court drew from the full evidentiary record. SA225.

KSA now appeals the district court's decision permitting Plaintiffs' claims to proceed to the merits. JA4505. The CAC Plaintiffs, though not the *Ashton* Plaintiffs, cross-appeal the court's rulings rejecting the alternative bases for jurisdiction. *Infra* pp. 102-121.

## SUMMARY OF ARGUMENT

The district court correctly held that Plaintiffs satisfied JASTA's requirements for jurisdiction over KSA based on its material support for the 9/11 hijackers. After overseeing five years of jurisdictional discovery and examining a massive evidentiary record, the court made detailed factual findings that MOIA agents

Bayoumi and Thumairy coordinated with Saudi Embassy and Consulate officials to provide extensive logistical assistance to the hijackers that substantially contributed to Plaintiffs' injuries from the 9/11 attacks.

KSA argues that the district court failed to resolve the factual disputes necessary to establish jurisdiction under JASTA. That argument fails for four reasons.

*First*, the district court appropriately made the essential factual findings to determine its jurisdiction, including examining issues that overlap with the merits, without adjudicating the ultimate merits of Plaintiffs' claims. KSA's argument that the court needed to do more mischaracterizes the court's order and finds no support in the statute or case law.

*Second*, KSA's challenges to the district court's scope-of-employment findings fall outside this Court's collateral-order jurisdiction and are, in any event, incorrect. The record contains substantial evidence supporting the court's detailed factual findings.

*Third*, KSA's challenges to the court's rulings on the statutory element of a tortious act or acts fail because JASTA requires only a showing, clearly met here, of a cognizable tort. Moreover, the court made specific findings, amply supported by the record, that KSA acted knowingly or with deliberate indifference in supporting

the 9/11 hijackers. Those factual determinations likewise are not subject to interlocutory review.

*Fourth*, the court considered the record, applied the correct legal standard, and properly found that Plaintiffs' injuries were caused by KSA's conduct. That latter determination too is not reviewable here, and is also supported by substantial evidence.

## STANDARD OF REVIEW

This Court reviews "the district court's legal conclusions concerning sovereign immunity de novo" and any factual findings that are subject to review for clear error. *Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 817 (2d Cir. 2021).

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY RESOLVED ALL MATERIAL FACTUAL DISPUTES NECESSARY TO FIND SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS

JASTA eliminates sovereign immunity in cases in which damages "are sought" for an act of international terrorism in the United States "caused by" the tortious act or acts of a foreign state "or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605B(b). KSA's appeal attempts to assign error to the district court's findings that JASTA's scope of employment, tortious act, and causation elements were satisfied for purposes of jurisdiction.

After targeted jurisdictional discovery and extensive submissions, the district court found that Plaintiffs met their burden of production on all three of the issues KSA sought to dispute. In doing so, the court carefully followed the approach required under the FSIA, and by decisions of the Supreme Court and this Court: it reviewed "the total evidence" and "conduct[ed] a limited examination on the merits when necessary" to reach detailed jurisdictional findings. SA212, 214, 222. Applying "common sense," the court concluded that Bayoumi and Thumairy were "working together" and "coordinating" with Consulate and Embassy officials—within the scope of their KSA employment and agency—to provide material support to the hijackers, knowingly or with deliberate indifference, and that this support was a proximate cause of the 9/11 attacks. SA213-23. The court further held that KSA failed to carry its "ultimate burden of persuasion," by a preponderance of the evidence, that immunity nonetheless applies. KSA's submissions were "insufficient to overcome" the conclusions supported by the court's consideration of the full record. SA224-25.

That is exactly how jurisdiction is supposed to be decided under the FSIA: the court resolves the jurisdictional questions on the record developed for that purpose and leaves the ultimate merits for later. KSA's appeal asks this Court to reweigh that record and draw different inferences. There is no basis for doing so. The jurisdictional ruling should be affirmed.

### A. The District Court Faithfully Applied The FSIA's Burden-Shifting Framework.

KSA's principal argument on appeal—that the district court failed to resolve factual disputes necessary to determine its jurisdiction, KSABr39-50—misapprehends both the court's decision and the settled FSIA framework. When a sovereign mounts a factual attack on jurisdiction, the court must decide the jurisdictional facts on the record before it, applying the burden-shifting framework. That is what occurred here.

**1.** This Court has long applied a burden-shifting approach to FSIA jurisdiction. *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001). Once the sovereign makes a prima facie showing that it is a foreign state, the plaintiff bears an initial burden of production to show that an FSIA exception applies. *Id.* If the plaintiff meets that burden, the sovereign bears the burden of persuasion—by a preponderance of the evidence—that the exception does not apply. *Id.*[2] "If the court cannot resolve the jurisdictional question as a matter of law because of the existence of conflicting evidence," it must look beyond the pleadings and "weigh evidence[] and resolve factual disputes" necessary to determine jurisdiction. *Nam v. Permanent*

[2] Contrary to KSA's arguments, KSABr43 (citing *Swarna v. Al-Awadi*, 622 F.3d 123, 143 (2d Cir. 2010)), "the preponderance-of-the-evidence standard applies to the foreign sovereign's ultimate burden of persuasion, not to the plaintiff's burden of production," *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 52 n.3 (2d Cir. 2021). KSA relied on *Gater Assets* to state the correct standard in its motion to dismiss. JA643.

*Mission of Republic of Kor. to U.N.*, 118 F.4th 234, 244 (2d Cir. 2024) (citing *Filetech S.A. v. Fr. Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998), *overruled on other grounds by Lotes Co., Ltd. v. Hon Hai Precision Indus Co., Ltd.*, 753 F.3d 395 (2d Cir. 2014)).

That inquiry may overlap with the merits, but it does not collapse into them. The court must answer the jurisdictional question, and if doing so requires resolving factual issues that bear on the merits, "so be it." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 179 (2017). What the Court may not do is "decide a case on the merits in order to decide if it has jurisdiction"; the inquiries are not "coterminous." *Robinson*, 269 F.3d at 141; *accord id.* at 149 (Sotomayor, J., concurring in the judgment).

**2.** The district court adhered to these principles in both its 2018 and 2025 decisions addressing Bayoumi's, Thumairy's, and KSA's conduct. *See* SA5-7; SA23; SA187-88; SA190-210; SA212-26.

In 2018, the district court resolved KSA's challenge to the sufficiency of Plaintiffs' jurisdictional allegations. It set forth the governing framework; noted the parties' agreement that "a tortious act" includes "the knowing or deliberately indifferent provision of material support to terrorists"; summarized New York agency law principles; and resolved the disputed causation standard. SA5-14. The court assessed whether Plaintiffs' allegations—assumed true "in the absence of

contrary evidence from Saudi Arabia"—were sufficient to establish for jurisdictional purposes that Saudi officials (1) committed tortious acts, (2) within the scope of their employment or agency, that (3) proximately caused Plaintiffs' injuries. SA19-24. It concluded that Plaintiffs adequately pleaded prongs (1) and (3) and ordered "limited and targeted discovery" directed to prong (2). SA23-24.

In 2025, after that limited discovery, the district court resolved KSA's factual challenge to jurisdiction. It reiterated the burden-shifting framework, SA186-88,[3] "considered the full record," and distilled the parties' extensive briefing and evidentiary submissions into a detailed statement of "relevant material facts" with record citations. SA190 & n.9. The court recognized that it had to decide whether those facts demonstrated that "Plaintiffs could bring a legally cognizable claim of a tortious act," that "Thumairy, Bayoumi, and/or others acted as KSA's agents when providing assistance to the hijackers," and that their conduct was a proximate cause of Plaintiffs' injuries. SA212-13.

---

[3] KSA fixates on an isolated quote in the opinion's background section concerning the handling of jurisdictional issues in jury cases. KSABr2,30,45. KSA's efforts to suggest that the district court was confused and applied the incorrect standard are meritless. The court's jurisdictional analysis did not otherwise reference juries, and as KSA itself acknowledges, KSABr30, the court expressly recognized its obligation to "resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." SA188 (quoting *Robinson*, 269 F.3d at 141).

Applying the burden-shifting framework, the court held that Plaintiffs met their burden of production by submitting evidence that Bayoumi, Thumairy, and their subagents—working with Embassy and Consulate officials—knowingly or with deliberate indifference provided material support to Hazmi and Mihdhar, and that the assistance fell within the scope of their employment. SA213-23. The court further held that the jurisdictional record confirmed the factual premises of its earlier causation ruling—*i.e.*, that the "key allegations that the 2018 Decision relied on remain true after jurisdictional discovery." SA213.[4]

Finally, the court reviewed KSA's submissions and found that KSA failed to carry its ultimate burden of persuasion on any disputed issue. Its factual proffers either did not materially dispute Plaintiffs' showing or were "lacking force in comparison," and its witness accounts were "unpersuasive," sometimes "self-contradictory," and unable to "withstand scrutiny." SA213, SA215, SA224-25. In short, the court did what the FSIA requires: it decided the jurisdictional facts necessary to resolve immunity and explained its reasoning with record support.

---

[4] Because the 2018 Decision found Plaintiffs made sufficient causation allegations and that KSA failed to raise a competent factual challenge to them, the court resolved the causation issue in Plaintiffs' favor and no jurisdictional discovery was conducted on that issue. SA22-24. Nevertheless, the court considered whether KSA presented contrary evidence in its motion and found that it failed to overcome Plaintiffs' causation showing. SA213.

### B. The Court Considered The Entire Record And Made The Necessary Jurisdictional Findings.

KSA's reliance on *Helmerich*, *Filetech*, and *Nam* to challenge the district court's approach is misplaced. *See* KSABr40-47.

*Helmerich* held that a plaintiff must satisfy an FSIA exception's requirements—not merely make a nonfrivolous argument—and reaffirmed that overlap with merits issues is not a reason to alter the jurisdictional inquiry. 581 U.S. at 177-79. The district court followed *Helmerich*'s instruction: it "review[ed] the evidence" and "conduct[ed] a limited examination on the merits when necessary," making the findings required to decide immunity while leaving the ultimate merits issues for trial. SA212.

*Filetech* is likewise inapposite. There, this Court vacated because the district court "accept[ed] the mere allegations of the complaint," despite evidence creating a material factual dispute. 157 F.3d at 932. Here, the district court did the opposite: it reviewed the evidence and issued extensive, record-supported jurisdictional findings on tortious acts, the scope of agency and employment, and causation. SA190-226. The court did not resolve jurisdiction by crediting allegations alone.

Nor does *Nam* help KSA. *Nam* vacated summary judgment where the district court drew inferences in the plaintiff's favor rather than undertaking the required jurisdictional analysis. 118 F.4th at 249. Here, the district court performed the

jurisdictional analysis and expressly declined to construe disputed evidence in Plaintiffs' favor. SA187.

KSA identifies no material factual dispute that the district court was required—but failed—to resolve. Its repeated claims that the court declined to resolve key issues mischaracterize the order below. Indeed, the three examples that it cites, KSABr48, confirm that the district court made the necessary findings.

**1.** The court rejected KSA's "chance meeting" narrative, finding it "more likely than not" that Bayoumi's contacts were the product of "prior planning [and] constant coordination with his employer, KSA." SA221.

**2.** It rejected KSA's "good Samaritan" theory, finding that Bayoumi was "following KSA's instructions when he assisted the hijackers." SA221.

**3.** It rejected "innocent" explanations for Bayoumi's airplane sketch and flight-planning calculations, concluding that the evidence "facially connect[ed]" Bayoumi to knowledge of the plot. SA221-22.

Nor is there merit to KSA's claims that the district court "bypass[ed] witness credibility." KSABr48-49. To the contrary, the court assessed the testimony offered by Bayoumi, Thumairy, and other KSA witnesses by comparing it with the documentary and objective evidence, finding their explanations could "not withstand scrutiny," were "unpersuasive," not "plausible," and at times "self-contradictory."

SA215, SA224-25,[5] *see Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985) (credibility determinations may be based on contradictory "documents or objective evidence" and whether the testimony is "internally inconsistent or implausible"); *Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004) ("credibility determinations are not composed of demeanor evaluations alone"). And the court correctly rejected "conclusory attorney speculations not grounded in facts" offered by KSA in support of its efforts to explain away damaging objective evidence. SA225.

KSA also claims that the court "refus[ed] to weigh" evidence it says was relevant to motive. KSABr49-50. But the court reviewed the total record and determined what evidence was relevant to the jurisdictional inquiry. It noted KSA's arguments about Wahhabi religious doctrine, including its claim that KSA's state religion is "quietist," *see* SA294 n.10, but correctly recognized that the jurisdictional question turned on what KSA officials did—not on theological abstractions.[6] The court therefore focused on the record evidence showing coordination and planning among Bayoumi, Thumairy and other KSA officials; the involvement of Thumairy

[5] To the extent KSA suggests the district court should have conducted further proceedings below, KSABr47, it nowhere suggests what those proceedings are and cannot when it insisted on limited discovery and expressly declined to request a hearing below. *See* JA3663.

[6] "Quietism" refers to internal political obedience within the Kingdom and has no bearing on MOIA's activities in the United States. *See* JA3781 (defining "political quietism" as "defer[ence] to the Al Saud [domestic] leadership").

and Bayoumi with the hijackers; and their joint associations with Aulaqi and others connected to the plot—demonstrating that the assistance to the hijackers bore "some connection with… employment by KSA." SA216.[7]

Contrary to KSA's claims, KSABr45-47, the court's description of certain findings as "preliminary," SA220, SA226, reflects the common practice in FSIA cases of treating subject-matter jurisdiction as a threshold issue decided on the record before the court at the time. *See, e.g.*, *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) (describing FSIA immunity as a "preliminary jurisdictional issue"). But the record may later differ at the merits stage (given the different scope of discovery). SA226. That does not mean the court declined to resolve the jurisdictional facts before it.

KSA misconstrues the court's observation that "[s]ome of the disputed facts cannot be resolved at this stage." SA226, KSABr36,47. The court plainly held that "the entire body of undisputed facts" and its "preliminary assessment of certain

[7] KSA's assertions that it opposed Al-Qaeda and Osama bin Laden present generalized statements about domestic Saudi policy that say nothing about Saudi conduct abroad during the relevant period affecting the U.S. and were beyond the scope of discovery. KSABr49-50. The record includes evidence concerning MOIA's ideological alignment with and broad support for Al-Qaeda, in the U.S. and elsewhere and U.S. warnings to KSA that MOIA was "empowering jihadists" and supporting Al-Qaeda and that, unless those activities were curtailed, more Americans would become victims of terrorist attacks. Yet Saudi authorities disregarded those warnings. *Supra* p.7.

disputed facts" were sufficient to conclude that subject matter jurisdiction exists. As the examples above illustrate, that assessment included disputes central to the merits, and KSA identifies no evidence the court overlooked that was necessary to resolve jurisdiction. And in any event, the court's undisputed findings—including those that Bayoumi secured housing for the hijackers, co-signed their lease, introduced them to key associates, and subsequently had his compensation increased—independently support jurisdiction. SA214-23.

## II. THE DISTRICT COURT CORRECTLY FOUND THAT KSA'S EMPLOYEES AND AGENTS ACTED WITHIN THE SCOPE OF THEIR EMPLOYMENT AND AGENCY AND THERE IS NO BASIS TO DISTURB THOSE DETERMINATIONS

### A. Fact-Bound Findings As To Scope Of Employment Are Not Subject To Collateral Order Review.

The collateral order doctrine is a defined adjunct to 28 U.S.C. § 1291's final judgment rule. It reaches a "small class" of non-final rulings that courts treat as final. *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009). A collateral order must "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." *Will*, 546 U.S. at 349 (citation omitted).

Although orders denying sovereign immunity "generally satisfy[y] the conditions necessary to invoke the collateral order doctrine[,]" *EM Ltd.*, 800 F.3d at

87, the doctrine does not permit review of a "fact-related district court determination." *Johnson*, 515 U.S. at 307. Appellate courts may review a sovereign's entitlement to immunity "as a matter of law given the facts as determined by the district court," *EIG Energy Fund XIV, LP v. Petroleo Brasileiro, S.A.,* 104 F.4th 287, 293 (D.C. Cir. 2024), but *not* appeals that challenge fact-bound determinations intertwined with the merits, *Tolbert v. Queens Coll.*, 164 F.3d 132, 138 (2d Cir. 1999). This is because "early appeals are unlikely to bring important error-correcting benefits unless they turn on purely legal matters within the comparative expertise of appellate courts." *In re ALBA Petróleos de El Salvador S.E.M. de C.V.*, 82 F.4th 105, 113 (2d Cir. 2023) (cleaned up).

Courts thus do not review immunity appeals challenging a district court's fact-finding. *See Oscarson v. Off. of Senate Sergeant at Arms*, 550 F.3d 1, 4-6 (D.C. Cir. 2008) (dismissing sovereign immunity appeal requiring "review of fact-related determinations"); *see also Ernst v. Carrigan*, 814 F.3d 116, 121-22 (2d Cir. 2016) (no appeal of "whether the evidence could support a finding that particular conduct occurred") (quoting *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996)).

KSA seeks exactly this. Its "scope-of-employment" challenge turns on fact-intensive disputes over a voluminous record from which the district court made findings on Bayoumi's and Thumairy's work activity. Reviewing these fact-findings would require this Court to "canvass the record" in detail now and likely again after

trial. *Johnson*, 515 U.S. at 317. The collateral order doctrine's limitations avert that inefficiency. There is no jurisdiction over KSA's objections to factual findings on scope of employment.[8]

### B. The District Court's Scope-Of-Employment Findings Are Amply Supported By The Record And There Is No Clear Error.

Even if the Court reaches KSA's challenges to the factual record, those arguments fail under clear-error review. To prevail on its clear-error challenge, KSA must show that the district court's findings were not "plausible in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 574. It is not enough that this Court might have weighed the evidence differently; where "there are two permissible views of the evidence," the district court's choice between them "cannot be clearly erroneous." *Id.*

The district court's findings were amply supported in the total record, as the court examined the combined force of the whole chronology of events alongside corroborating evidence and context. The court found that "Bayoumi and Thumairy were not just an accountant or an imam as they claim," but KSA agents whose employment included assisting the hijackers. SA220. That finding fit the broader

---

[8] That courts have reviewed factual findings in immunity appeals without addressing jurisdiction, *see Eisenberg v. Permanent Mission of Eq. Guinea to U.N.*, 832 F. App'x 38 (2d Cir. 2020), does not make this proper, *see Royal Canin USA, Inc. v. Wulschleger*, 604 U.S. 22, 42 (2025) ("drive-by jurisdictional rulings" carry "no precedential effect"). Nor is exercising pendent appellate jurisdiction a permissible end-run. *See Johnson*, 515 U.S. at 318.

record, showing KSA established and operated a MOIA-led extremist network in the U.S., acting through its Embassy and Consulate officials and other agents; and that Thumairy and Bayoumi led that network's operations in California, coordinating with and reporting to KSA government officials. *See* SA220-24; *supra* pp.5-6,8-14.

The district court's findings established a compelling sequence of material support: the choice of Los Angeles as Hazmi's and Mihdhar's initial destination; their reception by Thumairy at King Fahad Mosque; Thumairy's arrangements, through Mana, for mosque congregant Johar to care for and lodge them; the carefully-planned transfer to Bayoumi following Bayoumi's contacts with Consulate officials, including Mana; and their sustained logistical support in San Diego from Bayoumi and the network of subagents to whom he introduced them. SA216; SA221-23; *supra* pp.24-38.

The court then tested that sequence against corroborating evidence: among the contemporaneous indicia of coordination were call clusters at key junctures linking Bayoumi and Thumairy to Embassy and Consulate officials and subagents in the plot, such as the late-December 1999 "set-up calls" and the intensive call activity surrounding the hijackers' arrival in Los Angeles and transfer to San Diego. SA222-24; *supra* pp.22-25,29-31. The timing of the increase in Bayoumi's compensation during his assistance to the hijackers—justified as a "promotion" despite Bayoumi's non-performance of any accounting duties—was found by the court to add

"substance and particularity" to the evidence linking Bayoumi's assistance to his KSA employment. SA204; SA215-16; SA219, SA224-25; *supra* p. 36.

The court further evaluated the operational context. Al-Qaeda's "planes operation" depended on designating trusted individuals to receive and assist its operatives—especially Hazmi and Mihdhar, who lacked English proficiency and experience in the West. SA19; JA4336-37; *supra* pp.24-25; *see United States v. Anderson*, 747 F.3d 51, 66 (2d Cir. 2014) (applying general inference that covert actors place sensitive tasks in the hands of trusted associates). The chronology the court identified undermined KSA's theory of "chance" encounters and "good Samaritan" assistance. Instead, it reinforced the court's finding that KSA's assistance to the hijackers reflected coordination among Bayoumi, Thumairy, Mana, and officials at the Consulate and Embassy.

Against that backdrop, KSA identifies five purported errors, none of which comes close to satisfying the demanding standard. KSABr60-69.

*First*, the district court permissibly declined to credit "Bayoumi's, Thumairy's, and other witnesses' emphatic denials." KSABr60. The court acknowledged those denials but found them "lacking force" when weighed against "multiple pieces of circumstantial evidence" supporting a "reasonable inference that Bayoumi and Thumairy were coordinating with the Saudi government." SA224. It was appropriate for the court to give greater weight to objective record evidence—

particularly where multiple witness accounts were contradicted by later document production in discovery, such as Bayoumi's fabricated account that he resided in a U.K. dormitory through June 2000, and professed ignorance of Thumairy's work, Consulate officials, and MOIA's U.S. role, *supra* pp.37,45. *See Anderson*, 747 F.3d at 66 (false exculpatory statements may support inference of knowing involvement).[9]

*Second*, the district court drew reasonable inferences from Bayoumi's "frequent interactions" with Hazmi and Mihdhar and his status as a "connecting point" to "many other people" who assisted them. SA215; *contra* KSABr61-62. The court considered those connections as part of its determination that Bayoumi was "not just acting as … an accountant." SA214-16. That inference was supported by ample evidence of Bayoumi's active coordination, in-person and by phone, with Saudi officials—including Thumairy, the Consulate (Mana), and the Embassy (Sowailem, Sudairy, and Sadhan)—when arranging and providing support for the hijackers. *See* SA215, SA224; *supra* pp.22-24,30-31.

The record further showed how Bayoumi functioned as that connecting point in San Diego. He had sustained, coordinated interactions with the hijackers there,

---

[9] *United States v. Rizzo*, 349 F.3d 94, 101-02 (2d Cir. 2003), KSABr59-60, involved a single criminal actor and no proof of jointly-undertaken activity, whereas the record here identifies a MOIA-led network, multiple participants, and coordinated conduct.

"go[ing] out of his way" to assist them with housing and banking, and linking them to members of his network, including Aulaqi,[10] Aidarus, Zeid, and Shaikh, longstanding associates who also had ties to Thumairy. SA203, 215, 221; *supra* pp.14,20,23,29,31-32,34-38,48. Bayoumi hosted a sizeable welcome party introducing them to additional subagents who provided a range of additional support. SA203-04. Bayoumi's reports to MOIA and Embassy officials coincided with key junctures in the hijackers' movements. *Supra* pp. 29-34,38,40-41.

*Third*, the district court reasonably relied on Bayoumi's sustained contacts with MOIA officials in assessing the nature of his employment. SA215; *contra* KSABr62-64. Given record evidence that Bayoumi neither attended classes nor performed the duties of his nominal job, it was reasonable to infer that his frequent interactions with MOIA officials reflected a different functional role. *See id.*; *supra* pp. 16-17,36.

KSA's claim that Thumairy did nothing to assist the hijackers, KSABr63, is contradicted by the district court's findings. Thumairy and Bayoumi "each provided assistance to the hijackers at the cities and during the time period they were employed." SA218. The court found it "significant" that Los Angeles was the

[10] The district court found that Aulaqi was an "Al Qaeda recruiter" at the time he participated in the network assisting the hijackers. SA215. Record evidence supports that finding. *Supra* pp. 14,41.

hijackers' "initial destination," reasoning that it cast the "spotlight" on Thumairy as the person they went there to meet; and that the hijackers returned to Los Angeles in June 2000 to meet again with Thumairy, "revisit[ing]" their trusted contact. SA216. The court also found that Thumairy coordinated the hijackers' transfer to San Diego with Bayoumi, Consulate and Embassy officials, and the ICSD imam. SA216, SA224.

KSA likewise ignores evidence concerning MOIA officials Sadhan and Sudairy, whom Bayoumi hosted, visited in Washington, D.C. and corresponded with prior to the hijackers' arrival, and who were assigned to the Embassy's MOIA office, which Bayoumi contacted at key junctures. *Supra* pp. 18-21,30,40-41.[11] Bayoumi's calls to Sudairy in early 2000 were timed to the hijackers' transfer to San Diego, forming part of the same pattern of coordination found by the district court, implicating MOIA officials, Thumairy, and Bayoumi. SA224; *supra* p. 30.

*Fourth*, the district court appropriately evaluated the significance of the call patterns among Bayoumi, Thumairy, and Embassy and Consulate officials. *Contra* KSABr64-68. The court considered KSA's alternative explanations—they

[11] Plaintiffs' expert concluded that Bayoumi's video from that Washington trip bore the hallmarks of an Al-Qaeda "casing video" of the U.S. Capitol, but the magistrate judge granted KSA's motion to strike that testimony as untimely, leaving the district court to evaluate the videotape without expert context needed to understand its significance. SA208-09; *supra* pp. 21-22,52.

supposedly related to education, religious materials, administrative matters, and Ramadan—and found them speculative and unpersuasive in light of timing, frequency, and sequencing during critical periods. SA224. Drawing an inference of coordination from those clusters was well within the range of permissible factfinding. SA216.[12]

KSA mischaracterizes the district court's ruling regarding Plaintiffs' phone-call exhibits. KSABr67. The court relied on Pls. Ex. 12A "to the extent that KSA does not dispute that the phone calls indeed took place," SA197 n.12—clarifying that these were calls KSA "admits" occurred, as reflected in the underlying call records cited in the exhibit. KSA's arguments about misattribution were rightly rejected as speculative since they fail to show that anyone other than Bayoumi or Thumairy had taken part in the identified calls.

---

[12] KSA's focus on Bayoumi's separate calls to KSA's Cultural Mission — purportedly about "educational records," KSABr64-65—does not explain his "period of unusual and intense phone contacts" with the Embassy's MOIA office, including ten calls from January 27 through February 3, 2000. JA3926-27. Moreover, even if KSA's claim that the Cultural Mission calls concerned Bayoumi's "education" were credited, KSA Br65, it would not make them "innocent," but would rather reflect efforts to sustain his fabricated student status. *Supra* pp. 16. During the same period up to February 4, 2000, as the hijackers were being settled in San Diego, Bayoumi and Thumairy exchanged 27 calls; Bayoumi later claimed not to remember the calls, while Thumairy falsely denied even knowing Bayoumi. JA2460(454:12-22); JA1834-35(307:20-308:7); *see United States v. McDermott*, 245 F.3d 133, 138-39 (2d Cir. 2001) (volume of calls supported insider-trading inference).

Plaintiffs' expert analyzed the call records and concluded that Bayoumi and Thumairy were using the phone numbers attributed to them during the relevant periods. The FBI reached the same conclusion. *Supra* pp. 47-48. Plaintiffs' expert's communications analysis was ruled admissible, the district court relied on it, and KSA did not challenge that admissibility issue below. SA107, 111-12, 117, SA197. KSA presented no witness, and no qualified expert, disputing the attribution of those numbers or calls.

*Fifth*, the district court appropriately treated the timing of Bayoumi's "pay raise" as corroboration. *See* SA215, SA219; *contra* KSABr68-69. The record showed that after Bayoumi co-signed the lease, helped with banking logistics, and connected the hijackers to others who provided support, KSA directed that he receive a "promotion" under which his compensation "more than doubled" and later increased again. SA204; *supra* p. 36. The court found KSA's explanations insufficient to rebut the inference that the pay raise was connected to Bayoumi's assistance to the hijackers. SA204, SA215. The court did not treat the raise as conclusive proof; rather it corroborated the inference—drawn from Bayoumi's failure to attend school and his lack of accounting duties—that in "actual practice" his work for KSA included assisting the hijackers. SA215-16; SA218; *supra* pp. 16,36.

### C. The District Court Properly Applied New York Law On Scope Of Employment.

Under New York law, "an employer is answerable for the torts of an employee who acts within the scope of his or her employment." *Rausman v. Baugh*, 682 N.Y.S.2d 42, 43 (App. Div. 1998); *see Fils-Aime v. Ryder TRS, Inc.*, 837 N.Y.S.2d 199, 200 (App. Div. 2007) (same for agency relationships). Although New York courts articulate the inquiry in different ways, the core question is whether the employee was engaged in the employer's work—"no matter how irregularly, or with what disregard of instructions." *Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (N.Y. 1979) (citation omitted). "[T]hose acts which the employer could reasonably have foreseen are within the scope of the employment and thus give rise to liability …, even where those acts constitute an intentional tort or a crime." *Holmes v. Gary Goldberg & Co.*, 838 N.Y.S.2d 105, 106 (App. Div. 2007); *SantaMarina v. Citrynell*, 609 N.Y.S.2d 902, 903 (App. Div. 1994) (scope-of-employment principle applies "however improvident[]" the act may have been). New York law requires only that the conduct need be undertaken "at least 'in part to benefit the employer.'" *Agyin v. Razmzan*, 986 F.3d 168, 185 (2d Cir. 2021).

Here, the district court applied these principles and found not only that Bayoumi and Thumairy acted within the scope of their KSA employment and agency, but also that they acted in coordination with Consulate and Embassy

officials in furtherance of KSA's interests. KSA failed to rebut that showing. SA217-21.

In an attempt to sidestep the plain force and logic of the district court's factual findings, KSA argues that Bayoumi's and Thumairy's conduct, as a matter of law, could not have furthered Saudi Arabia's interests and thus was not within the scope of their employment. KSABr51-57. That issue, however, is "ordinarily" a question of fact. *Riviello*, 391 N.E.2d at 1281.

Beyond that critical flaw, the cases KSA relies upon involve isolated, lone-actor transgressions—sexual assault, abuse, battery, and the 2017 murders at a Florida airbase committed by a Saudi airman. *See* KSABr52-54; *Swarna*, 622 F.3d at 145 ("it is beyond question that Al-Awadi did not rape Swarna to further Kuwait's purposes in the United States"); *Watson v. Kingdom of Saudi Arabia,* 159 F.4th 1234 (11th Cir. 2025). Those cases involve personal misconduct by individual actors wholly unrelated to any employment activity.

By contrast, the district court found it "unconvincing" that Bayoumi and Thumairy acted purely for personal reasons given their sustained, clandestine coordination with Saudi officials, the logistical assistance they provided, and the implausibility of their claimed motivations. SA225.

KSA's public posture as a counterterrorism partner of the U.S., KSABr1, is belied by KSA's track record before 9/11 and irrelevant in any case. The

scope-of-employment inquiry turns on record evidence of KSA's employees' pre-9/11 conduct, objectives, and relationships—not on abstract characterizations of national policy. Here, the record evidence showed that MOIA's mission and activities were broadly intertwined with support for extremists and terrorism, including through its platform in the U.S. JA1139 (finding "evidence that official Saudi entities," including MOIA, "provide financial and logistical support to individuals in the United States and around the world, some of whom are associated with terrorism-related activity"). It further reflected how those activities served KSA's interests. *Supra* pp. 5-8. On this record, the district court did not clearly err in concluding that the assistance was undertaken, at least in part, to further institutional objectives.

### 1. The *Riviello* Factors Support the District Court's Conclusion.

KSA takes issue with the district court's application of the *Riviello* factors, but they too support the court's scope-of-employment findings.

**Time, place, and occasion.** The district court properly weighed that KSA deployed Bayoumi and Thumairy to California to promote its agenda, and that their assistance to the hijackers occurred during that assignment and within its geographic scope. SA218. KSA operated King Fahad Mosque ("KFM") and installed Thumairy there under false diplomatic credentials. SA192, SA218. That KSA-run mosque was the hijackers' first port of call in the U.S. and a coordination hub for Thumairy,

Bayoumi, Mana and their subagents. SA215-16; *supra* pp. 11,20,24-26,28. Bayoumi used both San Diego mosques at which he was stationed to assist the hijackers and recruited his accomplices from among their congregants. *Supra* pp. 28,32-36. As the district court found, Bayoumi's employment created venues, opportunities, and means for the terrorist activity into which he "injected himself." SA212. The cases cited by KSA involving commuting or recreational activities are clearly distinguishable. *See Lundberg v. State*, 255 N.E.2d 177, 179 (N.Y. 1969); *Fein v. Cook*, 61 N.Y.S.3d 10, 11 (App. Div. 2017). It was not clearly erroneous for the court to treat that factor as weighing in Plaintiffs' favor.

**History of employer-employee relationship.** The district court found that the record supported a reasonable inference that Bayoumi's and Thumairy's actual roles extended beyond their claimed job titles and involved assisting the hijackers. SA214-17. The record showed that Thumairy and Bayoumi regularly hosted MOIA propagators and introduced them to many of the same subagents they recruited to help the hijackers. SA219. The court reasonably noted similarities between the MOIA propagators' travel paths and logistical arrangements and those of the hijackers. *Id.* The record further showed critical patterns of phone calls and in-person interactions among Bayoumi, Thumairy, and other KSA officials at key junctures in the hijackers' support. *Supra* pp. 22-25,29-31,40-41. And it showed that Bayoumi

received a pay raise, which the court reasonably found was tied to his assistance of the hijackers. SA215.

**Commonness and departure from normal methods.** Despite KSA labeling Bayoumi and Thumairy, respectively, as an "accountant" and an "imam," KSABr55, the district court found that assisting the hijackers fell within the functions they were actually performing. SA220. That was a reasonable conclusion given the totality of the evidence, including Bayoumi's and Thumairy's ties to Al-Qaeda-linked figures such as Aulaqi. SA202, SA205, SA215; *supra* pp. 12,14-15,18-19,22-24,29,33,36,40-41. The district court's inference on their roles from the record was permissible.

**Foreseeability.** New York law asks whether the general type of conduct was reasonably foreseeable—not whether the employer anticipated the precise act or harm. *Riviello*, 391 N.E.2d at 1281-82. The district court concluded that Bayoumi's and Thumairy's "interactions with and assistance to the hijackers were a natural incident of the employment," given their roles, communications, and institutional affiliations. SA219. That conclusion is corroborated by evidence that KSA operated platforms for MOIA, including in the U.S., that were intertwined with terrorists; deployed Thumairy, Bayoumi and others to serve in those networks; and imbued them with false diplomatic credentials and access to diplomatic facilities that allowed them to act with greater impunity. *Supra* pp. 5-17. The risk that KSA

employees and agents in these circumstances would assist terrorists is only underscored by the U.S. government's warnings to the Saudi government to cease these activities. *Supra* pp. 7-8.[13]

KSA's criticism of the court's use of the phrase "some connection" in reference to the employment nexus, KSABr3,38,57, is misconceived. The court explained that its phrasing meant the conduct was "a natural incident of the employment." SA219; *Riviello*, 391 N.E.2d at 1282. The court then identified the specific evidentiary basis for that finding, including (for example) the "direct communication with KSA officials during their relevant activities." SA220.

### 2. KSA Had "Control" Over its Employees.

Finally, KSA argues that Bayoumi and Thumairy were not subject to its control and therefore could not have acted within the scope of their employment. KSABr57-59. But New York law requires only that the employer "could" exercise control, directly or indirectly—not that it micromanaged each act. *Agyin*, 986 F.3d at 184.

The district court properly relied on documented call patterns, contemporaneous communications with Embassy and Consulate officials, and

[13] KSA's reliance on *Ierardi v. Sisco*, 119 F.3d 183 (2d Cir. 1997), is misplaced. The case involved application of New York Correction Law § 24 to a sexual harassment claim, where an employee's misconduct was a personal transgression "involving a marked 'departure from the normal methods of performance.'" *Id.* at 187-88.

evidence that both Bayoumi and Thumairy operated within a KSA-directed infrastructure. SA224. KSA's argument, KSABr58, based on *Hamm v. United States*, 483 F.3d 135 (2d Cir. 2007), is misplaced. *Hamm* concerned a reservist commuting on his own time and rejected reliance solely on generalized disciplinary authority. *Id.* at 139. It does not preclude a finding, grounded in substantial record evidence of coordinated communications and operational integration, that Bayoumi and Thumairy acted within the scope of their employment.

## III. THE DISTRICT COURT CORRECTLY FOUND THAT KSA AND ITS AGENTS COMMITTED TORTIOUS ACTS AND THERE IS NO BASIS TO DISTURB THOSE DETERMINATIONS

The district court concluded—based on its jurisdictional factfinding—that Bayoumi, Thumairy, and their employer, KSA, knowingly, or at minimum with deliberate indifference, provided material support to Hazmi and Mihdhar and therefore committed what the parties agreed qualifies as a "tortious act" for purposes of JASTA. SA221. On appeal, KSA seeks to relitigate that conclusion by advancing a narrowed definition of "tortious act" and by recharacterizing the record evidence concerning Bayoumi's and Thumairy's conduct. Neither argument succeeds.

### A. The Statutory Meaning Of "Tortious Act" Does Not Require Violent Conduct By The Foreign State.

In the district court, KSA argued that JASTA requires Plaintiffs to make a showing of "tortious act[s]," which it defined as knowingly or with deliberate indifference providing material support to the hijackers. JA644 (citing SA9-10).

The district court accepted and applied that standard, as it had in 2018. *See* SA221. KSA now contends that the court should instead have required Plaintiffs to establish conduct satisfying its interpretation of the ATA's primary-liability provision. KSABr69 (citing 18 U.S.C. § 2333).

That shift is both procedurally improper and substantively unfounded. A party cannot complain on appeal of errors that he himself invited or provoked the district court to commit. *United States v. Wells*, 519 U.S. 482, 488 (1997) (cleaned up); *see United States v. Bastian*, 770 F.3d 212, 218 (2d Cir. 2014). KSA urged the district court—not once, but twice—to apply the very standard it now challenges. JA310; JA644. Its suggestion that it preserved this theory in its reply brief, KSABr69 n.34, is wrong; the district court was not required to entertain an argument raised in the reply that conflicted with the legal standard asserted in its motion. JA639.

The argument also fails on the merits. Section 1605B(b) does not require that the foreign state's tortious conduct itself be "violent" or "dangerous to human life." *See* KSABr70. The statute instead draws a deliberate distinction. It requires, first, that the plaintiff's injuries be "caused by … an act of international terrorism," which by definition involves violence or danger. 28 U.S.C. § 1605B(b)(1); *see* 18 U.S.C. § 2331(1) (defining the term "international terrorism"). Separately, it requires that those injuries be caused by "a tortious act or acts of the foreign state." 28 U.S.C. §

1605B(b)(2). Reading "tortious act" to require inherently violent conduct would collapse these two provisions into one and render subsection (b)(2) superfluous—an interpretation courts are bound to avoid. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001). It would also conflict with Congress's express intent to provide "full access to the court system" for claims against those who "knowingly or recklessly provided material support or resources"—"directly or indirectly"—to terrorists. Pub. L. No. 114-222, § 2(a)(7), 130 Stat. at 852-53.[14]

KSA's focus on Plaintiffs' ATA claim does not alter the analysis. Courts have repeatedly held that providing nonviolent material assistance to known terrorist organizations can support liability under Section 2333. *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018) (citing *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc)); *Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144, 160-61 (2d Cir. 2021).

Moreover, Plaintiffs assert valid claims under the ATA's aiding-and-abetting cause of action, *see infra* Cross-Appeal Argument § IV.C., as well as multiple state-law tort claims incorporating aiding-and-abetting principles under state law. *See, e.g.,* JA79-83,93(CAC¶¶317-36,372-77); JA4560-62(Ash¶¶58,65). It is well settled

[14] For the reasons discussed *infra* at Argument § III.B, refocusing the inquiry on the specific torts alleged does not advance KSA's position. At the jurisdictional stage, the question is whether the asserted conduct is cognizable as a "tortious act," not whether Plaintiffs will ultimately prevail on the merits. *Robinson*, 269 F.3d at 145.

that the FSIA operates as a pass-through for such claims. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 114 (2022). The district court's findings regarding KSA's material support likewise establish cognizable tortious acts under those additional theories.

### B. Fact-Bound Findings Are Not Subject To Appellate Review And Proof Of The Ultimate Tort Is Not A Jurisdictional Requirement.

KSA's attacks on the district court's tortious-act findings fare no better than its scope-of-employment arguments. As explained, *supra* Part II.A, the district court's findings of fact fall outside this Court's collateral-order jurisdiction.

In addition, KSA's arguments misunderstand JASTA's requirement that the case be one in which damages "are sought" for a tortious act or acts of or attributable to a foreign state. 28 U.S.C. § 1605B(b). As noted above, at the jurisdictional stage, the question is simply whether the asserted conduct presents a cognizable tort claim against the foreign state, not whether Plaintiffs will ultimately prevail on the merits. *Robinson*, 269 F.3d at 145; *see also Cassirer*, 596 U.S. at 113 (FSIA governs "amenability… to suit," not liability); *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004) (sovereign immunity is not a "substantive defense on the merits"); H.R. Rep. No. 94-1487, at 21 (1976) (explaining that "tortious act" speaks to the kind of "causes of action" at issue—*i.e.*, claims that sound in tort). Courts do not "decide a case on the merits in order to decide if [they have] jurisdiction." *Robinson*, 269 F.3d at 141.

To be sure, this assessment may in certain cases require inquiry into facts that overlap the merits to determine whether the tortious conduct that forms the basis of the claim is attributable to and thus cognizable against the foreign state defendant. That may be the case, for instance, where the tortious acts are committed by an employee and an inquiry into whether those actions fell within the scope of employment is necessary to determine if a claim is actionable against the foreign state as the employer. SA23-24; *see also Robinson,* 269 F.3d at 145-46 (assessing whether tortious acts of third-party contractor were cognizable against Malaysia as building owner); *USAA Cas. Ins. Co. v. Permanent Mission of Rep. of Namib,* 681 F.3d 103, 105, 108-09 (2d Cir. 2012) (same). But the determination whether the evidence ultimately proves the commission of the tort is a merits question. *Robinson*, 269 F.3d at 141-42; *see also Usoyan v. Rep. of Turkey*, 6 F.4th 31, 47 (D.C. Cir. 2021).

Consistent with this line between the jurisdictional and merits inquiries, the district court was not required to make factual findings as to whether the evidence established that KSA's agents committed a tort in order to resolve jurisdiction. The court nevertheless made such findings here as a prudential exercise given the scope of KSA's challenges. But those findings were not necessary to the jurisdictional determination and provide no basis for KSA's appeal.

### C. The District Court's Tortious Act Findings Are Amply Supported By The Record And There Is No Clear Error.

Even if this Court reaches KSA's factual challenge, the standard is clear error, and KSA cannot meet it. The record contains ample evidence supporting the district court's determination that KSA and its agents—including Bayoumi, Thumairy and the Embassy and Consulate officials with whom they coordinated—knowingly, or at least with deliberate indifference, provided material support to Hazmi and Mihdhar. KSA's arguments identify no clear error; they quarrel only with the weight of the evidence.

KSA contends that the district court "disregard[ed]" supposedly exculpatory conclusions drawn in reports of the 9/11 Commission, the FBI, and the CIA. KSABr71. But the district court previously addressed those "governmental report[s]" directly, concluding that they did not "adequately and specifically refute" Plaintiffs' allegations. SA22-23. In its August 2025 Order, the court made clear that it took full account of those reports, properly explained what it "mainly consider[ed]" and "focus[e]d on"—namely "the primary sources" that underpinned them—and then, as KSA counsel urged, "dr[e]w its own conclusions." SA189; JA4350-51. KSA's real objection is simply that the district court did not share KSA's view as to how certain selected passages from those agencies' reports should be weighed or interpreted. *See, e.g.*, KSABr73-74. But the weighing of evidence is for the district court, and disagreement about weight does not establish

clear error. *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001). In any event, all the reports KSA cites predate critical evidence developed in this litigation. *Supra* pp. 50-52.

KSA's reliance on the FBI's May 2021 "administrative[] clos[ing]" EC fares no better. KSABr72-73. That EC is an internal memorandum reflecting a prosecutorial charging determination, not an admissible factual finding. See *United States v. Davidson*, 308 F. Supp. 2d 461, 476 (S.D.N.Y. 2004). The EC fails to address evidence central to the court's findings, including MOIA's coordination—through the Embassy and Consulate—with Thumairy and Bayoumi to support the hijackers. *Supra* pp. 48-49.

KSA's argument about supposed "compartmentalization" within Al-Qaeda—drawn from highly unreliable Guantánamo Bay detainee interviews—is likewise misplaced. KSABr72,74,80. KSA relies only on generalized descriptions and counsel's speculation—contrary to the record evidence that Hazmi and Mihdhar were senior Al-Qaeda operatives who knew about and trained for their aircraft-hijacking martyrdom mission before traveling to California, and that Bayoumi's notes included not only flight-planning calculations, but also Hazmi's secret operational codename. *Supra* pp. 38-39,41-43. In any case, Plaintiffs' tort claims do not require that KSA's employees and agents possessed the particularized knowledge KSA's arguments (wrongly) claim to be lacking.

On this record, the district court was entitled to weigh the agency materials as part of the evidentiary mosaic; it was not obligated to treat selected passages as dispositive.

KSA's remaining objections merely invite this Court to reweigh the evidence and second-guess permissible choices between competing inferences—precisely what clear-error review forbids. *Lore v. City of Syracuse*, 670 F.3d 127, 150 (2d Cir. 2012); *Anderson*, 470 U.S. at 574.

*First*, the district court permissibly inferred that Bayoumi's restaurant meeting with Hazmi and Mihdhar at the Mediterranean Café was "not just [a] chance meeting[]" given "the degree of [Bayoumi's] involvement" with the hijackers and "other key people" across the "entire series of events during the hijackers' time in Los Angeles and San Diego." SA221. Those events included Thumairy's immediate reception of the hijackers upon their arrival; Thumairy and Bayoumi's coordination calls and in-person meetings; contemporaneous communications among Thumairy, Bayoumi, the Embassy and Consulate; Bayoumi's Consulate visits and meetings with Mana before and with Mana and Thumairy after the restaurant meeting; and Bayoumi's extraordinary assistance to the hijackers, including connecting them with subagents including Aulaqi, Shaikh, and Zeid. *Supra* pp. 25-27. The court properly treated the record as a coherent whole rather than its parts in isolation, *Kaplan*, 999 F.3d at 854.

The district court was not required to accept Bayoumi's shifting accounts. *See United States v. Friedman*, 998 F.2d 53, 57 (2d Cir. 1993) (noting that when testimony is not credible, the factfinder may conclude the witness's version of events is false and draw the contrary inference).

*Second*, the district court did not clearly err in finding that Bayoumi's housing assistance was premeditated, material support rather than an "innocent" good deed. KSABr76-77. Bayoumi went far beyond casual acts of assistance, going "out of his way to help" the hijackers—unlike anything he had done before. SA221.

KSA's claim that Bayoumi assisted the hijackers because they were "newcomers" is contradicted by his own testimony: Bayoumi insisted he would not provide housing assistance to Saudis if he did "not know them well." And his efforts in support of them were extraordinary and premeditated. Bayoumi started searching for a suitable apartment for the hijackers in advance of their arrival, visited the rental office over three separate days, obtained a certified check as well as a personal credit report, and signed as a lessee and guarantor. *Supra* pp. 26,28-29. The court reasonably determined that Bayoumi was "following KSA's instructions when he assisted the hijackers." SA221.

The sole example KSA offers to support its "newcomers" theory omits the most telling detail: the person who allegedly helped Bayoumi find an apartment was Hamerman, leader of the ICSD extremist cell. Part of Bayoumi's job was to establish

himself in that very same community of extremists, which he did while also ushering Hamerman into MOIA's apparatus in Saudi Arabia. *Supra* p. 14. FBI investigations in the 1990s led to terrorism convictions against members of that same ICSD extremist cell. *See* [redacted]; *United States v. Jayyousi*, 657 F.3d 1085, 1094-95 (11th Cir. 2011).

KSA also latches on to Bayoumi's belated, fictitious claim that his motive in helping the hijackers find housing was to get a "referral fee." KSABr76-77. Bayoumi never advanced that explanation in his multiple interviews between 2001 and 2004 under questioning from the MPS, the FBI, and the 9/11 Commission. There is no record of any fee being paid—and as co-signing lessee, Bayoumi was in any case ineligible. *Supra* p. 29. Bayoumi's vacillating accounts of this and other matters further undermine KSA's attempts to characterize his assistance as "innocent."

*Third*, the district court did not clearly err in concluding that Bayoumi's airplane sketch and calculations supported an inference of advanced, operational knowledge of the September 11th attacks. SA222. Bayoumi offered inconsistent explanations and could not provide a coherent account of the document's purpose. To the contrary, he claimed he intended to "memorize the equation" and asserted it was used to "measure distance," for example "to … Washington"—one of Al-Qaeda's targets for the attacks. The district court was entitled to consider the sketch alongside expert testimony about what the distances and calculations reflect and

alongside the broader record of Bayoumi's activities and contacts. *Supra* pp. 38-39. Clear error review does not permit KSA to convert an implausible explanation into a required one.

KSA's claim that Bayoumi's calculations "do not match" the 9/11 flight paths, KSABr78, mischaracterizes the record. Plaintiffs' expert made no concession that they do not match: he was asked a hypothetical "with no other context," and simply responded to it on its terms. JA1726(50:11-19). As for its discredited theory that Bayoumi's notepad evidence was part of a high school math assignment, KSABr78, KSA's counsel acknowledged at oral argument—when pressed by the court—that this theory had "no basis in fact." SA210; JA4452(lines6-9). Notably, KSA declined to question Bayoumi about the sketch or calculations.

*Fourth*, the district court did not clearly err in concluding that Thumairy provided material support. The record supported findings that Thumairy served as the hijackers' initial point of contact in Los Angeles and that they were brought to King Fahad Mosque to meet privately. Thumairy coordinated advance plans for specific forms of support with the Embassy, Bayoumi, Mana, and subagents in San Diego. Through Mana, Thumairy arranged for Johar to provide transport, lodging, and orientation, and he worked with Bayoumi, Mana, and the Embassy on the hijackers' settlement in San Diego. *Supra* pp. 25-31. The hijackers returned to King Fahad Mosque in June 2000—another critical juncture in the support network—to

meet privately with Thumairy. *Supra* pp. 37-38. As Hazmi united with hijacker-pilot Hanjour and prepared to leave San Diego, Thumairy had further coordination calls with Bayoumi; and in June 2001, contact was established between Mana and East Coast network members tied to Aulaqi, just as the hijackers were assembling to stage the attacks. *Supra* pp. 40-41.

The district court also reasonably relied on the pattern of communications timed to key logistical events and on other corroborating evidence developed in discovery. SA222. KSA objects to the court's reference to testimony that the FBI possessed a photo of Thumairy with the hijackers at the Mosque, KSABr81-82, but the fact that Thumairy met with them there is undisputed, and forms a solid basis for the court's findings. KSA says nothing of its own shielding of Thumairy from investigation after learning, shortly after 9/11, that the FBI was probing his relationship with the hijackers. *Supra* p. 43.

In short, KSA identifies no factual finding that is implausible in light of the record as a whole, and it offers no basis for the extraordinary step of reversal under clear-error review. The Court should reject KSA's tortious-act challenge for lack of jurisdiction and, alternatively, affirm on the merits.

## IV. THE DISTRICT COURT CORRECTLY FOUND THAT PLAINTIFFS' INJURIES WERE "CAUSED BY" KSA'S CONDUCT AND THERE IS NO BASIS TO DISTURB THOSE DETERMINATIONS

The district court correctly construed Section 1605B(b)'s *jurisdictional* "caused by" language to require "some reasonable connection between the act ... of the defendant and the damage which the plaintiff has suffered." SA14 (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017), *vacated and remanded on other grounds sub. nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020)); *see* SA212. Every court of appeals to consider the jurisdictional causation standard under the FSIA's terrorism exceptions has adopted that formulation and applied a "traditional proximate cause" test, as the district court did here. KSA identifies no persuasive basis for departing from it.

Whatever the correct standard, however, causation is satisfied here. Through its agents, KSA arranged and provided the precise forms of support the hijackers needed to settle in the U.S., avoid detection, and advance the 9/11 plot.

### A. Section 1605B(b) Requires Some Reasonable Connection Between The Defendant's Actions And Plaintiffs' Injuries Which Is Satisfied By A Showing Of Proximate Cause.

Section 1605B(b)'s jurisdictional "caused by" language mirrors the "caused by" language that Congress used in Section 1605A. When JASTA was enacted in 2016, it was already well-settled that "caused by" in Section 1605A requires only a showing of proximate cause—not but-for causation. *See Kilburn v. Socialist*

*People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004); *Rux v. Republic of Sudan*, 461 F.3d 461, 473 (4th Cir. 2006); *see also Owens*, 864 F.3d at 794.[15]

Congress deliberately "incorporate[d]" Section 1605A's proximate-cause standard into Section 1605B and made clear that "[c]ourts interpreting [the] new section 1605B should look to cases like *Kilburn*, *Rux*, and *Owens*," 162 Cong. Rec. at S2845 (May 27, 2016) (statement of Sen. Cornyn); *cf. O'Bryan v. Holy See*, 556 F.3d 361, 383 (6th Cir. 2009) (explaining that courts interpret FSIA provisions in line with the Federal Tort Claims Act because the "legislative history" directs them to do so).

Consistent with that directive, all three courts to address the causation requirement under Section 1605B have applied a proximate-cause standard, following *Kilburn*, *Rux,* and *Owens.* Most recently, the Eleventh Circuit affirmed a district court holding that Section 1605B(b) requires proximate cause and expressly rejected KSA's arguments—repeated here—that the statute requires but-for cause in addition. *Watson*, 159 F.4th at 1259 (quoting 28 U.S.C. § 1605B(b)). The governing

---

[15] *Kilburn* and *Rux* interpreted the "caused by" phrase when the terrorism exception was codified at 28 U.S.C. § 1605(a)(7), which contained materially identical language stripping foreign states of immunity in cases seeking damages "*caused by*" the same enumerated acts of terrorism. *See* Pub. L. No. 104-132 § 221(a)(7), 110 Stat. 1214, 1241-43 (1996) (emphasis added).

proximate cause standard requires a plaintiff to show (1) that the sovereign's conduct was a "substantial factor in the sequence of events" leading to their injuries, and (2) that the injuries were "reasonably foreseeable or anticipated as a natural consequence of" that conduct. *Id.* at 1260 (quoting *Owens*, 864 F.3d at 794).

The district court correctly followed this uniform approach and rejected KSA's attempt to graft on an additional but-for requirement. *See* KSABr82-83. That extra hurdle finds no support in the statutory text, the case law, or background principles of tort law.

*First*, nothing in Section 1605B supports a but-for causation requirement. The statute uses only the phrase "caused by," not "but for." As *Kilburn* explained in interpreting identical language in Section 1605A, "there is no textual warrant" for reading "caused by" to mean but-for causation. 376 F.3d at 1128. In ordinary and legal usage, a "cause" is "something that produces an effect or result." Cause, *Black's Law Dictionary* (12th ed. 2024); *accord* KSABr82-83 (defining "cause" as "a person, thing, fact, or condition that brings about an effect or that produces or calls forth a resultant action or state" (quoting Cause, *Webster's Third New International Dictionary* 356 (1993)). KSA's dictionary citations to the word "cause" thus undermine, rather than support, its position.

*Second*, appellate decisions interpreting Section 1605B—or the identical "caused by" language in Section 1605A—have uniformly rejected KSA's proposed

but-for standard. *See Watson*, 159 F.4th at 1259; *Kilburn*, 376 F.3d at 1128; *Rux*, 461 F.3d at 472-73; *see also Owens*, 864 F.3d at 794. KSA relies on cases involving *other* phrases and *non*-jurisdictional statutes, KSABr83-84,[16] which shed no light on the meaning of "caused by" in the FSIA's terrorism exceptions. *See, e.g.*, *Watson*, 159 F.4th at 1259 ("None of the authorities cited by Saudi Arabia supports the application of but-for causation here."). And when interpreting the identical "caused by" phrase in another jurisdictional statute, the Supreme Court held that the phrase means proximate causation. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995).[17]

KSA's lone FSIA case, *O'Bryan*, does not support its position. *See* KSABr89 (citing *O'Bryan*, 556 F.3d at 382). There, the Sixth Circuit conflated the question whether state law supplies a cause of action with the distinct question whether the FSIA confers jurisdiction. *See* 556 F.3d at 381. Even so, *O'Bryan* did not apply a

[16] *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020) (interpreting "because of" in Title VII of the Civil Rights Act of 1964); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013) (same); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (interpreting "because of" in the Age Discrimination in Employment Act); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63 (2007) (interpreting "based in whole or in part on" in the Fair Credit Reporting Act); *Burrage v. United States*, 571 U.S. 204, 214 (2014) (interpreting "results from" in a criminal statute); *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 265 (1992) (interpreting "by reason of" in RICO).

[17] KSA strains to read but-for causation into *Grubart*. KSABr87. But that decision never mentions but-for causation, much less adopts it. *Watson* rejected that same argument, explaining that the Supreme Court "concluded that the same phrase means proximate causation." 159 F4th at 1259.

but-for cause standard; it asked whether the alleged acts were a "substantial factor in causing plaintiffs' damages." *Id.* at 386.

*Third*, KSA's reliance on background presumptions fares no better. The presumption that but-for causation "supplies the 'default' or 'background' rule against which Congress ... ha[s] legislated" applies only when Congress is "creating its own new *causes of action*." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 332 (2020) (emphasis added); KSABr84. Section 1605B(b) does not create a cause of action; it governs immunity. That distinction matters. The FSIA's terrorism exceptions operate across a range of substantive claims—including state-law torts and claims under the ATA—with differing causation standards. *See Kilburn*, 376 F.3d at 1129.[18] Imposing a restrictive but-for test at the jurisdictional stage would defeat Congress's design.

That point is underscored by JASTA's expansion of the ATA to include aiding-and-abetting liability. *See* 28 U.S.C. § 1605B(c); 18 U.S.C. § 2333(d)(2). Aiding-and-abetting claims do not require proof of but-for causation. *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 486 (2023) (explaining that an aiding-and-abetting claim under the ATA demands that the defendant was "generally aware of his role"

---

[18] Contrary to KSA's assertion, KSABr88, *Kilburn* did not "assum[e] that a jurisdictional requirement must not overlap with a merits requirement." Rather, *Kilburn* simply declined to adopt a jurisdictional test that might eliminate jurisdiction for claims Congress intended to permit.

and that the defendant "knowingly and substantially" assisted the principal's violation). Reading Section 1605B(b) to require but-for causation would conflict with Congress's express decision to permit aiding-and-abetting claims against foreign states.

*Fourth*, even if background tort principles applied, they would not yield KSA's rule. Acts of international terrorism are paradigmatic multiple-tortfeasor cases, often involving numerous supporters whose individual contributions may be difficult to trace. *Kilburn*, 376 F.3d at 1129. In such cases, tort law does not apply a strict but-for test. Where multiple actors' conduct combines to cause a harm, and application of the but-for rule would absolve all of them, each actor's conduct is treated as a cause in fact. Restatement (Third) of Torts: Physical & Emotional Harm § 27 (2010); Prosser & Keeton, *The Law of Torts* 266-68 (1984); *see also Kilburn*, 376 F.3d at 1129; *Rux*, 461 F.3d at 473 (rejecting as overly restrictive a requirement that plaintiffs "chart a direct and unbroken causal line" from support to attack).

**B. Any Causal Test is Satisfied Here.**

The district court correctly held that Plaintiffs' injuries were "caused by" KSA's provision of material support to the 9/11 hijackers through its officials and agents. *See* SA12-14; SA213; SA221-26. As explained, *supra* Part II.A, the district court's findings of fact fall outside this Court's collateral-order jurisdiction. In any

event, the record evidence demonstrates that KSA's conduct was a substantial factor in bringing about Plaintiffs' injuries and that the harm was reasonably foreseeable.

Hazmi and Mihdhar were veteran Al-Qaeda terrorist operatives anointed by Bin Laden himself as the first hijackers to arrive in the United States. The district court considered the 9/11 Commission's finding that the hijackers were "ill-prepared for a mission in the United States": they spoke little or no English, had spent little time in the West. SA19. The Commission concluded that Al-Qaeda would likely have arranged "assistance from one or more individuals informed in advance of their arrival." SA19.

The court found that assistance was provided by Bayoumi and Thumairy, acting in concert with Consulate and Embassy officials. SA216, SA221-22, SA224-25. They arranged and coordinated the precise forms of support the hijackers required, including housing; banking; wire transfers; transportation; setting up phones, computers, email and Internet; purchasing and insuring a car; obtaining state driver's licenses; exploring and securing immigration status. *Supra* pp. 25-37.

Enabled by this KSA-coordinated support, Hazmi and Mihdhar tested the core logistical and operational mechanisms of the plot, settled in the U.S. and began preparations for the attacks, successfully remained in the U.S. undetected, and, ultimately, fulfilled their roles as essential participants in the attacks.

KSA's craven attempt to contest proximate causation under the theory that Hazmi and Mihdhar "failed" or that they were merely "muscle hijackers" is indefensible. KSABr.90-91. Both men played central roles in the attacks—Hazmi as second-in-command operations leader, and Mihdhar as organizer of the "muscle" hijackers. *Supra* pp. 42-43. Their months in California laid the foundation for the other hijackers who followed. They did exactly what they were sent to do: establish the operation on U.S. soil, facilitate the arrival of additional operatives, smooth the pathways for other hijackers, and advance the plot—culminating in their direct perpetration of the 9/11 attacks.

KSA's key assistance was a substantial factor in the sequence of events that culminated in the 9/11 Attacks, far more so than the material and financial support at issue in *Owens*. *See* 864 F.3d at 794-95 (support in *Owens* was substantial factor even though more remote and provided years earlier). And the attacks were a reasonably foreseeable consequence of providing sustained material support to known Al-Qaeda operatives. KSA does not meaningfully argue otherwise. *See* KSABr91-92.

The district court found that KSA offered no evidence challenging Plaintiffs' causation proof. The court observed that the central underpinnings of its 2018 decision were now confirmed by jurisdictional discovery: Thumairy met with the hijackers after they arrived in Los Angeles, Bayoumi met with them in Los Angeles

and San Diego, Bayoumi assisted Hazmi and Mihdhar in obtaining an apartment and opening a bank account, and that their subagents assisted the hijackers. SA213. As the district court held, those undisputed facts are "sufficient, as they were in 2018, to satisfy the substantial factor and reasonably foreseeability elements of the proximate cause test." *Id.* The court observed that Bayoumi's assistance "move[d] [the hijackers] forward toward their goal." JA4342.

Even if Section 1605B(b) required proof of but-for causation, that standard would still be satisfied. Al-Qaeda's need for prearranged contacts on the ground to receive and support its operatives was a "prerequisite" for deployment of Hazmi and Mihdhar. *Supra* pp. 24-25. KSA's U.S. MOIA operation uniquely possessed the organizational capacity, cover, funding, intelligence, personnel, ability, and motivation to serve that essential function for Al-Qaeda inside the U.S. and thereby cause the 9/11 plot to take root and succeed.

On this record, Plaintiffs have shown that their injuries were "caused by" KSA's conduct under any plausible causal standard. 28 U.S.C. § 1605B(b).

## PLAINTIFFS-APPELLEES/APPELLANTS' CROSS-APPEAL

## CROSS-APPEAL JURISDICTIONAL STATEMENT

The Court may exercise pendent appellate jurisdiction over the cross-appeal challenging the rejection of alternative jurisdictional grounds. *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995); *infra* § I.A.

## ISSUE PRESENTED IN CROSS-APPEAL

Whether the district court erred in refusing to exercise jurisdiction under JASTA, where Plaintiffs adequately alleged that KSA-controlled charities and other agents provided material support to Al-Qaeda and that KSA aided-and-abetted the 9/11 attacks.

## ARGUMENT

Plaintiffs advanced independent grounds for jurisdiction under JASTA, including KSA-controlled charities' and other KSA agents' provision of material support to Al-Qaeda and KSA's aiding-and-abetting of the 9/11 attacks. JA369-92, JA603-14. The district court rejected those bases. SA24-37; SA53-60. This Court should reverse.

### I. THIS COURT HAS JURISDICTION OVER THE CROSS-APPEAL.

Pendent appellate jurisdiction is appropriate when (1) the appealable and non-appealable issues are "inextricably intertwined" or (2) pendent review is "necessary to ensure meaningful review" of the former. *Walczyk v. Rio*, 496 F.3d 139, 153 (2d Cir. 2007). Both apply.

### A. The Alternative JASTA Predicates Are Inextricably Intertwined With KSA's Appeal.

"Inextricably intertwined" does not mean "identical." It is enough that the appeals present "the same specific question," *Stolt-Nielsen SA v. Celanese AG*, 430 F.3d 567, 576 (2d Cir. 2005), or "there is substantial factual overlap bearing on the issues raised," *Clubside, Inc. v. Valentin*, 468 F.3d 144, 161 (2d Cir. 2006). That standard is satisfied here.

KSA's appeal asks this Court to adopt restrictive interpretations of JASTA's causation requirement (KSABr82-90), "tortious act" requirement (KSABr69-70), scope-of-employment principles (KSABr51-54), and foreseeability (KSABr56-57). Those same legal positions govern not only the Bayoumi-and-Thumairy predicate the district court accepted, but also the charity-support, individual-agent, and aiding-and-abetting predicates the district court rejected. *Cf. Lamar Advert. of Penn., LLC v. Town of Orchard Park*, 356 F.3d 365, 372 (2d Cir. 2004).

This Court has exercised pendent appellate jurisdiction in comparable circumstances. It has done so where jurisdiction under one FSIA exception and personal jurisdiction turned on overlapping facts, *see U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 199 F.3d 94, 97 (2d Cir. 1999) (per curiam), where a qualified-immunity issue and cross-appeal on liability required resolution of the same underlying evidentiary question, *see Luna v. Pico*, 356 F.3d 481, 487 (2d Cir.

2004), and where appealable and non-appealable issues shared "substantial factual overlap." *Clubside*, 468 F.3d at 161.

Other circuits have exercised jurisdiction in precisely this posture—where a sovereign appeals the denial of immunity under one FSIA exception and the appellee cross-appeals the rejection of alternative predicates. In *O'Bryan v. Holy See*, 556 F.3d 361 (6th Cir. 2009), for example, the Sixth Circuit reviewed both the appealed immunity ruling and the district court's rejection of alternative FSIA exceptions because the "ultimate issue" was whether the sovereign was immune from suit. *Id.* at 377 n.7. The logic applies here even more so where all predicates arise under JASTA.

KSA's efforts to distinguish *O'Bryan* fail. Contrary to KSA's claims, KSA Reply at 5-6 (25-2202, Dkt. 107.1), the Sixth Circuit expressly applied its strict standard for pendent jurisdiction, which this Court has acknowledged mirrors the law in this Circuit, *O'Bryan*, 556 F.3d at 377 n.7; *see Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 758 (2d Cir. 1998). Its reference to D.C. Circuit precedent was merely to note that judicial economy also counseled exercising jurisdiction.

### B. Review Of The Alternative JASTA Predicates Is Necessary For Meaningful Review Of KSA's Issues.

Pendent review is also warranted because it is "necessary to ensure meaningful review" of the immunity question the KSA presents. *Walczyk*, 496 F.3d

at 153. KSA asks this Court to reverse and remand for dismissal, claiming it is immune. KSABr93. But the Court cannot fully resolve whether immunity exists without also deciding whether jurisdiction exists on the alternative predicates the district court rejected. And sovereign-immunity questions should be resolved "as near to the outset of the case as reasonably possible." *Helmerich*, 581 U.S. at 174.

## II. THE DISTRICT COURT HAD JURISDICTION BASED ON THE MATERIAL SUPPORT PROVIDED BY KSA-CONTROLLED CHARITIES.

Plaintiffs alleged that KSA established, funded, supervised, controlled, and directed a network of "charities"—including the Al-Haramain Islamic Foundation, International Islamic Relief Organization ("IIRO"), World Assembly of Muslim Youth ("WAMY"), and Muslim World League ("MWL")—that provided systemic and sustained financial and logistical support to Bin Laden and Al-Qaeda for over a decade leading up to 9/11. JA22-29,31-42(CAC¶¶60-75,80,86,91,94,102,108-33); JA114,123-24,130,178-262(Aver.¶¶19,48,81,286-580). For example, the Treasury Department identified the KSA-controlled Al-Haramain as "one of the biggest terror-financing operations in the world" and designated the entirety of the Al-Haramain organization for "providing support for the Al-Qaida network." JA925,929-30. Affidavit testimony from Al-Haramain's own leadership confirmed that Al-Haramain "operates under the supervision of the Saudi Minister of Islamic Affairs, who appoints its Board of Directors and senior management personnel,"

JA35,38-42(CAC¶¶121,131), JA231-32(Aver.¶477-78), and additional factual allegations showed that Al-Haramain branch offices operated under the direction of Islamic Affairs officials in KSA's Embassies and Consulates. JA14,34(CAC¶¶33,116); JA231-32(Aver.¶¶477,478).

Al-Haramain's involvement in Al-Qaeda's terrorist activities went beyond pervasive financial and logistical assistance, and included direct operational involvement in Al-Qaeda plots and attacks, including the 1998 embassy attacks and the support network for the 9/11 attacks. JA28-29(CAC¶¶86,91-92); JA123-24,171-72,185-86,232-41(Aver.¶¶48,257,313-15,480-506). After 9/11, multiple entities and leaders, including Al-Haramain, were designated as terrorism-related actors based on their pervasive roles in supporting Al-Qaeda. JA26(CAC¶77); JA171-72,233-41(Aver.¶¶257,483-503).

Plaintiffs also alleged that KSA was specifically aware that government funds and resources channeled to those ostensible charities were broadly being deployed to support Al-Qaeda and its campaign to attack the U.S., JA13-14,38-42(CAC¶¶30-33,133), and that the charities' support for terrorism was in furtherance of MOIA's core mission. JA5-6,14,22-23,42-47(CAC¶¶2,33,61,133-54); JA173-78(Aver.¶¶264-85).

At the pleading stage, Plaintiffs needed to make only a prima facie showing that § 1605B(b) applies. The district court rejected jurisdiction because attribution

and causation were not adequately pleaded. SA31. But it erred at the outset by failing to engage Plaintiffs' argument that KSA itself committed torts satisfying JASTA through its funding and support of Al-Qaeda via the charities and the government officials that headed them. And its conclusions as to attribution and causation were incorrect.

**A. KSA's Tortious Acts In Support Of Al-Qaeda Are Actionable.**

Plaintiffs alleged that KSA violated JASTA and state law by knowingly providing substantial assistance indirectly to Al-Qaeda through the charities and others. JA79-83,93(CAC¶¶317-36,372-77). That material support constitutes a tortious act even if the charities' and individuals' actions cannot be attributed to KSA under agency or alter-ego principles. *See Kaplan*, 999 F.3d at 855-56; JA378-83. The district court erred in 2018 by failing to consider these allegations and instead requiring Plaintiffs to demonstrate attribution. SA17-18.

**B. The Charities' Actions Are Attributable To KSA.**

The district court also did not meaningfully analyze Plaintiffs' primary attribution theory—agency. Instead, it treated the alter-ego test from *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) (*Bancec*), as the governing standard, and suggested that agency attribution would be an "end-run around Bancec." SA36. That was error. Section 1605B(b) expressly

attributes tortious acts by a foreign state's "official[s], employee[s], or agent[s]" acting within scope to the foreign state. 28 U.S.C. § 1605B(b). Agency therefore provides an independent basis for attribution, and Plaintiffs adequately alleged it. In any event, Plaintiffs also pleaded extensive control sufficient under *Bancec*.

### 1. The District Court Collapsed Agency and Alter Ego.

Agency asks whether an actor was authorized to act on the principal's behalf and subject to the principal's control. *See, e.g., Maurillo v. Park Slop U-Haul*, 194 A.D.2d 142, 146 (N.Y. App. Div. 1993). Alter ego asks when an instrumentality's juridical separateness should be disregarded because it is "so extensively controlled" by the sovereign that it lacks meaningful independence. *Bancec*, 462 U.S. at 627-29. The doctrines address different problems; alter ego does not displace agency attribution for particular acts. And JASTA's design confirms that Congress meant to reach indirect support: it was enacted to provide "the broadest possible basis" for relief against foreign states that provided material support "directly or indirectly," JASTA § 2(b), and it withdraws immunity where a foreign state's "agent[s]" commit tortious acts causally connected to terrorism in the United States, 28 U.S.C. § 1605B(b). Requiring alter-ego status as a gateway to attribution would collapse agency into veil-piercing and narrow § 1605B(b) in a way JASTA does not permit.

### 2. Plaintiffs Adequately Alleged Agency and Scope.

Plaintiffs alleged that the relevant charities were established, funded, directed, and controlled by KSA as instruments for overseas propagation. JA22,33-34(CAC¶¶60,109-114). They were established by royal decree, funded almost entirely by the KSA government, led by KSA-appointed officials, and supervised by senior Saudi officials. JA38-42(CAC¶131-32). Plaintiffs further alleged that the charities operated "pursuant to the policies established by the Saudi government," under MOIA and embassy supervision and subject to KSA approvals. JA35,38-42(CAC¶¶119,131(ii)-(qq),132-33). And multiple charities submitted affidavits confirming as much. JA35-37(CAC¶¶121-27).

Plaintiffs further alleged that, within this structure, the charities provided concrete operational support to Al-Qaeda—raising and laundering funds, channeling money, providing logistical support and assets, and funding camps where September 11 hijackers trained. JA24-26,28(CAC¶¶70-72,75,85-86); JA178-263(Aver.¶¶286-587) (documenting charities' support). And Plaintiffs alleged that these "tortious acts" were undertaken "in furtherance of their core mission" and therefore were "within the scope of their agency." JA42,44(CAC¶¶133,139); JA139-43(Aver.¶¶115-129). That is sufficient at the jurisdictional stage—and certainly sufficient to warrant jurisdictional discovery.

### 3. Plaintiffs Also Pleaded "Extensive Control" Under *Bancec*.

Even under the district court's alter-ego framework, Plaintiffs alleged that KSA had "significant and repeated control over" the charities' "day-to-day operations." SA32. They alleged "complete domination" through legal, financial, administrative, and operational controls, including that overseas offices were "incapable of independent action"; that even "relatively minor" undertakings required review and approval in KSA; that offices had mandatory quarterly and annual operational and financial reporting plus monthly bank and expense reporting; and that they could not open accounts, withdraw funds, or spend even locally raised donations without prior written consent from senior Saudi officials. JA38-42(CAC¶¶131-32). Those are precisely the granular, operational allegations that plausibly plead "extensive control." At minimum, they warranted jurisdictional discovery rather than dismissal. JA42(CAC¶132&n.6).

### 4. Plaintiffs Alleged a Reasonable Connection Between the Charities' Support and September 11th.

The district court acknowledged allegations that KSA-controlled charities knowingly provided Al-Qaeda with funds, equipment, and supplies to establish terrorist training camps; enabled operatives—including eventual hijackers—to travel to those camps; furnished false travel documents facilitating that travel; and provided covert couriers and other logistical support for communications. SA36-37 (citing JA27-28(CAC¶¶80,86); JA185-86,203-05,214(Aver.¶¶315,377-78,382,422).

Indeed, it previously concluded that Plaintiffs had adequately alleged causation as to Al-Haramain, IIRO, and WAMY. *See In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 569 (2005) (IIRO), *aff'd*, 538 F.3d 71 (2d Cir. 2008); *In re Terrorist Attacks on September 11, 2001*, 740 F. Supp. 2d 494, 519-20 (2010) (WAMY), *aff'd*, 714 F.3d 118 (2d Cir. 2013); *id.* at 520 (Al-Haramain). Nevertheless, in 2018, it deemed the support "too temporally and geographically remote" and too indirect. SA37. That misapplied the governing causation standard.

Courts interpreting the FSIA's terrorism exceptions have repeatedly adopted proximate causation and rejected demands for an "unbroken causal line." *Rux*, 461 F.3d at 473; *see Kilburn*, 376 F.3d at 1128-29; *Owens*, 864 F.3d at 794-95. Those decisions recognize that upstream support—training infrastructure, travel facilitation, documentation, and communications—can be a substantial factor in later attacks even when provided abroad and years earlier. *See Owens*, 864 F.3d at 794-95; *Kilburn*, 376 F.3d at 1128-29.

Nor does "indirectness" defeat causation under JASTA. Congress enacted JASTA to provide the "broadest possible basis" for relief against foreign states that provided material support "directly or indirectly." JASTA § 2(b). Section 1605B(b) accordingly requires a reasonable, proximate connection—not that the defendant's conduct be the last link in the chain. The allegations here describe upstream support central to terrorist operations. At the jurisdictional stage, Plaintiffs were not required

to trace each payment, document, or courier to a specific hijacker's day-by-day movements. They were required to plead a plausible, reasonable connection. Under *Kilburn*, *Rux*, and *Owens*, these allegations suffice—and, at minimum, warranted jurisdictional discovery rather than dismissal.

## III. THE DISTRICT COURT HAD JURISDICTION OVER PLAINTIFFS' CLAIMS BASED ON MATERIAL SUPPORT BY ADDITIONAL KSA AGENTS.

Plaintiffs alleged that, beyond Bayoumi, Thumairy, and the KSA-controlled charities, other KSA agents and employees—including Osama Basnan, Mohammed al Qudhaeein, Hamdan al Shalawi, and Omar Abdi Mohamed—provided material support to Al-Qaeda and the 9/11 plot while acting within the scope of their agency or employment. The district court concluded these allegations were insufficient. SA25-31. That was error. At this stage, Plaintiffs needed only a prima facie showing that the Section 1605B(b) exception applies—not proof on the merits. *See Robinson*, 269 F.3d at 140-41. Plaintiffs' unrebutted allegations and supporting averments met that burden and, at a minimum, warranted jurisdictional discovery.

### A. Basnan

Plaintiffs adequately alleged that Basnan was an undisclosed KSA agent who assisted Hazmi and Mihdhar. Basnan worked under MOIA auspices in Washington, D.C.; U.S. intelligence identified him as an "ardent" Bin Laden supporter; and he organized an event honoring Blind Sheikh Rahman.

JA15,56,66(CAC¶¶36,200,252); JA158-61(Aver.¶¶196-207). He reentered the United States on a tourist visa while continuing to work for KSA. JA66(CAC¶251). Like Bayoumi, Basnan maintained close MOIA ties and received regular payments from Saudi-controlled charities, the Embassy, and even the KSA Ambassador. JA56,60,66(CAC¶¶199-200,218,252-56); JA159-61(Aver.¶¶200-01,206). Plaintiffs also alleged that Basnan effectively succeeded Bayoumi in 2001. JA62(CAC¶228).

On material support, Basnan lived in the same complex as Bayoumi, Hazmi, and Mihdhar. JA160-61(Aver.¶205). He claimed he helped the hijackers "more than al-Bayoumi did." JA56(CAC¶201). The FBI concluded that while Bayoumi and Basnan were the hijackers' neighbors, Hazmi and Mihdhar contacted a close Basnan associate for flight training. JA57(CAC¶203). The 9/11 Commission also found Basnan "lack[ed] credibility on virtually every material subject." JA58(CAC¶210). Taken as true, these allegations support jurisdiction—and certainly warrant discovery.

### B. Qudhaeein And Shalawi

Plaintiffs alleged that Qudhaeein and Shalawi were undeclared KSA agents who conducted a "dry run" of airline security procedures and otherwise assisted the plot. JA15-16,69-72(CAC¶¶36,267-80). Both were employed by KSA and financially supported to attend school in Arizona. JA69-70(CAC¶¶267-68). FBI

investigators viewed Qudhaeein as sharing the same "profile" as Bayoumi and Basnan, and Shalawi had longstanding KSA ties. JA70(CAC¶¶269,272]. In November 1999, they traveled on KSA-purchased tickets to an Embassy symposium. JA70(CAC¶¶270,274). During that flight, Qudhaeein twice attempted to access the cockpit—conduct the FBI viewed as testing security procedures. JA70(CAC¶¶270-71). After the incident and even after 9/11, both held positions at Imam Muhammad Ibn Saud Islamic University, a KSA institution. JA71-72(CAC¶¶278-80). These facts plausibly place them within a KSA-sponsored framework.

Plaintiffs also alleged nexus: while in Arizona, Qudhaeein and Shalawi interacted with hijacker Hani Hanjour (and at least one other Al-Qaeda member), and after the cockpit incident Shalawi traveled to an Al-Qaeda training camp in Afghanistan. JA48,70-72(CAC¶¶158(j),270,279,280). U.S. authorities later watch-listed Shalawi and denied him a visa in 2001. JA72(CAC¶280). At this stage, Plaintiffs were not required to plead the full chain of transmission; it suffices that the alleged conduct plausibly benefited the plot. And discovery was warranted.

### C. Abdi Mohamed

Plaintiffs alleged that Abdi Mohamed, another undisclosed MOIA employee in the United States, provided substantial funds to an Al-Qaeda front while acting within the scope of his KSA role.

He entered the country on a religious-worker visa without disclosing longstanding MOIA employment. JA76(CAC¶¶302-03). In San Diego, he created the Western Somali Relief Agency and sent 65 checks over roughly 18 months—nearly $400,000—to Dahab Shil, an Al-Qaeda front whose Pakistan office was controlled by Khalid Sheikh Mohammed while he planned the September 11th attacks and disbursed funds to hijackers. JA76-77(CAC¶¶304-05). Evidence obtained after the motion-to-dismiss argument showed that KSA tasked him with "intelligence gathering missions" and he operated under Thumairy's supervision. SA29. He was later deported for concealing Saudi employment. JA77(CAC¶306). These allegations plausibly show MOIA-network activity and material support; Plaintiffs were not required at this stage to trace each dollar to a particular hijacker. SA30.

## IV. THE DISTRICT COURT HAD JURISDICTION BASED ON KSA'S AIDING-AND-ABETTING.

The district court erred in refusing to exercise jurisdiction over Plaintiffs' claims that KSA is liable for aiding-and-abetting Al-Qaeda. In 2018, the district court did not address this alternative theory. *Compare*

JA370-71,392 with SA15-37. On reconsideration, it held that JASTA does not permit ATA aiding-and-abetting claims against foreign states. SA53-60. That holding conflicts with JASTA's text, structure, and purpose. And even if the Court disagrees as to the ATA, Plaintiffs' state-law secondary-liability claims provide a jurisdictional predicate under Section 1605B(b).

### A. JASTA Authorizes ATA Aiding-And-Abetting Claims Against Foreign States.

The ATA creates a cause of action for U.S. nationals injured "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). JASTA amended the ATA to clarify that liability extends to "any person who aids and abets" such an act. *Id.* § 2333(d). Before JASTA, the ATA barred suits "against ... foreign state[s]." *Id.* at § 2337(2). JASTA removed that bar and provides that "[n]otwithstanding section 2337(2)," a U.S. national "may bring a claim against a foreign state in accordance with section 2333 ... if the foreign state would not be immune under" Section 1605B(b). 28 U.S.C. § 1605B(c).

That text incorporates Section 2333 as Congress defined it—including Section 2333(d). Section 1605B(c) authorizes claims "in accordance with section 2333," not "in accordance with section 2333(a)." If Congress intended to limit foreign-state exposure to primary liability, it would have said so. It did not.

JASTA's structure reinforces the same point. Congress simultaneously opened the door to ATA suits against foreign states and clarified that ATA liability

includes aiding-and-abetting and conspiracy. *See* JASTA §§ 2(a)(4), 3(a), 4(a). Those reforms were linked: Congress cross-referenced Section 2333 while expanding what Section 2333 means. JASTA's stated purpose confirms the design—providing victims "the broadest possible basis" to seek relief against foreign states that provide material support "directly or indirectly." JASTA § 2(b); *see* 162 Cong. Rec. 12,170 (2016) (Rep. Nadler). A categorical bar on aiding-and-abetting claims would defeat that objective.

### B. The District Court's "Person" Analysis Was Incorrect.

The district court held aiding-and-abetting claims unavailable because Section 2333(d) applies to "person[s]," and the Dictionary Act's definition does not expressly list foreign sovereigns. SA56 (citing 1 U.S.C. 1). That reasoning misreads the Dictionary Act and JASTA.

The Dictionary Act's definition is inclusive, not exhaustive, and "does not by itself imply that a foreign government ... falls without its bounds." *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 312 n.9 (1978) (interpreting "person" in the Sherman Act). Courts therefore look to statutory context and purpose to determine the term's scope. *Id.* at 313. Here, Congress expressly authorized claims against foreign states "in accordance with section 2333" in the same enactment that clarified Section 2333 includes aiding-and-abetting. 28 U.S.C. § 1605B(c). The district court's reading produces an implausible mismatch: foreign states are subject to Section 2333, but

the principal clarification Congress made to Section 2333 would be categorically unavailable. Courts do not apply default definitions in ways that "frustrate th[e] purpose" of the statute. *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 209-10 (1993).

The district court also inverted the statute's definitional structure. It treated Section 2333(d)'s cross-reference to the Dictionary Act as narrowing liability compared to the ATA's general definition of "person." SA57. But Section 2331(3) has the narrower definition. It limits "person" to those "capable of holding … in property," while the Dictionary Act includes no such limitation. 18 U.S.C. § 2331(3); 1 U.S.C. § 1. It is therefore more natural to read § 2333(d)'s Dictionary Act reference as at least not restricting the set of liable actors.

Nor do interpretive presumptions rescue the district court's approach. Any negative inference from the Dictionary Act's list must "yield to clear contrary evidence of legislative intent." *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974). And the presumption that "person" excludes the sovereign applies chiefly to the enacting sovereign and only when purpose is uncertain. *United States v. California*, 297 U.S. 175, 186 (1936). Here, Congress directly targeted foreign states in Section 1605B(c) and removed the ATA's foreign-state bar.

Finally, the district court demanded an extra clear statement based on possible foreign-policy consequences. SA59–60. But JASTA is itself a clear statement.

Congress chose to expose foreign states to ATA suits when they provide material support "directly or indirectly" to terrorism against the United States. Courts may not narrow that choice to avoid consequences Congress expressly accepted.

### C. Jurisdiction Exists Based On Secondary-Liability Claims.

Even if Section 2333(d) did not reach foreign states, Plaintiffs' aiding-and-abetting theories still provide a jurisdictional predicate under JASTA. At this stage, Plaintiffs needed only a prima facie showing that Section 1605B(b) applies, and they provided it. *Robinson*, 269 F.3d at 140-41.

First, aiding-and-abetting is tortious conduct. *See Halberstam v. Welch*, 705 F.2d 472, 482 (D.C. Cir. 1983). Under the ATA and state common-law variants, it requires culpable participation and a nexus between the defendant's assistance and the principal's wrong. *Twitter*, 598 U.S. at 493-94; *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592, 597 (D.C. Cir. 2026).

Plaintiffs alleged such assistance here. As detailed above, *supra* §§ II.B and II.C, they alleged that KSA directed, employed, funded, and controlled networks of charities and individuals that provided Al-Qaeda with concrete operational support—financing, logistics, travel facilitation, training infrastructure, and support to operatives and facilitators tied to the 9/11 plot. JASTA permits aiding-and-abetting liability through intermediaries. *See Kaplan*, 999 F.3d at 856. And Plaintiffs alleged knowledge: KSA's control over a support infrastructure that provided

operational assistance central to terrorist activity supports a plausible of knowing or deliberately indifferent participation. *Atchley*, 165 F.4th at 608.

Second, Plaintiffs plausibly alleged that their injuries were "caused by" KSA's tortious acts. Section 1605B(b) requires a reasonable connection—not strict but-for causation. *See* Part I.D, *supra*. Plaintiffs' allegations satisfy that standard for the reasons already set out in Parts II.B and II.C: KSA's alleged support helped build and sustain Al-Qaeda's operational capacity and facilitated operatives at critical stages. That is enough to plead substantial factor and foreseeability at the jurisdictional stage. *See* Part I.D, *supra*.

* * *

In sum, JASTA's text, structure, and purpose foreclose the categorical bar the district court imposed. And in any event, Plaintiffs' secondary-liability allegations supply "tortious act[s]" and a reasonable connection to Plaintiffs' injuries under Section 1605B(b), at least sufficient to warrant jurisdictional discovery. The district court's contrary ruling should be reversed.

## CONCLUSION

The district court's 2025 order denying KSA's renewed motion to dismiss Plaintiffs' claims should be affirmed. The district court's 2018 order should be reversed to the extent it rejected the CAC Plaintiffs' alternative theories of jurisdiction and granted KSA's motion to dismiss as to the CAC Plaintiffs' related claims.

Dated: July 21, 2026

Respectfully submitted,


*/s/ Robert T. Haefele*
Robert T. Haefele, Esq.
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464
(843) 216-9000

-and-

Michael J. Quirk, Esq.
MOTLEY RICE LLC
Three Logan Square
1717 Arch St., Suite 3610
Philadelphia, PA 19103
(267) 267-4740

*Attorneys for the Burnett and Euro Brokers Plaintiffs-Appellees/Cross-Appellants* (25-2355)

*/s/ Steven R. Pounian*
Steven R. Pounian, Esq.
James Gavin Simpson, Esq.
Andrew J. Maloney III, Esq.
Megan Wolfe Benett, Esq.
KREINDLER & KREINDLER LLP
485 Lexington Avenue
New York, NY 10017
(212) 973-3477

*Attorneys for the Ashton Plaintiffs-Appellees* (25-2202)

*/s/ Sean P. Carter*
Sean P. Carter, Esq.
J. Scott Tarbutton, Esq.
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-2000

-and-

Carter G. Phillips, Esq.
Christopher A. Eiswerth, Esq.
Madeleine Joseph, Esq.
Jacob Steinberg-Otter, Esq.
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

-and-

Richard Klingler, Esq.
ELLIS GEORGE LLP
3222 Woodland Drive, N.W.
Washington, D.C. 20008
(202) 492-4678

*Attorneys for the Federal Insurance Co. Plaintiffs-Appellees/Cross-Appellants* (25-2390)

*/s/ Jerry S. Goldman*
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Ethan Greenberg, Esq.
ANDERSON KILL P.C.
7 Times Square, 15th Floor
New York, NY 10036
(212) 278-1000

*Attorneys for the O'Neill Plaintiffs-Appellees/Cross-Appellants* (25-2320)

*/s/ David A. Paul*
David A. Paul, Esq.
Amanda Miller, Esq.
CANTOR FITZGERALD
110 East 59th Street,7th Floor
New York, NY 10022
(212) 428-5988

*Attorneys for the Cantor Fitzgerald Plaintiffs-Appellees/Cross-Appellants* (25-2341)

*/s/ Edward M. Pinter*
Edward M. Pinter, Esq.
FORD MARRIN ESPOSITO WITNEYER & GLESER, LLP
Wall Street Plaza, 16th Floor
New York, NY 10005
(212) 269-4900

*Attorneys for the Continental Casualty Plaintiffs-Appellees/Cross-Appellants* (25-2323)

*/s/ Robert Charles Sheps*
Robert Charles Sheps, Esq.
SHEPS LAW GROUP, P.C.
25 High Street
Huntington, NY 11743
(631) 249-5600

*Attorneys for the Charter Oak Fire Insurance Co. Plaintiffs-Appellees/Cross-Appellants* (25-2324)

*/s/ Jessica M. Skarin*
Jessica M. Skarin, Esq.
Scott Katz, Esq.
BUTLER WEIHMULLER KATZ CRAIG LLP
400 N. Ashley Drive, Suite 2300
Tampa, FL 33602
(813) 281-1900

*Attorneys for the General Reinsurance Corp. Plaintiffs-Appellees/Cross-Appellants* (25-2340)

*/s/ Steven J. Badger*
Steven J. Badger, Esq.
ZELLE LLP
901 Main Street, Suite 4000
Dallas, TX 75202
(214) 749-4207

*Attorneys for the Allianz Plaintiffs-Appellees/Cross-Appellants* (25-2391)

*/s/ Thomas G. Rohback*
Thomas G. Rohback, Esq.
AXINN, VELTROP & HARKRIDER LLP
45 Rockefeller Plaza (630 5th Ave.)
New York, NY 10111
(212) 728-2200

*Attorneys for the Hartford Accident and Indemnity Co. Plaintiffs-Appellees/Cross-Appellants* (25-2448)

*/s/ Thorn Rosenthal*
Thorn Rosenthal, Esq.
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
(212) 701-3000

*Attorneys for the Swiss Reinsurance Plaintiffs-Appellees/Cross-Appellants* (25-2450)

*/s/ Joseph N. Froehlich*
Joseph N. Froehlich, Esq.
TROUTMAN PEPPER LOCKE LLP
875 Third Avenue
New York, NY 10022
(919) 578-6337

*Attorneys for the Global Aerospace Plaintiffs-Appellees/Cross-Appellants* (25-2334)

*/s/ Timothy Brian Fleming*
Timothy Brian Fleming, Esq.
WIGGINS CHILDS PANTAZIS FISHER GOLDFARB PLLC
1211 Connecticut Ave., N.W.
Suite 420
Washington, D.C. 20036
(202) 467-4489

*Attorneys for the Homer Plaintiffs-Appellees/Cross-Appellants* (25-2457)

*/s/ Noel Jason Nudelman*
Noel Jason Nudeman, Esq.
Heideman Nudelman & Kalik, P.C.
5335 Wisconsin Ave., N.W.
Suite 440
Washington, D.C. 20015
(202) 463-1818

*Attorneys for the Aronow Plaintiffs-Appellees/Cross-Appellants* (25-2392)

*/s/ Madeline Muniz*
Madeline Muniz, Esq.
CANNATA, HENDELE & CANNATA, LLP
60 East 42nd Street, Suite 1460
New York, NY 10165
(212) 553-9205

*Attorneys for the Abrams Plaintiffs-Appellees/Cross-Appellants* (25-2442)

*/s/ Melanie Muhlstock*
Melanie Muhlstock, Esq.
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
(516) 723-4629

*Attorneys for the Atbelo Plaintiffs-Appellees/Cross-Appellants* (25-2443)

*/s/ Dorothea M. Capone*
Dorothea M. Capone, Esq.
BAUMEISTER & SAMUELS, P.C.
200 Vesey Street, 24th Floor
New York, NY 10281
(212) 363-1200

*Attorneys for the Bauer Plaintiffs-Appellees* (25-2202)

*/s/ Douglas Alan Latto*
Douglas Alan Latto, Esq.
Jeanne M. O'Grady, Esq.
SPEISER KRAUSE P
800 Westchester Ave, Ste. S-608
Rye Brook, NY 10573
(914) 220-5333

*Attorneys for the Burlingame Plaintiffs-Appellees and Allianz Plaintiffs-Appellees/Cross-Appellants* (25-2202, 25-2391)

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32

On October 27, 2025, this Court issued an Order setting the word limit for this consolidated brief to 24,750 words. *See* Dkt. No. 85.1. This consolidated brief complies with the Court's Order because it contains 24,364 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(f).

This consolidated brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point-font.

Dated: July 21, 2026

/s/ *J. Scott Tarbutton*
J. Scott Tarbutton, Esq.

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 21, 2026, a copy of the foregoing Final Form Brief for Plaintiffs-Appellees/Cross-Appeal Appellants was filed Under Seal with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system, and was additionally served on counsel for the Kingdom of Saudi Arabia via electronic mail:

Michael K. Kellogg, Esq.
Gregory G. Rapawy, Esq.
Andrew C. Shen, Esq.
Kellogg, Hansen, Todd, Figel
& Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
mkellogg@kellogghansen.com
grapawy@kellogghansen.com
ashen@kellogghansen.com

*Counsel for Defendant-Appellant/Cross-Appellee Kingdom of Saudi Arabia*

/s/ *J. Scott Tarbutton*
J. Scott Tarbutton, Esq.